# DAMAGE STUDY

## THE EFFECT OF WESTERN KENTUCKY HOG CAFOS

## ON PROXIMATE PROPERTY VALUES

Prepared for
Hon. W. Henry Graddy, IV
W.H. Graddy & Associates
103 Railroad Street
Midway, KY 40347

Prepared By

Mary McClinton Clay, MAI
218 Main Street
Paris, Kentucky

December 12, 2006

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Environmental and Health Effects of Confined Animal Feeding Operations | 1 |
| CAFOs and Hog Manure | 1 |
| Manure Pit Systems | 3 |
| Effects of Proximity to Hog CAFOs | 6 |
| Odor | 6 |
| Water and Soil Polution | 7 |
| Animal Feeding Operations and Residential Land Values: Summary of Literature | 8 |
| Regulatory Control of CAFOs | 23 |
| Setbacks | 23 |
| Permitting | 24 |
| Standards | 24 |
| Effects of CAFOs on Proximate Real Estate | 26 |
| Methodology | 30 |
| Effects of CAFOs on Western Kentucky Property Values | 33 |
| Calloway County | 33 |
| Single Family Lots/Tracts | 34 |
| Agricultural Tracts | 34 |
| Single Family Residential Tracts | 35 |
| Graves County | 36 |
| Single Family Lots/Tracts | 37 |
| Agricultural Tracts | 38 |
| Single Family Residential Tracts | 39 |
| Carlisle and Hickman Counties | 40 |
| Single Family Lots/Tracts | 41 |
| Agricultural Tracts | 41 |
| Single Family Residential Tracts | 42 |
| Warren County | 42 |
| Single Family Lots/Tracts | 41 |
| Agricultural Tracts | 41 |
| Single Family Residential Tracts | 42 |
| Daviess County | 46 |
| Single Family Lots/Tracts | 47 |
| Agricultural Tracts | 48 |

Conclusion                                                                49

Addendum
   Calloway County
   Graves County
   Carlisle and Hickman Counties
   Warren County
   Daviess County
Statement of Limiting Conditions
Certification
Qualifications

# ENVIRONMENTAL AND HEALTH EFFECTS
# OF CONFINED ANIMAL FEEDING OPERATIONS

**CAFOs and HOG MANURE**

Confined Animal Feeding Operations (CAFOs) are defined as a farm that raises livestock and seeks to maximize production by making highly efficient use of space and other resources. Operating a CAFO is sometimes referred to as factory farming, though the term is now officially used to recognize most commercial animal growing operations, even those that are quite small.

CAFOs hold large numbers (up to hundreds of thousands) of animals, often indoors. These animals are typically cows, hogs, or chickens. The distinctive characteristic of a CAFO is the confinement of livestock in a given space. Food is supplied in place, and artificial methods are often employed to maintain animal health and improve production, such as therapeutic use of antimicrobial agents, vitamin supplements and growth hormones.

The designation CAFO, used in the US, resulted from the 1972 Federal Clean Water Act, which was enacted to protect and restore surface water—lakes and rivers—to a "fishable, swimmable" quality. The United States Environmental Protection Agency (EPA) identified certain animal feeding operations (AFOs), along with many other types of industry, as point source polluters of groundwater. These operations were designated as CAFOs and subject to special anti-pollution regulation.[1]

The corporation of livestock production during the 1990s has led to rapid growth of large-scale CAFOs, especially in the pork industry. The result has been a decrease in the total number of hog farms in the United States and a significant increase in the size of individual operations. The negative effects of CAFOs are the result of the large concentrated amounts of

---

[1] Sweeten, John, et al. "Fact Sheet #1: A Brief History and Background of the EPA CAFO Rule" (http://www.lpes.org/cafo/01FS_History.pdf). Midwest Plan Service, Iowa State University; July 2003.

hog manure that result from confinement of these animals and the disposal problem that they produce.

The following scientifically established comparisons between hog and human waste and the potential human health dangers associated with disposal of hog waste were presented at a 1999 North Carolina Department of Health conference. According to Dr. Mark Sobsey, professor of environmental sciences and engineering in the University of North Carolina School of Public Health:

- Per capita swine produce about 10 times as much feces as humans—adult swine: up to 4.0 pounds/day compared to humans: up to 0.4 pounds/day

- A swine farm with 5,000 animals produces as much fecal waste as a city of 50,000 people

- Treatment and management requirements for swine waste are primitive compared to those for human municipal waste—**no requirement for microbial or pathogen quality**

- Swine can be infested with and decally shed high concentrations of viruses, bacteria and parasites that are pathogenic for humans

- Swine pathogens are capable of causing disease and death in infected humans

- Concentrations of human pathogens in swine waste can reach millions to billions per gram of feces

Regarding nutrient pollution that is damaging North Carolina's streams and sounds, the U.S. Geological Survey (USGS) reported in part:[2]

> The Albemarle-Pamlico drainage area contains elevated concentrations of nitrogen and phosphorus that eventually reach the Sounds. Of the largest river basins, total nitrogen concentrations were highest (1-2 milligrams per liter) in the Neuse and Tar Basins, and lowest (0.2-0.8 mg/L) in the Roanoke and Chowan Basins.....These four rivers carry at least 13,000 tons of nitrogen and 1,100 tons of phosphorus to the Sounds every year, with the Neuse Basin contributing the largest share....Agricultural fertilizer and livestock waste are major sources of nitrogen and phosphorus found in streams in all 4 basins, supplying 50 percent of the nitrogen and 75

---

[2] http://nc.water.usgs.gov/albe/findings.html

2

percent of the phosphorus originating in the basins, Atmospheric inputs are a source of 27 percent of the nitrogen load and 21 percent of the phosphorus load in the basin. Permitted point sources of nitrogen and phosphorus from municipal waste water treatment plants and industrial sources account for less than 5 percent of the nutrient source inputs in all basins.

According to Dr. Joann Burkholder, Professor of Aquatic Botany and Marine Sciences at North Carolina State University in 2003, ammonia levels over the past several years have risen in the Neuse River over 400.0 percent. The hog industry is one of the leading producers of ammonia in North Carolina. It has been scientifically stated that between 50 and 90 percent of the ammonia generated in hog waste production is discharged into the environment through the air.[3]

## MANURE PIT SYSTEMS

The latest hog farms no longer use earthen lagoons, but store the manure in deep concrete pits underneath the buildings. The manure is injected into neighboring fields rather than spread on the ground. Although both changes are intended to help control odor and lessen the risk of manure washing into nearby streams, the odor remains.

The manure pit system is not new. In fact, is as the norm for confinement facilities 30 to 40 years ago. The reason that this system was replaced by the lagoon is system is that the means of spreading the manure from slurry wagons was environmentally inferior to pumping it into lagoons as the technology for such advanced. However, as the problems with lagoon leakage became apparent, as well as the economic effects of higher fertilizer costs and new technology for spreading manure directly into the ground became available, the trend has returned to pit systems.

Manure pit systems are commonly used on livestock farms to allow for easy cleaning of animal confinement buildings and storage of large amounts of raw manure. They are typically 8 feet deep beneath a slotted floor running the entire width and length of the

---

[3] http://riverlaw.us/introduction/Frame-11-hogfactspage11.html?refresh=1157380047008

3

confinement building. Large areas of the confinement build can be efficiently cleaned by washing manure and debris through the slats and into the pit. Inside such pits, manure undergoes anaerobic digestive fermentation. This process can generate four potentially dangerous gasses: methane, hydrogen sulfide, carbon dioxide, and ammonia. Accumulation of these gases within the confined space of the manure pit can produce an oxygen-deficient, toxic environment.[4]

Oxygen levels below 16.0 percent lead to impaired judgment and breathing; levels below 6.0 percent lead to death within minutes. Methane is a colorless odorless gas which is explosive at concentrations between 5.0 percent and 15.0 percent and at high concentrations can displace oxygen causing suffocation. The atmospheric concentration of carbon dioxide is generally 0.035 percent; higher concentrations may displace oxygen causing labored breathing, drowsiness, headache, and suffocation. Ammonia has a sharp, pungent odor, and can irritate the eyes and respiratory membranes. High concentrations may cause pulmonary edema and suffocation. Hydrogen sulfide has a "rotten egg" odor at concentrations between 0.02 to 0.13 ppm, but odor perception is unreliable as a warning because rapid olfactory fatigue may develop at concentrations above 100 ppm. Hydrogen sulfide is a metabolic toxin, blocking the cellular respiration in the mitochondria (cytochrome electron transport chain). Hydrogen sulfide concentrations above 1000 ppm may cause rapid unconsciousness and death. With hydrogen sulfide being heavier than air, the oxygen is displaced just above the emitting manure surface. With agitation, a large amount of hydrogen sulfide is emitted, replacing the oxygen at the level of a pig before affecting an adult in the upright, standing position.[5]

---

[4] Sanderson, Wayne T., PhD., Iowa FACE Program, "Hog Farmer Dies from Asphyxiation from Manure Pit Agitation." College of Public Health, The University of Iowa, 2005.
[5] Ibid.

## NIOSH RECOMMENDED EXPOSURE LIMITS (RELS)

| Gas | Odor | Exposure Limits | Effects |
|---|---|---|---|
| Ammonia ($NH_3$) | Pungent | 25 ppm*<br>35 ppm (ST) | Eye/respiratory irritation, asphyxiation at high level |
| Carbon dioxide ($CO_2$) | None | 5,000 ppm* | Drowsiness, headache, Asphyxiation |
| Hydrogen sulfide ($H_2S$) | Rotten Egg | 10 ppm (C) | CNS depression respiratory irritation, chemical asphyxiation |
| Methane ($CH_4$) | None | 1,000 ppm* | CNS depression, cardiac sensitization, asphyxiation, explosive |

\*    REL for a time-weighted average 10-hour workday during a 40-hour workweek
ST    REL for a 15-minute time-weighted average exposure that should not be exceeded at any time during the workday.
C    REL Ceiling value which should not be exceeded at any time.

Hydrogen sulfide, which is readily released from water and liquid manure slurries when agitated, has been responsible for numerous fatalities among workers who entered manure pits. Hydrogen sulfide has also killed confined animals when manure pits beneath the floors were agitated.

Animal waste is rich in nitrogen, much of which escapes (as ammonia) into the air from waste storage pits and from field application of animal wastes. Rain then deposits the nitrogen onto water, and onto land where it can run into waterways. Excessive nitrogen feeds algae growth and depletes the oxygen supply killing fish and other aquatic life.[6]

To compound the effect of nitrogen contamination into the ground, "many CAFO have dead animal 'composting' areas, where scores of carcasses may be piled up to let nature take its course. The liquid from the decomposing animals, and the consistently over-applied CAFO waste, is sucked into underground drainage tiles and split out into local waterways, making human contact with nearby rivers very unwise."[7]

---

[6] http://www.sierraclub.org/factoryfarms/factsheets/air.asp
[7] http://www.sierraclub.org/factoryfarms/nightmare_documentary.asp

An example of nitrogen poisoning occurred in Allen County in 2004? when Billy Wayne Driver lost 22 head of cattle when they drank from a stream contaminated by a PIC hog barn.

**EFFECTS OF PROXIMITY TO HOG CAFOs**

ODOR

Although odor is difficult to measure, available research confirms that there are offensive odors and air pollution associated with hog CAFOs. For example:[8]

- The National Institute for Occupational Safety and Health has issued warnings for several years to workers in animal confinement operations about **job-related asthma and the threat of death from manure-pit gases** if ventilation systems fail to work adequately.

- In Iowa, a study found neighbors of hog facilities had respiratory problems similar to those of workers in hog confinement operations (e.g. bronchitis, asthma, upper-air inflammation, and a flu-like illness). (Donham, 1988)[9]

- Studies have found **psychological stress** in residents near hog factories that are related to frequent exposure to intense hog odors.[10]

- A study of North Carolina residents who had lived by hog factories an average of five years reported **significantly more tension, depression, anger, and fatigue** than residents not exposed to hog odor at home (Schiffman, 1995)[11]

- Another study by University of North Carolina researchers found that people living near large fog farms suffer significantly higher levels of upper respiratory and gastrointestinal ailments than people living near large cattle farms or in non-livestock areas. (Wing, 1999)[12]

- In a 1998 report, a team of University of North Carolina researchers stated, "We must undertake an aggressive initiative to address issues of odor nuisance and potential health effects associated with odors." (U.N.C., Board of Governors, 1998).

---

[8] Environmental Defense, Animal Factory Farms Fact Sheet, "Myths vs. Facts about Hog Pollution," 2002.
[9] Donham, Kelly. "Respiratory Disease Hazards to Workers in Livestock and Poultry Confinement Structures," Seminars in Respiratory Medicine, Vol.14, No. 1, 1993.
[10] Thu, Kendall, et al. "A Control Study of the Physical and Mental Health of Residents Living Near a large-scale Swine Operation," Journal of Agricultural Safety and Health, Vol.3, No. 1, 1997.
[11] Schiffman, Susan, et al. "The Effects of Environmental Odors Emanating From Commercial Swine Operations on the Mood of Nearby Residents," Brain Research Bulletin, Vol. 37, No. 4, 369-375, 1995.
[12] Wing, Steve and Susanne. "Intensive Livestock Operations, Health and Quality of Life Among Eastern North Carolina Residents." University of North Carolina School of Public Health. A report prepared for North Carolina Department of Health and Human Services Division of Public Health. May, 1999.

The Schiffman report (NC) indicated that odor does necessarily disperse as it leaves hog barns; in fact, depending on weather, it can be just as potent at 1,500 feet as it is just outside the barn. This compares to the North Carolina minimum setback of 750 feet. The North Carolina Swine Odor Task Force, in its preliminary report, suggested that buffer zones be site-specific, taking into account prevailing winds and other factors. The report stated that this will mean **situating lagoons and buildings at least one mile** from communities, business or schools.

## WATER AND SOIL POLUTION

When the pits are emptied, the liquid manure is injected into the farmland as nutrient. The problem arises when the surrounding farmland can't handle the amount of waste. Then the manure is not a nutrient, it is a toxin. Hog waste contains heavy metals like copper, nickel and manganese. Once these metals are over-used on farmland, they destroy it. Soil scientist Fred Cox of North Carolina State University states, "Once there's toxicity, you can't remove it. Plants won't grow there. The soil damage is permanent."[13]

---

[13] http://www.constitutional.net/Luksik/fatpig.html

7

## ANIMAL FEEDING OPERATIONS AND RESIDENTIAL LAND VALUES:

## SUMMARY OF LITERATURE

A University of Missouri Extension publication by Ann Ulmer and Ray Massey of Agriculture Economics Extension summarized the literature published between 1996 and 2005.[14] This summary examined eight published studies on the impact of animal feeding operations (AFOs) on rural residences and property values. All studies were conducted by agricultural economists employed by universities. None of the studies were conducted by real estate professionals or academicians.

The findings were summarized as follows:

- All studies indicated that the impact of AFOs on property value was localized or **limited to properties near the AFO**.

- **Five of the eight** indicated that AFOs reduced nearby residential property values.

- A 1996 Minnesota study (Taff, Tiffany, and Weisberg) showed that **rural residences increased the value**, supporting the hypothesis that the AFOs increased the demand for nearby residences by those employed in agriculture.

- One 2004 Colorado study (Park, Seidl, and Davies) indicated that AFO could **either raise or lower the value** of particular residential properties, depending on specific characteristics of the AFO.

- One 1999 Missouri study (Hamed, Johnson, and Miller) indicated **no impact of AFOs on agricultural land**.

- One 1997 Michigan study (Ables-Allison and Connor) compared the local effects of the AFO on land prices with the impact of the AFO on the local economy and found local **economic impact exceeded negative impact** on residential real estate land values.

---

[14] Ulmer, Ann and Ray Massey. "Animal Feeding Operations and Residential Values: Summary of Literature." Agricultural Economics Extension, University of Missouri, 2005.

8

The Ulmer and Massey review summarized the studies in terms of the effect of four factors (distance, size and concentration, management, economic benefits) on the relationship between AFOs and rural residential values.

DISTANCE

With respect to distance, seven of the eight studies considered distance as a factor. The studies considered sales up to 10 miles from AFOs. The conclusions indicated that the **negative impact of AFOs on residential value diminishes quickly** with distance between the AFO and the residence.

- The 2005 Iowa study conducted by Herriges, Secchi, and Babcock reported that a new AFO located **0.25 miles upwind** of a residence would decrease residential value a **maximum of 16.0 percent. At 1.25 miles away there was no impact.**

- A 1997 North Carolina study by Palmguist, Roka, and Vukina indicated that a new AFO located **0.5 miles** from a residence would decrease the value a **maximum of 0.3 percent to 8.4 percent** depending on the density of livestock around the residence before the new facility was built. This effect decreases to **3.6 percent or less at 2 miles** distance from the AFO.

- A 2005 Pennsylvania study (Ready and Abdalla) indicated that an AFO located within a maximum of a **0.5 mile** of a residence decreased the residential value a maximum of **15 percent.** This impact decreased to **zero a distance of 1.0 mile** from the AFO.

- The 2004 Colorado study by Park, Seidl, and Davies found that nearby beef and dairy operations **increased residential values;** poultry within 2 miles increased residential values, while poultry within 2 to 3 miles decreased residential values; **swine operations decreased values up to 3 miles away.**

- The 2005 Pennsylvania study by Ready and Abdulla reported that proximity to a poultry operation was more negative than proximity to a swine facility which was more negative than proximity to beef and dairy facilities.

The following is a discussion of the various individual studies, several of which were mentioned above, that have been published for the purpose of determining diminution of value upon generally residential properties as a result of proximity to CAFOs.

9

## EVALUATING THE EFFECT OF PROXIMITY TO HOG FARMS ON RESIDENTIAL PROPERTY VALUES: A GIS-BASED MODEL APPROACH

This article appeared in the 2005 *URISA Journal*, Vol.17. No.1. It was written by Katherine Milla, Michael H. Thomas and Winsbert Ansine of the Division of Agricultural Sciences in the College of Engineering Sciences, Technology and Agriculture at Florida A & M University.

This study used a hedonic pricing model (HPM) to estimate the impact of CAFOs on property values. HPM is a form of multiple regression analysis. This study was conducted in Craven County, N.C. where 26 hog operations existed with a design capacity ranging from 720 to 7,680 hogs. House sales were selected from January 2000 to July 2001 and included 810 parcels after removing parcels with missing data, apparent data entry errors, or large lot sizes. The multiple regression model was based on the log-log functional form with 7 variables including D/D. The D/D variable is hog density/distance, the number of hogs in the nearest hog farm divided by linear distance from the house measured in feet (swine/linear ft). The result of the study was that a 1% increase in D/D results in a decrease of 0.03113% in property value. For a median valued house located one mile from a farm with 5,000 hogs, the property value decreases by $0.71 when an additional hog is added. Assuming the marginal impact is an average impact per hog, a 5,000 head swine operation would result in a one-time loss of $3,550. **This study resulted in one-time loss for the average home valued at $114,000 of 3.1%, or $3,550.**

The model demonstrated that, on average, the externality of swine farms caused a statistically significant reduction in residential property values of 7.0% with the actual amount depending on the number of swine and their distance from the property.

10

THE EFFECT OF LIVESTOCK INDUSTRY LOCATION ON RURAL RESIDENTIAL PROERTY VALUES

This study was written by Dooho Park, Andrew F. Seidl and Stephen Davies of the Department of Agricultural and Resource Economics, Colorado State University. The study was published in the Colorado State University Cooperative Extension September 2004 *Economic Development Report*.

The data collection included 3,354 residential housing sales over three years (1999-2001) from the Weld County (Colorado) Assessor's Office, which was processed using GIS spatial information. Features of the livestock operations near each rural residential sale were collected to estimate a social cost of the livestock sector. There were 184 livestock operations included in this analysis. Within the sample, 72 dairy farms; 58 beef cattle operations, including feedlots; 25 hog operations and 28 poultry and others species (20 chicken + turkey and 8 sheep) were found. A radius for each housing unit was considered including 0 to 1.0 mile, 1.0 to 2.0 miles and 2.0 to 3.0 miles. Within each mile were collected the number, size and species of the operation for every single housing unit basis, based on the EPA's norms.

This very detailed study concluded beef and dairy operations, which are quite traditional in the region, seem to create a positive rural lifestyle amenity effect up to a point. People are willing to pay to locate in the countryside with small, diversified or unconcentrated livestock operations. However, the net impact of livestock operations on rural residential sales turns to negative if the operation gets to large and especially close to a residence. More hog and sheep operations contribute negatively to property values and the poultry industry shows mixed impacts.

11

MEASURING THE EFFECTS OF CONFINED ANIMAL FEEDING OPERATIONS: TECHNICAL ISSUES AND POLICY IMPLICATIONS

This study was written by Peter Goldsmith, Jungik Kim and Michael H. Thomas of the Department of Agricultural and Consumer Economics at the University of Illinois, Department of Urban Planning at the University of Illinois and Department of Agriculture at Florida A & M University, respectively. The report was published in 2004.

This study analyzed the economic impacts and public cost of CAFOs at the spatial scale of individual hog farms and houses. The economic impacts of hog farms were assessed using an economic input-out-put model, which provided an assessment of how specific economic activity (livestock) impacts the local economy in terms of jobs, taxes, and spillovers. The public costs of swine production were derived indirectly by measuring livestock's neighboring property values, which was accomplished by using a spatial hedonic model, explicitly taking into account spatial autocorrelation of individual property values.

With respect to the property value aspect of the study, data was collected from Craven County N.C., a community of 25,684 housing units and 26 farms with 85,000 pigs. The data collected included (1) **assessed property values**, (2) general neighborhood characteristics, and (3) hog operation and location.

After culling non-applicable housing units, including urban and one with excess of 10.0 acres, the remaining data set included 5,352 rural houses.

With respect to costs (value decline) "using a spatial-lag hedonic modeled indicated hog farms in Craven County negatively impacted neighboring property values to the extent that the **impact decays with distance up to 1.75 miles from the farm**. Specifically, the impact on property loss on a per hog basis is -$0.47 at 0.85 mile, -$-.52 at 1.0 mile, and -$0.42 at 1.25 mile. Thus, the impact on the value of the

12

median house ($63,520) 1 mile from a swine facility with 10,000 head is -$5,200, or 8.2%."

**This study concluded that, "While the negative impacts on housing values may be non-trivial; they may in fact be only one-time effects. The economic impacts of a well-managed large livestock operation are annual and under certain circumstances appear to exceed the public costs."**

LIVING WITH HOGS IN IOWA: THE IMPACT OF LIVESTOCK FACILITIES ON RURAL RESIDENTIAL PROPERTY VALUES

This study was conducted by Joseph A. Herriges, Silvia Secchi and Bruce A. Babcock of the Center for Agricultural and Rural Development of Iowa State University in August 2003.

This hedonic analysis which was based on 1,145 residential sales under 10.0 acres in five north central Iowa counties between 1992 and 2002 obtained from the assessors' office. This data was merged with the location and size of **550 livestock operations** to determine proximity. On the average there were **2.5 livestock facilities within 3.0 miles of the properties sold.** The study found that values decreased up to 11.0 percent within a 0.25 mile of a livestock facility. Homes within a 0.5 mile declined up to 8.0 percent; and homes more than 1.0 mile away declined 3.0 percent.

THE IMPACT OF OPEN SPACE AND POTENTIAL LOCAL DISAMENITIES ON RESIDENTIAL PROPERTY VALUES IN BERKS COUNTY, PENNSYLVANIA

This study was written by Richard Ready and Charles Abdulla of the Department of Agricultural Economics and Rural Sociology of The Pennsylvania State University in June of 2003.

This project examined 8,090 single family houses sold between 1998 and 2002 using regression to determine the affect a variety of disamenities had on value. These included landfills, high traffic roads, sewage treatment plant, airport,

13

mushroom production facilities and CAFOs (over 200 animal equivalent units). The study produced the following results.

House Price Impacts by Distance from House

| | Distance from House | | | |
|---|---|---|---|---|
| | 500m | 800m | 1200m | 2400m |
| Landfill | -12.4% | -6.9% | -3.8% | -0.8% |
| Airport Runway | - 0.3% | -0.2% | -0.1% | |
| Mushroom Production | - 0.8% | -0.4% | -0.1% | |
| Animal Production | - 6.4% | -4.1% | -1.6% | |

Specific to large-scale animal production facilities, the study found a significant impact within 1600 meters from such facilities, but not father than 1600 meters. A criticism of this study is that it did not control for the direction of the housing unit relative to the livestock facility.

A COMPARISON OF THREE RECENT HEDONIC MODELS OF HOG FARM DISCOMMODITY IN COASTAL NORTH CAROLINA: EVIDENCE OF DISECONOMIES OF SCALE AND BROWN ZONES

This paper was written by Michael Thomas, Peter Goldsmith, Jungik Kim, Winsbert Ansine, and Natasha Bruton of Florida A & M University and University of Illinois. The paper was presented at the SERA-IEG 30: Natural Resources Economics Meeting held at the University of Kentucky, May 2003.

Three Hedonic Price Models (HPM), using Geographic Information Systems (GIS) data, were developed and used to quantify the impact of swine externality on residential property values in Craven and Onslow Counties, North Carolina. The models demonstrate that, on average, swine externality causes a statistically significant reduction in residential property values. For the average valued house located one mile form a swine farm, the marginal affect of the additional animal results in a **one time cost** to home owners ranging from $0.48 to $2.04. Evidence from one model suggests diseconomies of scale may exist for discommodity of hog externality. In other words, smaller operations (5,200 or less hogs) have a smaller cumulative impact on residential property owners than larger farms (13,000 hogs).

14

**All three models provide evidence that environmental setbacks of less than two miles will likely offer little protection to residential property owners.**

The first study discussed is the Bruton Model (2001). This study was conducted in Onslow County, N.C. The data set consisted of residential sales from 1,464 properties dating from 2000-2001 that were within a five mile radius of only one of the 57 swine farms in the county.

The second study is the Ansine et al Model which was previously discussed having appeared in the 2005 *URISA Journal.*

The third study discussed is the Kim Model which is a hedonic analysis based on sale prices and assessed values in Craven County, N.C where there are 29 hog operations.

A SUMMARY OF THE REGIONAL ECONOMIC EFFECTS OF CAFOs

This paper was written by Dr. William J. Weida of the Department of Economics at The Colorado College and The Grassroots Action Center for the Environment (GRACE) Factory Farm Project in July 2001. The paper discusses many studies documenting the negative environmental impact CAFOs have on health, etc. it also discusses loss of property value studies, including the following.

An 18 month study of 75 rural land transactions near Premium Standard's hog operations in Putnam County, Missouri conducted by the departments of Agricultural Economics and Rural Sociology at the University of Missouri found an average $58 per acre loss of value within 3.2 kilometers (1.5 miles) of the facilities. This study primarily evaluated farmland without dwellings. These finding were confirmed by a second study at the University of Missouri-Columbia by Hamed, Johnson, and Miller that found that proximity to a hog ILO does have an impact on property values. Based on the averages of collected data, loss of land values within 3 miles of a hog ILO

15

would be approximately $2.68 million (US) and the average loss of land value within a 3-mile area was approximately $112 (US) per acre.

These findings were further substantiated by a Sierra Club study that documented lower tax adjustments by county assessors in at least eight states for properties near CAFOs. The states include Alabama, Illinois, Iowa, Kentucky, Maryland, Minnesota, and Missouri. The **reductions ranged from -10.0 to -40.0** percent for dwellings only and not to the entire property.

Palmquist, et al in a 1995 study in North Carolina, found that neighboring property values were affected by large hog operations based on two factors: the existing hog density in the area and the distance from the facility. The maximum predicted decrease in real estate value of **-7.1 percent** occurred for houses within **0.5 mile** of a new facility in a low hog farm density area. A 1997 update of this study found that home values decreased by $0.43 for every additional hog in a five mile radius of the house. For example, there was a decrease of -4.75 percent (about $3,000) of value of residential property within 0.5 mile of a 2,400 head finishing operation where the mean housing price was $60,800.

A 1996 study by Padgett and Johnson found much larger decreases in home value than those forecast by Palmquist. (This was not documented further by Weida).

**In Iowa, hog CAFOs decreased the value of homes in a 0.5 mile radius by 40.0 percent, within 1 mile by 30.0 percent, 1.5 miles by 20.0 percent, and 2 miles by 10.0 percent.**[15]

---

[15] Park, Dooho, Kyu-Hee Lee and Andrew Seidl, "Rural Communities and Animal Feeding Operations," Department of Agricultural and Resource Economics, Colorado State University, Ft. Collins, CO, 1988.

16

THE IMPACTS OF ANIMAL FEEDING OPERATIONS ON RURAL LAND VALUES

This study was written by Mubarak Hamed, Thomas G. Johnson, and Kathleen Miller of the Social Sciences Unit of the University of Missouri—Columbia, College of Agriculture, Food and Natural Resources in May, 1999.

Data was collected on 99 rural property sales of which 39 included a house with an average parcel size of 86 acres in Saline County, Missouri. The date of sales ranged from January 1, 1996 to December 31, 1997. There were 35 CAFOs in the county of which 32 were swine. The average distance to the nearest CAFO was 2.2 miles. The average loss of land value within the **3-mile area was -\$112 per acre only if it contained a house.**

COMMUNITY AND NATURAL RESOURCE ECONOMIC ISSUES AND THE SWINE INDUSTRY

This study was published in the October 1998-04 Colorado State University Agricultural and Resource Policy Report. It was prepared by Andrew Seidl and Jennifer Grannis of the Department of Agricultural and Resource Economics at Colorado State University.

This paper summarized studies that examined various affects of swine operations on aspects of economic development including: employment and income, infrastructure and public finance, natural resource management, and real estate impacts.

With regard to the latter the paper discusses a North Carolina study (Palmquist) the indicated residential values decreased 4.75 percent (about \$3,000) of value within 0.5 miles of a 2,400 head finishing operation where the mean home price was \$60,816. As homes were located farther from an operation, the decrease in total home value decreased to less than \$100 at 2.0 miles away.

A Minnesota has inconclusive results.

17

An Iowa study found that agricultural land values increased due to an income increased demand for "spreadable acreage." However, total assess value, including residential, decreased in proximity to a hog operation. In Illinois and Iowa county assessors have, somewhat arbitrarily, discounted the assessed value of homes within a certain range of a hog operation. For example, one county in Iowa has decreased the assessed value of homes within **0.5 miles of a hog operation by -40%, within 1 mile by -30%, 1.5 miles by -20.0% and 2 miles by -10%,** much greater discounting than the N.C. study would warrant.

## CONCENTRATED ANIMAL FEEDING OPERATIONS AND PROXIMATE PROPERTY VALUES

This article, written by John A. Kirkpatrick, appeared in the July 2001 Appraisal Journal. John Kirkpatrick is an analyst with Mundy and Associates, an economic, market, and valuation firm in Seattle Washington.

This article describes the appraisal theory relative to diminution in value as a result of proximity to CAFOs and summarizes case studies to date. These include the following.

North Carolina Study:[16] Palmquist, et al, were the first to determine that the distance from a residence to a CAFO has an impact on residential values. However, their study looked only at residences already near CAFOs and measured the impacts of additional CAFO capacity (either new CAFOs or additional livestock at existing CAFOs) located at 0.5-, 1.0-, and 2.0-mile distances from the residence. Nonetheless, they established a methodological model for spatial impacts of CAFOs.

---

[16] Palmquist, R, F. Roka and T. Vukina, "Hog Operations, Environmental Impacts, and Residential Property Values," *Land Economics* (73:1, 1997):114-124.

University of Minnesota Study:[17] In 1996, the Minnesota Department of Agriculture commissioned a study by researchers at the University of Minnesota on the topic of value diminution resulting from proximate CAFOs. In addition to substantial secondary research in the area, the study authors also conducted primary research into value impacts in that state. Specifically, they conducted a hedonic price analysis on 292 rural residences that were sold during 1993-1994 in two Minnesota counties. They found a statistically significant pricing impact related both to the existence of a CAFO as well as the distance from the CAFO. In other words, not only does a CAFO have a significant impact on property value, but the nearer the CAFO, the greater the impact. The researchers also found that CAFOs tend to be near older or lower valued homes. Hence, the pricing impacts in the simple empirical study may be muted by other negative impacts on value, and high-valued residence may be impacted to a greater degree by CAFOs than would be suggested by their findings.

University of Missouri Study:[18] Following the methodology of the Minnesota study, researchers at the University of Missouri were able to quantify both the average value impact of a CAFO and the impact of distance. An average vacant parcel **within 3 miles of a CAFO experienced a value loss of about 6.6 percent.** However, if that parcel was located **within one-tenth of a mile** from the CAFO (the minimum unit of measure in the study) and had a residence on it, then the **loss in value was estimated at about 88.3 percent.**

Pasco, Washington Case Study: A 309-acre family farm that had been operated for many years produced alfalfa, asparagus, corn, apples, peaches, nectarines, cherries, melons, and a range of garden produce. A CAFO was adjacent to

---

[17] Taff, Steven J., Douglas Tiffany, and Sanford Weisberg, "Measured Effects of Feedlots on Residential Property Values in Minnesota: A Report to the Legislature," University of Minnesota Staff Paper Series (July, 1996).

[18] Hamed, Mubarek, Thomas Johnson, and Kathleen Miller, "The Impacts of Animal Feeding Operations on Rural Land Values," University of Missouri-Columbia Community Policy Analysis Center Report R-99-02 (May, 1999).

the residence (about 0.25 mile away), and consequently the farm product was impacted by flies, fly fecal matter, and odor. The farm was appraised for litigation purposes and **a value diminution of over 50 percent** was determined, using traditional farm appraisal methods. The CAFO settled the law suit by purchasing the plaintiff's farm and relocating the residents to a nearby barn that was not impacted by the CAFO externalities.

Michigan Horse Farm Case Study: A horse-breeding operation (owner-occupied farm) is located approximately 1,000 feet from a recently constructed large scale, pork processing facility. The use and enjoyment of the home has been diminished by airborne externalities, and the ability to use the site as a farm may be comprised as a result of flies carrying animal blood and feces that contain antibiotics and other nuisances. In 2000, the property owner appealed for a property tax reassessment representing a **devaluation of over 50% from fair market value, and the county attorney concurred with that appeal.**

Michigan Residence Case Study: A family purchased a "fixer upper" residence in rural Vicksburg, Michigan in 1995. In 1997, a large scale pork processing facility was located about 700 feet from the home. The reduction is air quality was so severe as to force the residents to abandon their home and move elsewhere. To date, they have not been able to sell the home. The owner of the processing facility offered to compensate them for 60% of the fair market value of the home (i.e., **a 60% diminution in value**). As of this writing, litigation is pending.

Kilpatrick states that the studies suggest that the establishment of a CAFO may result in value diminution to other nearby properties. The amount of value loss is typically the inverse function of distance (closer properties diminish more), a function of property type (newer, nicer residence lose more), and a function of property use (farm will lose value due to diminished productivity and comparative marketability to other farm lands). While the appraisal profession has only begun to quantify the loss

20

attributable to CAFOs, it is clear from the above case studies that diminished marketability, loss of use and enjoyment, and loss of exclusivity can result in a diminishment ranging from 50.0 percent to early 90.0 percent of otherwise unimpaired value.

Kilpatrick concludes that when appraising a property located proximate to a CAFO, the appraiser needs to consider seven specific issues, each of which will have an impact on the value conclusion.

1. Type of subject property,
2. Distance to the CAFO,
3. Physical manifestations (e.g., air quality, insects),
4. Engineering/scientific testing performed (e.g., air quality),
5. Impacts on property use (e.g., habitability, rental income or vacancy),
6. Marketability evidence (e.g., time on market of comparable properties)
7. Impact on highest and best use

CONCLUSION

The only article or study prepared by a real estate appraiser is Kilpatrick article. The previous studies or accounts were prepared by academics within the agricultural departments of state universities. Although funding for these studies have not been determined, it is customary for entities with a vested interest in the subject matter to fund such reports.

The academic studies were conducted in counties with dozens, if not hundreds of CAFOs. A probable reason that the results show -10.0 percent or less diminution in value is because the studies, in effect, measured the relative difference between similarly damaged properties.

In addition, several of the academic studies have characterized the diminution of value as a "one time loss." As indicated by the Warren County analysis,

21

**properties continue to loose appreciation (opportunity costs)** that they would otherwise experienced as a result of not being proximate to a hog barn.

22

## REGULATORY CONTROL OF CAFOs

Because of the noxious and obvious problems associated with CAFOs, many states have enacted severe restrictions on permits. For example, in 1997 the legislature of typically livestock-friendly **Okalahoma mandated setbacks and other pollution controls**, and in 1998 that legislature enacted a **moratorium on new livestock permits**. **Kansas** is another typically agriculture-friendly state that recently has enacted a **moratorium on CAFOs**, and it is considering **legislation to end CAFOs**. In 1998 **North Carolina** legislature, faced with unregulated establishment of CAFOs, enacted House Bill 1480, which mandated the **registration of growers for integrators, extended a moratorium**, and mandated substantial **elimination of both atmospheric emission of ammonia** odor beyond the boundary of existing CAFOs. **Minnesota** enacted similar **odor control legislation** in 1997 and established both a complaint control protocol and an enforcement response protocol specific to CAFOs.[19]

As a result of the negative affects upon proximate properties numerous governmental agencies have enacted a variety of regulations regarding location of such facilities to minimize the impact upon neighboring properties.

### SETBACKS

South Carolina adopted strict limitation on how close hog CAFOs can be to homes, schools, drinking wells, and waterways. A number of other states have stricter setbacks including **Oklahoma** which prohibits hog factories from locating closer than three miles from a public water supply, one mile of an ecologically important waterway, and up to **two miles from a neighbor's property.**

---

[19] Kirkpatrick, John A., "Concentrated Animal Feeding Operations and Proximate Property Values," *The Appraisal Journal,* July 2001.

## PERMITTING

Several states have strict permitting requirements and mandatory odor abatement planning requirements.

## STANDARDS

States are beginning to tighten up technology requirements for hog facilities. For example, Colorado now requires that waste lagoons be covered to reduce odors and cut down on ammonia emissions to the air.

"Farm communities in the Midwest understood the costs of corporate factory farms back in the 1980's. To combat the corporatization of agriculture, citizens in nine states adopted 'anti-corporate farming' laws, which prohibit the ownership and control of farms by non-family owned corporations. The laws prevented corporations from both owning farmland and 'engaging' in farming—a provision which prevents corporations from transforming independent farmers into contractors for the corporation.

Those laws were most recently adopted in South Dakota and Nebraska with over 60% support from the farming community. In South Dakota the people of the state adopted the law as an amendment to the South Dakota Constitution, and the state's Attorney General recently booted Seaboard Farms Corporation, the largest factory farm corporation in the nation, out of the state under the provision of the law."[20] These laws survived appeals by the factory farm corporations—even to the Supreme Court.

Beginning in 1999, local governments in Pennsylvania began adopting ordinances identical to the Midwest. To date nine local governments in South-Central and Western Pennsylvania have adopted ordinances barring absentee corporations from owning or controlling farms. In eight of these municipalities—which had previously been targeted for factory farms—no new farms have been built. However, in 2002 the Pennsylvania Farm

---

[20] http//www.celdf.org/GuestEditorials/EmpireoftheHogCorportation/tabid/187/Default.aspx

24

Bureau joined the corporate factory farms to appeal the ordinances in court, having failed in the legislature to overturn the ordinances.

## EFFECTS OF CAFOS ON PROXIMATE REAL ESTATE

A CAFO impacts the value of proximate properties to the extent that the CAFO is viewed, in the market, as a negative externality. As an externality, it is typically not considered to be economically "curable" under generally accepted appraisal theory and practice. Some of this loss in value may be attributable to stigma, when there are unknowns and risk associated with ownership of the property.[23]

From an economic perspective, the rights enjoyed by a fee-simple owner fall into three categories: (1) right of use and enjoyment, (2) right of exclusion, and (3) right of transfer. In the United States, property itself is not "owned," but rather the rights of the property are owned. The ability to delineate these rights, and the ability of owners to transfer some or all of these rights voluntarily is a necessary condition for property valuation.

The right of use and enjoyment is generally interpreted to mean that the owner may determine how property will be used, or if it is to be used at all. The right of use traditionally is limited by both public restriction (e.g., eminent domain, police power) and private restriction (e.g., liens, mortgages). Private restrictions are generally voluntary, and property owners willingly submit to the disutility of such restrictions in trade for some other economic benefit.

Impairment often places a restriction on the right of use without some economic compensation. This is illustrated in potential restriction that may be placed on the use of real estate due to a physical impairment and can thus limit the property to something less than its highest and best use. For example, odor or flies from a nearby CAFO will restrict the use and enjoyment of impaired property without compensation.

The right of exclusion—often called the right of exclusive use or right of exclusive enjoyment—provides that those who have no claim on property should not gain economic

---

[23] Kirkpatrick, John A., "Concentrated Animal Feeding Operations and Proximately Property Values," *The Appraisal Journal*, (July 2001): 301.

benefit from enjoyment of the property. In other words, the right of use is exclusive to the property owners, and any violation of the right of exclusive use typically carries either payment of compensation to the rightful owner or assessment of a penalty. Physical impairment, such as odor or flies, in effect, is a trespass on property rights and violates the right of exclusion.

The right of transfer provides the owner with the ability to swap one resource for another. An impairment restricts the right of transfer, and may destroy the right of transfer altogether.

Real estate economics and appraisal practice uniformly recognize that many externalities, such as contamination, may have a negative impact on property values. For example, the Uniform Standards of Professional Appraisal Practice (USPAP) requires appraisers to consider the impacts of such contamination in the valuation process.

Stigma is an increasingly common term in appraisal and real estate economics literature, and refers to a very specific quantitative mechanism by which value is impacted by proximate contamination or negative externalities.

The earliest references to stigma as a quantitative concept in real estate economics are in the 1991 and 1992 writings of Peter Patchin and William Moody, respectively. Moody differentiated between the cost to cure and the cost of stigma. The former is an out of pocket expense born either by the property owner or some other responsible party, while the latter manifests in property value diminution even in the absence of a cost to cure. For example, a property that is completely cured may continue to suffer a diminution in value, and hence damages, because of stigma.

An environmental stigma results from perceptions of uncertainty and risk. It may be relatively easy to quantify the cost to remedy a simple contamination problem, such as a leaking underground storage tank. However, as the complexity of the contamination increases the level of uncertainty and perceived risk rises.

27

> The level of uncertainty or risk associated with a hazard or contamination is influenced by the amount of knowledge people have about it. When a contamination problem becomes known, there is generally a period of heightened uncertainty during which the magnitude and character of the problem are researched and documented. During this period of heightened uncertainty, risk is much greater. Therefore, value discounts are greater. As research progresses and possible solutions to the problem are reached, uncertainty decreases. The market's ability to predict the possible value effects and the probability of whether those effects will be realized become more certain. Even though the risk of catastrophe may be high, the degree of uncertainty about it is low at this point, and an analysis will be able to calculate the value changes resulting from the hazard more easily. Consequently, time is an important consideration in determining the degree of uncertainty.[24]

Risk can be either real or perceived. The effect of real risk can be quantified with a high degree of confidence with respect to cost to cure estimates, for example. Perceived risk, on the other hand, is the risk seen by the public in the marketplace. It is an individual's disinclination to believe that a source of contamination is safe.

The level of perceived risk can vary depending on the nature of the event; that is, whether it is involuntary, unfamiliar, or catastrophic. The same type of risk can vary depending on the degree of media exposure. Risk varies to the extent to which blame can be attributed to a person or entity; that is the extent to which the entity or person responsible for the even acted carelessly, incompetently, or irresponsibility. The final factor affecting the intensity of risk for a particular incident is the innocence of the victim.

From an economic standpoint, value is impaired to the extent that that the rights of ownership are impaired with regard to the right of use and enjoyment, right of exclusion, and right of transfer. Real estate value is a function of the perception of the participants within the market. All factors that influence a property's desirability, and therefore, its value are the result of the market's perception. Richard Roddewig noted that:

> Appraisers must look to the market place for answers and analyze what the marketplace itself is actually saying. Scientific conclusions about persistence of contaminants do not necessarily correlate with the

---

[24] Bill Mundy, "Stigma and Value," The Appraisal Journal, (January, 1992).

marketplace's conclusion about the duration of economic impact on real estate.[25]

Not only are property values diminished by environmental problems, but property owners are also denied opportunity costs stemming from the inability to move. Homeowners, for example, are stuck holding houses unable to be sold with stagnate prices, while homes in other neighborhoods are selling at increasing values. Thus, the owners are harmed not only by the diminution of value in the existing residence, but by the opportunity costs inherent in lost gains from alternative home investments.

---

[25] Richard J. Roddewig, "Temporary Stigma: Lessons from the Exxon Valdez Litigation," The Appraisal Journal (January, 1997): 100.

29

## METHODOLOGY

The following chart of Kentucky Hog CAFOs was obtained from a list of KPDES permits for chicken and hog facilities provided by Kentucky Department of Environmental Protection Division of Water in response to a FOIA request by environmentalintegrity.org.[26] The list, which is limited to hog CAFOs, was confirmed with the Division of Water as representing all such Kentucky farms subject to the permitting process.

From this list the following counties were judged to likely provide the most abundant sales data: Calloway, Carlisle/Hickman, Daviess, Graves, and Warren. Due to time constraints, data collection within each county was limited to generally a two mile radius of the hog facilities. Property cards were collected from Property Valuation Administrator (PVA) in each county reflecting all sales occurring before and after construction of the hog facilities. If a hog barn had been inexistence prior to 1990, data was collected to the mid-1990's to have sufficient sales, but not to reflect values prior to the construction. Because of the time constraints, deeds were not able to be examined and all data is based on the PVA information. However, significant sales that were emphasized were confirmed with property owners. In addition to the property description, the sales were sited on PVA maps to ascertain their exact location relative to the respective hog facilities.

The methodology was defined by constraints of time and financial resources which precluded a multiple regression analysis. However, such an analysis is less reliable of the actual damage given the variable nature of air currents which affect a broad geographic area. For example, in Calloway County, Clayton Garland whose home adjoins a hog farm reported that odors routinely drift eastward to his son's home on KY 94 East, approximately 2 miles away. He also stated that hog odors have been reported as far as five to six miles away on

---

[26] www.environmentalintegrity.org/pubs/KPDES%20Permits%20and%20Impaired%20W

30

# KENTUCKY HOG CAFOS

| NO. | KPDES # | COUNTY | FACILITY NAME | OWNER | LOCATION | CITY |
|---|---|---|---|---|---|---|
| 2 | KY0104515 | Allen | Concord Bluegrass | Pig Improvement Co.Franklin | 816 Concord Church Road | Adolphus, KY 42120 |
| 3 | KYA100114 | Allen | Pleasant Ridge Growout Farm | PIC Company, Franklin | 483 Pleasant Ridge | Adolphus, KY 42120 |
| 4 | KYA100147 | Allen | PIC Mt Gilead Site | Pig Improvement Co.Franklin | KY 671 | Red Hill, KY 42135 |
| 5 | KY0105333 | Butler | Sugar Grove Farm | Green River Land Co. | 3358 Sugar Grove Farm | Bowling Green, KY |
| 9 | KYA100138 | Calloway | Barnett & Harper Hog Farm | James C. Barnett, Murrary | Green Valley Road | Murray, KY 42071 |
| 10 | KY0106071 | Carlisle | Byasse Farm | Todd Byasse | 3831 KY 1371 S | Bardwell, KY 42023 |
| 11 | KY0106178 | Carlisle | Cannon Farm | Same Location | 980 KY 1772 | Arlington, KY 42021 |
| 12 | KY0106186 | Carlisle | Hunt Farm | Same Location | 1815 Co. Rd 1011 | Cunningham, KY 42035 |
| 13 | KY0106089 | Carlisle | Thornsbrough Farm | Same Location | 3448 KY 1377 | Bardwell, KY 42023 |
| 14 | KYA100151 | Casey | Jesse Shoopman Hog Farm | Same Location | 2217 Reynolds Creek Rd | Liberty, KY 42539 |
| 15 | KY0106160 | Christian | Pleasant Hill Livestock Co. | KY Corn Utiliz. Corp Eastwood | 7050 Grapevine Road | Nortonville, KY 42442 |
| 19 | KY0104426 | Daviess | Iron Maiden Hog Farm | Obryan Farms | 6939 Curdsville-Delaware | Owensboro, KY 42301 |
| 20 | KY0104825 | Daviess | Loan Oak Farm | Obryan Farms | 6939 Curdsville-Delaware | Owensboro, KY 42301 |
| 21 | KY0105708 | Daviess | Obryan Farms Inc-Doby Farms | Obryan Farms | 9 MIS W C-D North Side | Owensboro, KY 42301 |
| 22 | KY0106062 | Daviess | Obryan Sow Farm | Obryan Farms | 6729 Curdsville-Delaware | Owensboro, KY 42301 |
| 32 | KY0105520 | Graves | Crider Hog Farm | 714 Heath Lane, Mayfield | Trace Ck Church KY 1374 | Mayfield, KY 42066 |
| 47 | KY0106208 | Hickman | Workman IV Farm | ?, 3172 KY1826, Clinton | 1001 Poole Road | Clinton, KY 42031 |
| 51 | KY0105601 | Hopkins | Colonial Farms Finishing Pigs | Colon. Holding 515 Nebo Rd | 9250 Beulah Rd | Madisonville, KY 42431 |
| 52 | KY0105902 | Hopkins | Tosh Farms Madisonville | POB 308, Henry, TN | 9250 Beulah Rd | Madisonville, KY 42431 |
| 54 | KY0104434 | Marshall | Williams Farms | Gregg Williams, Same Location | 851 Phelps Road | Benton, KY 42025 |
| 56 | KYA100117 | McClean | Sam Revelett Hog Farm | Same Location | KY 85 W | Sacremento, KY 42372 |
| 58 | KY0104256 | Monroe | Triple C Farm | Beth Crowe, Gamaliel, KY | 4132 Harlan Crossroads | Tompkinsville, KY 42167 |
| 60 | KY0104086 | Mulhenberg | Bicketts Blacklake Farm on 175 | Same Location | 10391 KY 175 N | Central City, KY 42330 |
| 64 | KY0104833 | Trigg | Bush Hog Farm | Three Rivers Farms, Madisv | 4303 Adams Mill Rd | Cadiz, KY 42211 |
| 65 | KY104761 | Warren | Bush Farms | Same Location | 4534 Browing Road | Rockfield, KY 42274 |
| 66 | KY0105619 | Warren | Heard Hog Farm | Same Location | 3767 Galloway Mill Rd | Rockfield, KY 42274 |

Kentucky Lake. In addition, as the geographic area of analysis increases the number of variables which impact value also increases; and the less reliable are the results.

The object of the analysis was not to process all available sales through a limited multiple-regression analysis, but to analyze the individual data relative to market response to the hog facilities. This method, though less scientific, eliminates sales that were purchased by market precipitants who were unaware that proximate hog facilities existed at the time of sale. These sales, which reflect general market levels, skew the data as do properties which were on the market and removed because they were unable to be sold. In other words, this analysis describes the market response to hog CAFOs within the context of local conditions.

The following section analyzes each county individually. Exhibits pertaining to each county analysis are included in the Addendum. These exhibits include the following data:

- County PVA mapping index, which indicates the location of the hog farm in pink and the surrounding maps used in the analysis in yellow
- A site map with one and two mile radii with the hog farms marked by a star or solid red dot and numbered comparable sales
- An aerial photograph of the hog farm
- A spread sheet which includes the sales of the hog farm at the top of each page followed by comparable sales of single family lots, single family residential sales, and agricultural sales
- Graphs which plot the sale price per unit of the comparable sales

32

## EFFECT OF CAFOS ON WESTERN KENTUCKY
## PROPERTY VALUES

### CALLOWAY COUNTY

Calloway County's only CAFO, the Barnett & Harper Hog Farm, is in the northeast section of the county. The 255.72 acre farm has road frontage along the north side of Green Valley Road, the west side of Morris Road and the east side of recently constructed KY 68/80. The hog facility is on Parcel No. 20A of PVA Map 75 and consists of 3 hog barns and 2 lagoons. Although the precise date of construction was not available, indication is that the first barn was construction about 1985 with the other two added prior to 1997. In addition to the Green Valley Road farm, Barnett & Harper also have a 185.0 acre farrowing farm approximately 3.0 miles to the south east. It is on the north side of Kirk Ridge and Liberty Roads, and east of KY 94 East. This farm is on PVA Map 84 and contains several nursery barns and two lagoons. The farrowing barns were constructed in 1997. The farm owner lives several miles from the hog operations.

Comparable sales were obtained from Map 75, as well as the adjoining maps including Nos. 66, 74, 76, and 84. The following chart contains 96 sales of which 28 are single family lot/tract sales, 32 are single family residential sales and 36 are agricultural sales. (Although sales which date to the early 1990s were collected, only the most recent sales were analyzed due to time constraints and availability of sufficient recent data. Also, inherent within these sales are opportunity costs lost to the present date not found in earlier sales. In addition to the recent sales, any prior sale of a resale was included to reflect any rate of change over time). The most recent unimproved single family lot/tract sales and agricultural sales were graphed based on their sale price per acre. The graph follows the sales charts.

33

SINGLE FAMILY LOTS/TRACTS

The single family lots range in size from 0.67 acres to 10.01 acres and include sales that have occurred since 2001. The graph indicates generally three groups of sales: (1) sales within one mile of the hog barns; (2) sales that are 2.0 miles or more distant or west of the hog barns; and (3) sales which represent uneconomic remnants, sales with limited or no road frontage, and sales with limited utility.

Sales No. 2, 4, 10, 11, 21, 22, 23, and 25 represent sales closest to the hog barns. They range in size from 1.74 acres to 9.90 acres and range in sale price from $1,010 to $3,446 per acre. Sales No. 16 and No. 17 are approximately 2.5 and 3.0 miles west of the hog barns. These sales contain 5.00 and 8.50 acres, respectively, and indicate a range of values from $2,012 to $2,500 per acre. Sales No. 10 and 16 are the most representative of the two groups and require no adjustment. A comparison of Sales No. 10 and 16, which are 5.0 acre tracts and similar in all respects except location, indicates a difference of -43.96 percent.

Sale No. 16:   $2,500/AC

Sale No. 10:   $1,401/AC    -43.96%

AGRICULTURAL TRACTS

The third group of sales represent agricultural tracts ranging in size from 11.08 acres to 117.50 acres. The most recent sales were graphed based on their sale price per acre. The graph indicates generally three groups of sales: (1) sales within one mile of the hog barns; (2) sales within 2 miles of the hog barns; and (3) sales which represent properties with limited or no road frontage and woodland tracts.

Sales No. 72, 75 and 91 are closest to the hog farms while Sales No. 77 and 78 are within approximately 2.0 and 1.5 miles, respectively. A comparison between Sale No. 75 and No. 78 which are 50.0 acre and 46.43 acre tracts, respectively, indicate a difference of -25.88 percent.

34

|  |  |  |  |
|---|---|---|---|
| Sale No. 78: | $1,804/AC | | |
| Adjusted for size: | - 50/AC | | |
| Adjusted Sale Price: | | $1,754 | |
| Sale No. 75 | | $1,300 | -25.88% |

## SINGLE FAMILY RESIDENTIAL TRACTS

Due to the wide variety, but limited number of improved single family sales, a paired sales analysis is not as reliable as the land sales. However, several observations can be made regarding this array of sales.

The highest priced property within this group is the tract closest to the Green Valley Road hog farm. This is Sale No. 33, a 15.90 acre predominantly wooded tract with a 1,891 square foot 1997 brick veneer dwelling that sold for $159,900. The odor from the hog farm was the reason that the seller sold it, according to a neighbor. Conversations with the realtor and purchaser indicated that the purchaser was not informed of the hog farm's existence. The purchaser was from California and was here for only one week to purchase property.

Sale No. 34 is on the west side of Morris Road surrounded by the hog farm. This tract was on the market for 511 days compared to the average marketing time in 2005 of 30 to 45 days.

Sale No. 36 increased in value from $50,000 in 2001 to $73,000 in 2005 as a result of major renovation.

Sale No. 50 is typical of Master Commissioner Sales within proximity to hog farms. The property decreased from $28,000 in 1996 to $20,000 in 2001, or -28.57 percent. The subsequent sale after the master commissioner sales indicated a further decline of an additional -10.0 percent. As will be indicated in other county examples, subsequent sales to master commissioner sales recover to near pre-master commissioner levels the further the property is from a hog farm.

Clayton Garland owns a 3.5 acre tract (Map 75-20B) at the northeast intersection of KY 68/80 and Green Valley Road. His property is surrounded on two sides by the hog farm

35

and is the closest property in the area to the hog barns. Approximately five years ago, Mr. Garland attempted to sell his residential tract. It was listed with two different firms for over one year and was removed from the market. Mr. Garland stated that as soon as a prospective purchaser arrived and smelled the hogs they rejected his property immediately. Mr. Garland has since purchased an older dwelling several miles away that he is remodeling. Once completed he plans to sell his Green Valley Road property for what ever it will bring or abandon it. Mrs. Garland reports that they can not invite anyone to her home; the windows must be kept closed at all times; clothing can not be dried on the line; and both she and Mr. Garland have developed severe sinus conditions in recent years.

Also, according to Mr. Garland, L.A. Travis, who owns a mobile home and 3.5 acres opposite the Barnett and Harper Hog Farm on the south side of Green Valley Road had his property on the market 2 to 3 years ago and was unable to sell it due to the hog odor.

**GRAVES COUNTY**

The result of the only hog CAFO in Graves County was the adoption of an ordinance in 1998 relating to hog operations in excess of 500 hogs. **The ordinance requires ground monitoring wells, provide financial assurance that funds will be available for remediation and clean up of any contamination, confined hog facilities and wasted treatment lagoons shall be at least 1,500 feet from a property boundary line or public roadway, or 2,500 feet from a church or school.**

The hog farm which prompted this ordinance that has prevented any subsequent hog facilities is the Crider Hog Farm at 1374 Trace Creek Church Road in northeastern Graves County at the intersection of KY 131. The 198.93 acre farm consists of two tracts of land on the north and south side of Trace Creek Church Road and the east side of Heath Road. Twelve hog barns and a lagoon, which were constructed in 1996, are at the southeast corner of the intersection. Six chicken barns that were constructed in 1991 are on the north side of

36

Trace Creek Church Road. The farmer and his son live immediately east and south of the hog facility, respectively. The hog facility is on Parcels No. 101 and 102 of PVA Map 135.

Comparable sales were obtained from Map 135, as well as adjoining maps 117, 118, and 134. The following chart consists of 77 sales within generally a two miles radius of the hog barns, including 22 single family lot/tract sales, 33 improved single family residential sales, and 24 agricultural sales. The unimproved single family lot/tracts and agricultural sales were graphed based on their sale price per acre. The graphs follow the sales charts.

SINGLE FAMILY LOTS/TRACTS

Since the hog barns were constructed relatively recently, sales occurring both before and after construction were graphed.

Due to the limited number of single family lot/tract sales, the Graves County analysis included sales ranging in size from 1.0 to 20.0 acres (the other county analyses range from 1.00 to 10.00 acres). The graph is based on sales dating from 1991 through 2000 since these are the majority of available sales. It is notable that there have been so few sales since 2000 on these maps. (Those that have occurred are likely family transfers, though this has not been confirmed. They are from a dead end road and are not considered reliable relative to the rest of the market).

The graph of the 22 sales represents three groups of sales. The lower group consists of sales dating from 1991 to 1995 prior to the construction of the hog barns. These sales range from 8.38 acres to 20.0 acres and indicate a value range of generally $750 to $1,700 per acre. The sales are correlated to the 1991 Crider 20.0 acre purchase for the chicken houses (Sale No. 7). It is significant that the Gregory Bryant sales (Nos. 5 and 6) bracket this sale adjusted for size. This property was adversely affected subsequent to the construction of the hog barns, as will be discussed later. These sales indicate a consistency of values prior to the construction of the hog facility.

37

The two upper groups represent sales dating from 1997 to 2000 and indicate a higher range of values largely due to a greater increase in value from the earlier sales due to a change in market conditions (time, appreciation).

Sales No. 15 and No. 19 represent farms 2.0 miles and 2.75 miles northwest of the Crider Hog Farm, respectively, and range in size from 2.0 acres to 7.51 acres.

Sale Nos. 8 and 14 and are within 1.00 mile and 1.5 miles of the Crider Hog Farm and range from 5.92 to 20.0 acres, respectively. Although Sale No. 17 is graphed within this group, the sale is over 2.5 miles northwest of the hog barns. It was purchased by a speculator and he considered it to have sold below the market.

The two sales that are similar in all respects except proximity to the hog farm are Sales No. 8 and 15. Both sales occurred in 2000 and contain 5.92 acres and 7.51 acres, respectively, and are comparable with respect to configuration. Sale No. 8 is approximately 0.75 miles northeast of the hog barns and Sale No. 15 is approximately 2.0 miles northwest of the hog barns. Sale No. 8 sold for $3,618 per acre, and adjusting for size Sale No. 15 indicates an adjusted value of $5,300 per acre indicating a difference of -31.74 percent.

| Sale No. 15: | $4,993/AC | |
| Adjusted for size: | + 350/AC | |
| Adjusted Sale Price: | | $5,343 |
| Sale No. 8: | | $3,618 | -32.29% |

The result of this analysis is considered to be a minimal damage indication because these sales do not reflect any opportunity costs lost to the present date which would be reflected using more recent data.

AGRICULTURAL TRACTS

The agricultural sales represent tracts ranging in size from 20.0 to 110.0 acres. Similar to the data relative to single family lot/tracts, agricultural sales data is also limited, particularly with respect to sales of properties within one mile of the Crider Hog Farm. Of

38

the recent sales, there is only one sale in proximity of the hog barns. This is Sale No. 60, which occurred in 2002 and contains 62.99 acres. This farm is opposite the Crider Farm on the north side of Trace Creek Church Road and sold for $1,389 per acre.

Sale Nos. 65, 66, and 71 represent sales that are 2.0 to 2.50 miles northwest of the Crider Farm. The sales range in size from 31.64 acres to 88.20 acres and indicate a range of values from $1,939 to $2,502 per acre.

A paired sales analysis comparing Sale No. 60 with No. 65, which is similar in its irregular configuration to the former sale, indicates a difference attributable to hog barn proximity of -45.14 percent.

| | | |
|---|---|---|
| Sale No. 65: | $1,939/AC | |
| Adjusted for size: | + 261/AC | |
| Adjusted Sale Price: | $2,200 | |
| Sale No. 60: | $1,207 | -45.14% |

SINGLE FAMILY RESIDENTIAL TRACTS

Due to the wide variety, but limited number of improved single family sales, a paired sales analysis is not as reliable as the land sales. However, one property (Sale Nos. 37, 38, and 39) was known to be affected by the Crider Hog farm as evidenced by a letter to the editor of the local newspaper, which is included in the Addendum. As a result of the negative effects of the hog barns on this family, their property was put on the market in 2003 and sold for $132,500. In March 2006, the property went into foreclosure and FNMA acquired it for $130,656. The property subsequently sold in June 2006 for $128,800. According to the purchaser, Melissa Garrison, the reason that she and her husband acquired the property is that her ill mother lives next door and she needed to move from Paducah to care for her. She stated that she otherwise would not have purchased the property due to the odor problem of which she was aware.

A current appraisal of this property, included in the Addendum, is based on the following comparable sales: 8075 KY 1241, 120 Reece Road, and 575 N. Sutton Lane. The

39

estimated value is $148,000, which compared to last sale at $128,800 indicates damage of -12.97 percent.

A 21.53 acre tract improved with a 2,064 square foot two story frame residence constructed in 1994 was placed on the market in 1999 having been appraised for $225,000. This tract is at 3343 Trace Creek Church Road and adjoins the south side Crider Farm (hog side) to the east. The property was on the market for 90 days. Only two individuals looked at the property. One made an offer of $165.000, a difference of -26.67 percent of the appraised price. The farm was removed from the market due to the failure to sell it due to its proximity to the hog barns.

According to a veterinarian, Dr. Chad Badger, who lives immediately west of the hog barns near the intersection of Trace Church Road and Heath Lane, he and his neighbors think it is pointless to even attempt to sell their property knowing they would take a loss and could not replace what they have (minus the odor) with the proceeds from such a sale.

## CARLISLE AND HICKMAN CALLOWAY COUNTIES

Carlisle County has five new hog CAFOs, of which four belong to Thornsborough Farm southeast of Bardwell at 2762 KY 1372 approximately 0.5 miles west of the Carlisle County High School. The farm, containing approximately 138.24 (300.0?) acres is improved with three hog barns constructed in 2004 and one constructed in 2005. Prior to construction of the hog facilities, the Thornsborough farm had three chicken barns constructed in the mid to late 1990s. The facility is on Parcel No. 33-15-3 of PVA Map 33.

In addition to Thornsborough hog barns, the Cannon Farm constructed one pit hog barn in 2004 at 980 KY 1772, immediately north of the Hickman County line. This hog facility is on Parcel No. 24 of PVA Map 29.

Comparable sales were obtained from Maps 24 and 33, as well as the adjoining maps including Nos. 23, 27, 28, 29, 32, 34, 38, 39, and 40. The following chart includes 91 sales

40

within generally a two mile radius of the hog barns including 14 sales of single family lot/tracts, 38 improved single family residential sales, and 39 agricultural sales.

SINGLE FAMILY LOTS/TRACTS

The following chart represents 14 sales of single family lots of which 12 were analyzed ranging in size from 1.00 acres to 10.99 acres. The sales occurred between 1999 and 2006. The graph represents generally two groups of sales—those immediately north and south of the Thornsborough Hog Farm and those sales that are 3.0 miles north and 5.0 miles south of the farm. Adjusted for size, Sales No. 13 and 14 are bracketed by Sales No. 3 and No. 7 which are recent sales, as well as Sales No. 1 and No. 11 which are older sales.

The sales immediately south and north of the Thornsborough Farm are Sales No. 4 and Nos. 5 and 6. The latter represent a sale/resale which occurred in 2005 and 2006 and indicates a -37.5 percent difference. Although Sale No. 4 occurred in 2003, prior to the construction of the hog barns, it nonetheless appears to be affected by the existing chicken houses which are immediately north of this tract. Based on the graph, and particularly comparing Sale No. 14 adjusted for size to the most recent sale No. 6 indicates a difference of -67.04% percent.

| | | | |
|---|---|---|---|
| Sale No. 14: | $2,000/AC | | |
| Adjusted for size: | + 75/AC | | |
| Adjusted Sale Price: | | $2,075 | |
| Sale No. 6: | | $ 684 | -67.04% |

AGRICULTURAL TRACTS

The agricultural sales ranging in size from 10 acres to 150 acres which date from 2000 to the present were graphed and indicate two distinct group of sale: (1) those in proximity to the Thornsborough Farm and Cannon Farm and (2) those sales that are a greater distance from the farms.

Sales No. 59 and 60 are immediately south of Thornsborough Farm, while Sale No. 79 is northeast of Cannon Farm and Sales 82 and 87 are immediately southwest of Cannon

41

Farm. These sales range in size from 10.29 acres to 150.0 acres and indicate a range of values from $1,003 to $1,700 per acre.

Sales No. 56, 78 and 86 represent the most recent sales that are further away from the hog farms than the previous mentioned sales. These sales range in size from 25.0 to 52.0 acres and indicate a range of values from $1,800 to $2,000 per acre.

Adjusting for size, a comparison between Sale No. 82 and Sale No. 56 indicate a difference of -38.89 percent attributable to proximity to the Cannon Hog Farm.

|  |  |  |  |
|---|---|---|---|
| Sale No. 56: |  | $1,800/AC |  |
| Sale No. 82: | $1,340/AC |  |  |
| Adjusted for size: | -  700/AC |  |  |
| Adjusted Sale Price: |  | $1,100/AC | -38.89% |

## SINGLE FAMILY RESIDENTIAL TRACTS

Because the hog barns have been constructed for only four years there has been insufficient data relative to the analysis of improved single family residential tracts.

## WARREN COUNTY

Warren County has two hog CAFOs which adjoin each other in the southwestern section of the county near the community of Browning. Bush Farms contains 1,694.98 acres and is on the north and south side of Browning Road approximately 1.0 mile west of Browning. The 8 hog barns and two lagoons were constructed in 1975 are on the north side of the road. The hog facility is on Parcel 9 of PVA Map 7(A).

Heard Hog Farm adjoins Bush Farm at the rear property line. This 1,380.42 acre farm fronts on Galloway Mill Road (KY 1083) and is improved with 9 hog barns and two lagoons constructed in 1993. The hog facility is on Parcel 33 of PVA Map 8(A).

Comparable sales were obtained from Maps 7 and 8, as well as the adjoining Maps 16 and 17. The following chart consists of 165 sales within generally a two mile radius of the two hog farms including 27 sales of single family lot/tract sales, 70 improved single family

42

residential sales, and 68 agricultural sales. The unimproved single family lot/tract sales and agricultural sales were graphed based on their sale price per acre. The graphs follow the sales charts.

SINGLE FAMILY LOTS/TRACTS

The single family lot/tract sales range in size from 1.30 acres to 9.84 acres and sold from 1995 to the present. The sales data was sufficient to consist of generally two groups of sales—those occurring between 1999 and 2002 and those occurring between 2003 and 2006.

The graph of the earlier sales indicates two distinct sets of data. Sale Nos. 15 and 18 represent a 4.0 acre and a 3.6 acre tract, respectively, that are approximately two miles east of the hog barns. Sale Nos. 2, 5 and 7 range in size from 3.39 acres to 5.14 acres and are within one mile east of the hog barns. A comparison between the most similar sales in all respects except location, Sale No. 5 and No. 15, indicates a -38.63 percent difference.

| | | |
|---|---|---|
| Sale No. 15: | $7,341/AC | |
| Correlated to Sale 18: - | 254/AC | |
| | | $7,088/AC |
| | | |
| Sale No. 5: | $4,425/AC | |
| Adjusted for size: - | 75/AC | |
| Adjusted Sale Price: | | $4,350/AC    -38.63% |

The graph of the later sales also indicates two distinct sets of data. Sale Nos. 8 and 10 represent a 5.14 acre and a 5.00 acre tract, respectively, which are within one mile east of the hog barns. The remaining sales are at least 2.00 miles east of the hog barns. Sales No. 14, 17, and 19 have the greatest correlation and represent sales ranging in size from 2.50 acres to 4.00 acres. A comparison between the two groups indicates a difference of -45.05 percent.

| | | |
|---|---|---|
| Sale No. 14: | $8,750/AC | |
| Adjusted for Size: - | 425/AC | |
| | | $8,325/AC |
| | | |
| Sale No. 10: | $4,200/AC | |
| Correlated to Sale 8: + | 375/AC | |
| Adjusted Sale Price: | | $4,575/AC    -45.05% |

43

The later sales indicate an additional -6.42 percent loss of value (45.05% – 38.63%). Inherent within this additional damage are opportunity costs lost to the present date not found in earlier sales. For example Sale No. 7 and 8 represent a sale/resale of a tract within proximity to the hog barns. Between 9/99 and 8/03 this property did not increase in value, where as Sales No. 14, 16, 19, and 24 which represent sales generally 2.0 miles from the subject indicate annual rates of increase ranging from 2.91 to 8.57 percent.

AGRICULTURAL TRACTS

The agricultural sales range in size from 9.84 acres to 513.93 acres and sold from 1994 to the present. The sales data was sufficient to consist of generally two groups of sales—those occurring between 1994 and 1999 and those occurring between 2000 and 2006.

The graph of the earlier sales indicates two distinct sets of data. Sale Nos. 155, 156, 159 and 161 range in size from 10.00 acres to 20.00 acres; and are all more than 2.0 miles east of the hog barns. Sale Nos. 104, 106, 107, 109, 110, 111, 115, and 124 range in size from 12.50 acres to 90.16 acres. These sales are all within 1.5 miles south and west of the Heard and Bush hog barns, respectively. A paired sales analysis representative of these groups compares Sale 159 with Sale 110 and indicates a difference of -39.56 percent.

| | | | |
|---|---|---|---|
| Sale No. 159: | $2,399/AC | | |
| Sale No. 110: | $1,345/AC | | |
| Correlated to Group: | + 105/AC | | |
| Adjusted Sale Price: | | $1,450/AC | -39.56% |

The graph of the more recent sales also indicates two distinct sets of data. Sale Nos. 99, 105 and 131 represent tracts of land ranging from 48.72 acres to 77.50 acres. Sale No. 131 is approximately 2.0 miles east of the hog barns. Although Sales No. 99 and 105 adjoin the Bush Hog Farm, the former sale was purchased by an adjoining owner and the later was purchased by Bush. Sale No. 138 sold for considerably more than the other three sales however; it is nearly 3.0 miles southeast of the hog barns.

44

The second set of data includes Sale Nos. 127, 128 and 130 which are all within 1.5 miles west of the Heard hog barns. A comparison between the two groups with Sale 131 and Sale 128 representing the two sets of data indicates a difference of -48.36 percent.

| | | |
|---|---|---|
| Sale No. 131: | | $2,130/AC |
| Sale No. 128: | $1,623/AC | |
| Adjusted for Size: | - 523/AC | |
| Adjusted Sale Price: | | $1,100/AC    -48.36% |

Because Sales 99 and 105 are adjoining owner sales, the -48.36 percent diminution in value may be overstated. As with the single family lot/tract sales the degree of damage increased from the earlier sales to the later sales indicating that the properties continue to suffer additional damage to the extent that they do not receive appreciation that lesser affected properties experience.

SINGLE FAMILY RESIDENTIAL TRACTS

Because of the wide variety, but limited number of improved single family sales, a paired sales analysis is not as reliable as the land sales. However, several observations can be made regarding this data. This group of single family sales indicates more homogeneity than the other counties. For this reason, three direct comparisons are possible.

Sale No. 28 is within one mile of the hog barns at 5333 Browning Road and represents a 1.06 acre tract improved with a 1,288 square foot brick veneer residence constructed in 1964 with a one-car attached garage. It sold in 1996 for $65,000. This sale can be compared to Sale No. 40 at 3142 Browning Road, 2.0 miles east of the hog barns. This 1964 brick veneer residence contains 1,242 square feet with a two-car attached garage. It sold in 1997 for $75,500. The difference between these two sales is -13.9 percent.

Sale No. 32 is within one mile of the hog barns at 4288 Browning Road and is a 0.50 acre tract with a 1,736 square foot 1981 brick veneer residence with a 1-car attached garage. This property sold in 2002 for $81,000. This sale can be compared to Sale No. 76, a 1,764 square foot 1987 brick veneer residence with a 1-car attached garage. This property sold for

45

$106,500 1n 2004; and is within two miles of the hog barns. The difference between these two sales is -23.9 percent.

Sale No. 33 is within one mile of the hog barns at 4252 Browning Road and is a 0.50 acre lot with a 1,392 square foot brick veneer dwelling constructed in 1981 with a 1-car detached garage and 1.5 bath. The property sold in 1993 for $63,000. It can be compared to Sale No. 76 at 3557 Crestwood subdivision within two mile of the hog barns. This property consists of a 0.45 acres with a 1,161 square foot brick veneer residence constructed in 1981. This property sold in 1995 for $64,000. Adjusting this sale for the differences between this sale and No. 33, which include the 0.5 bath, 1-car garage and size results in an adjusted sale price of $70,658. The difference between the two sales is -10.8 percent.

With respect to **Master Commissioner Sales,** there have been six such sales within two miles of the hog barns, including Sale Nos. 45, 48, 52, 71, 77 and 87. Without exception, each sale recovered to its pre-Master Commissioner level by the next sale. This is contrasted to Master Commissioner Sales in other counties that are **within one mile of a hog barn. Without exception, these sales declined further after the Master Commissioner Sales.** These sales include Calloway County Sale Nos. 28 and 52; Daviess County Sale Nos. 35, 38, and 60; as well as Graves County Sale No. 39.

**DAVIESS COUNTY**

Daviess County has four farms in the western section of the county immediately east of the Green River and west of the community of Curdsville. All four farms are on Curdsville-Delaware Road and are owned by Jerry W. O'Bryan. This is a farrow to finish operation on 452.21 acres with 2 nurseries, 21 finishing barns (reportedly 4 more proposed finishing barns), and three lagoons. The hog facilities are on Parcel 13 of PVA Map 6, Parcel 11.02 of Map 2, and Parcels 1.00 and 36.00 of Map 3.

Comparable sales were obtained from Maps 2, 3, and 6, in addition to the adjoining Maps 1, 4, 5, and 7, 14, 15, and 16. The following chart consists of 85 sales within generally

46

a two mile radius within Daviess County of the hog farms including 18 sales of single family lot/tract sales, 45 improved single family residential sales, and 22 agricultural sales. The unimproved single family lot/tract sales and agricultural sales were graphed based on their sale price per acre. The graphs follow the sales charts.

SINGLE FAMILY LOTS/TRACTS

The single family lot/tract sales range in size from 1.00 acre to 5.610 acres and sold from 1994 to the present. The sales data is inconclusive particularly as it relates to two sets of 1.00 acre lot sales which occurred generally during the same period. Sales No. 1-4 represent piano key lots on Pond River Road immediately southeast of the primary O'Bryan hog farm (Map 06-13.00). The four lots sold between August and December 2000 with 2 lots selling for $15,000 and 2 lots selling for $12,000 and $13,500. These compare to three piano-key lots adjoining the community of St. Joseph over two miles east of hog barns. These lots sold from April 2000 to May 2003 for $15,000 each (Sales 11-13).

With insufficient data any conclusion based on these sales is speculative. However, there is one paired sales comparison that offers an indication. Sale No. 5 represents a 2.130 acre tract on Jennings Road approximately 1.5 miles south of the main hog farm. This tract sold in 2006 for $9,300 per acre. It is compared to Sale No. 7, a 4.270 acre tract that was an out-conveyance from the O'Bryan farm that contains the seven hog barns and 2 nurseries. The tract sold for $5,000 per acre. A comparison between these two sales indicates a difference of -30.11%.

|  |  |  |  |
|---|---|---|---|
| Sale No. 5: |  | $9,300/AC |  |
| Sale No. 7: | $5,000/AC |  |  |
| Adjusted for size: | - 1,500/AC |  |  |
| Adjusted Sale Price: |  | $6,500/AC | -30.11% |

47

AGRICULTURAL TRACTS

The agricultural sales range in size from 15.98 acres to 1174.64 acres and sold from 1993 to May 2006. The sales data was sufficient to conclusively analyze only the recent sales from 2001 to 2006.

The graph indicates two distinct sets of data. Sale Nos. 76, 80, 82 and 85 represent sales that are 2.75 to 4.0 miles southeast of the main hog farm at the intersection of Curdsville and River Roads. Sale No. 80 is not considered a reliable indicator as it has minimal road frontage. The remaining three sales range in size from 29.23 acres to 62.00 acres.

Sale Nos. 64, 66, 67 and 70 range in size from 28.48 to 100.00 acres. These sales are all within one mile of a hog barn. Sale No. 72 is not considered a reliable indicator because it is largely in a flood plain and was purchased for a house site.

A paired sales analysis representative of these groups compares Sale No. 82 with Sale No. 70 indicating a difference of -35.0%.

|  |  |  |  |
|---|---|---|---|
| Sale No. 82: | $3,100/AC | | |
| Adjusted for Size: | + 400/AC | | |
| | | $3,500/AC | |
| Sale No. 70: | $2,380/AC | | |
| Correlated to Group: | - 105/AC | | |
| Adjusted Sale Price: | | $2,275/AC | -35.00% |

A 119.00 acre tract recently sold that is not only contrary to the sales data previously described, but it represents one of the highest sales in the county. In addition this property, Sale No. 71 is directly opposite the main O'Bryan farm on the north side of Curdsville Delaware Road. Conversations with neighbors indicated that there is growing concern regarding O'Bryan's reported claim to aspire to be the "largest hog farmer." This purchase, at auction with the buyer bidding against O'Bryan, at $5,230 per acre is evidence of the neighbors' intent to prevent this hog operation from expanding any more in this area. The tract was purchased by a Connecticut relative of the owner of an adjoining farm.

48

## CONCLUSION

The following chart summarizes the findings to date as described above.

| COUNTY | 10-10 ACRES | 10-120 ACRES | S. FAMILY RESIDENTIAL |
|---|---|---|---|
| Calloway | -43.96% | -25.88% | |
| Graves | -32.29% | -45.15% | -12.97%, -26.67% |
| Carlisle/ Hickman | -67.04% | -38.89% | |
| Warren | -45.05% | -48.36% | -13.9%, -23.9%, -10.8% |
| Daviess | -30.11% | -35.00% | |
| AVG | -43.69% | -38.66% | -17.65% |
| MEAN | -43.96% | -38.66% | |

**The general indication of the matched pairs analysis for the six counties analyzed is that unimproved land within one mile of a hog CAFO is negatively impacted approximately 40.0 percent below that of a property at an approximate 2.0 mile distance.**

Though the data for **improved properties** is limited relative to sale-resale and matched pair analysis, the above data indicates a **negative decline of 11.0 to 26.7 percent.** It is to be expected that the unimproved difference would greater, because the land is purchased with the knowledge that any improvements built upon it will be depreciated upon construction. Therefore, the land must take a greater hit to offset any future new construction.

Although the analysis is preliminary, it indicates sufficient evidence to warrant further more sophisticated and costly multiple regression analysis which will provide for a statistically significant conclusion of the improved comparable sales, which have been collected, but not analyzed, as well as the unimproved sales.

49