UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CASE NO. 5:09-cv-121


VIDEOTAPED DEPOSITION OF RICKIE SPANN


TERRY POWELL, et al.                          PLAINTIFFS

vs.

JIMMY TOSH, et al.                            DEFENDANTS


     Pursuant to Notice, the videotaped deposition of RICKIE SPANN was taken on behalf of Defendants before Sandra L. Allyn, RPR, CCR and Notary Public in and for the Commonwealth of Kentucky at Large, at the offices of Garmer & Prather, 141 North Broadway, Lexington, Kentucky, on Thursday, October 27, 2011, commencing at the hour of 10:21 a.m.

     The deposition was taken for purposes of discovery and for all other purposes permitted under the Federal Rules of Civil Procedure.


ACTION COURT REPORTERS
116 Mechanic Street
Lexington, Kentucky 40507
859.252.4004

22

prior when she was doing some work in my area.

Q.   Do you know what work she was doing at that time?

A.   I do not.  She had asked for my assistance in gathering some data, but I was not privy to what exactly she was working on.

Q.   Have you ever discussed what she was doing previously with Ms. Clay?

A.   No, sir.

Q.   So I believe you testified that Ms. Clay called you on the phone?

A.   Yes, sir.

Q.   Okay.  Do you recall when that was?

A.   Not specifically, no, sir.

Q.   Do you recall what year?

A.   It was earlier this year or late last year.  I would have to -- I would have to look to make sure.

Q.   I have a copy of a cover page of your -- a letter dated January 5, 2011, directed to Mr. Graddy that has your and Ms. Clay's signature on it.  Does that help to refresh your recollection as to when you might have been contacted by Ms. Clay?

A.   Yes, sir.  It -- I would say it was in 2010.

Q.   Okay.

A.   Roughly mid-2010.  I -- I hesitate to get

Q.    Were you ever asked to prepare a valuation of the current value of the plaintiffs' properties without assuming a hypothetical condition associated with hog barns?

A.    No, sir.

Q.    Okay.  Do you have any such opinion today? The value of the plaintiffs' properties in the condition which they're found today with certain hog barns in a relative general area?

A.    In my opinion, they would negatively impact the properties' values.

Q.    Were you asked to render that opinion in this case?

A.    Not in the portion of the report that I was working on.

Q.    Okay.  Have you been asked to render that opinion at any time?

A.    No, sir.

Q.    Okay.  Do you have such an opinion?

A.    Not during the preparation of the report, no.

Q.    Okay.  Do you have any opinions outside the report as to whether the presence of any hog barns in any proximity to the plaintiffs' homes have on the current value of their -- of their property?

A.    If they im- -- if their presence impacts the

It was not relevant to the portion of the report that I was working on.

Q.   Why is it not relevant?

A.   The values that I worked on were before values, and I had no -- no part in the determination of the diminution.

Q.   What -- what do you mean by "before values"?

A.   Values that were not impacted by the -- by the barns.

Q.   What does that mean in laymen's terms?

A.   No consideration was given in the values that I determined from any negative influence of any kind from the -- from the hog barns.

Q.   Okay.  Am I correct in understanding that -- that the work that you did in calculating the before values does not reflect real-world conditions on the site?

A.   It is a hypothetical situation that does not reflect impact of the hog barns.

Q.   Which hog barns in particular did you exclude in constructing your hypothetical condition from any appraisal you did in this case?

A.   The -- the hog barn -- I call it the Lela Green Road hog barn and the Brewers Highway hog barn.

Q.   Okay.  Are you aware of the existence of any

a second.

(Discussion held off the record.)

THE VIDEO TECHNICIAN:  We're back on video.  It's 1:47 p.m.

Q.    Mr. Spann, if you could turn to page 3 -- I'm sorry -- Table 3, which is located at page 125 through 128 of your report.  This immediately follows parcel 20, the land parcel.

A.    Yes, sir.

Q.    First -- actually, let's take a step back. This document, the first page of which, which was a January 5, 2011, letter to Mr. Graddy, is that your signature at the bottom?

A.    Yes, sir.

Q.    Okay.  And why don't you tell me what was your role in the preparation of this 150-odd-page report -- 165-page, approximately, report?

A.    My part of the report was assistance to Mary. We worked together on determining the before values.

Q.    Did you draft any portion of this document? And by "this document," again, I'm talking about the 160-page January 5, 2011, report.

A.    It's all meant to be one document.  So --

Q.    Well, if you could --

A.    -- I'm assuming you're speaking of this

portion here with the cover dated January the 5th?

Q. Correct.

A. Yes.

Q. There were two -- I'll use this term loosely -- "submissions" from counsel --

A. Sure.

Q. -- in January, related to appraisal expert services?

A. Yes, sir.

Q. One was on January 5, which contained the document that I have in front of me now, which is 160 -- 162 -- -3 pages, plus a four-page table, Table 9, that follows it. We received a later submissant -- submission on or about the 10th of January via email from Mr. Graddy that provided that the supporting data would be provided in a later volume. See that in the last paragraph of the January 5th letter?

A. Yes.

Q. So that's the later volume.

A. Okay.

Q. So I'm not referring to the later volume in the context of this question.

A. Okay.

Q. So with respect to the January 5th -- and I'll

98

refer to it from going forward as the January 5th submission and then the January 10th submission.

A.    Yes, sir.

Q.    Is that clear?

A.    Uh-huh.

Q.    Okay.  What portion of the January 5th submission did you, in fact, prepare yourself?

A.    I prepared the -- the sales comparison grids, I prepared the maps that go along with each one, and I prepared the sketches.

Q.    Did you draft any of the text in the January 5th submission?

A.    No, sir.

Q.    Okay.

MR. PRATHER:  Stewart, can I just clarify?  Are you talking about the narrative text or the notes on the individual appraisal reports?

MR. FRIED:  The narrative text.

MR. PRATHER:  Okay.

A.    No, sir.

Q.    Okay.  Did you prepare all of the tables?  And I believe there are, in this submission, various tables marked 1 through 9 with some subletters.

A.    I assume you're not speaking of this type table?

Action Court Reporters

completion of the report?

A.    No.

Q.    Did you review this report before signing your name on January 5, 2011, to the letter to Mr. Graddy?

A.    I reviewed the portions that I was pertained to.

Q.    Okay.  We'll get back to that in a moment.

So you never reviewed any of the tables -- is that correct? -- before January 5, 2011?

A.    No, sir.

Q.    Okay.  Do you know how Ms. Clay relied upon these tables in reaching any opinions in this case?

A.    I do not.

Q.    Did --

MR. FRIED:  Let's go off the record a second.

THE VIDEO TECHNICIAN:  Stand by, please. We're going off video.  It's 2 p.m.

(Discussion held off the record.)

Q.    I asked you a moment ago whether you reviewed -- I asked you to confirm that you did not review Table 3 or Table 4 in preparing -- or prior to the -- the conclusion of the report on January 5, 2011. You answered no.  I just wanted to confirm that your testimony is that you did not review these tables or

play any role in the preparation of these tables prior to signing your name on the letter to Mr. Graddy on the 5th of January, 2011.

A.    I did not prepare these tables.

Q.    Okay.  Or review them?

A.    I did not review these tables.

Q.    Okay.  Did you review any portion of this January 5th report other than the ones you specifically worked on?

A.    I reviewed the portions that I specifically worked on.

Q.    Did you review anything else --

A.    No, sir.

Q.    -- contained in this report?

A.    No, sir.

Q.    Thank you.

Do you recall having ever appraised any of the properties -- the four properties listed as "sales/resales after to 7/4/07"?

A.    I do not recall having appraised any of these properties.

Q.    Do you have any information as to the existence of any detrimental conditions on any of the properties in Table 3 or Table 4?

A.    I do not.

Q.    By "associated," do you mean brokers or appraisers?

A.    Could be brokers, could be Realtors, could be family members pertinent to the transaction.

Q.    If you could turn to Table 5.  Am I correct that you didn't play role any in the preparation of this table whatsoever?

A.    Correct.

Q.    Okay.  So walking through the report, turn to page 1, please.

MR. PRATHER:  Are you saying page 1 or Table 1?

MR. FRIED:  Page 1.

Q.    Mr. Spann, you testified earlier that your primary role was to prepare the valuation -- the before value of the plaintiffs' properties; correct?

A.    Yes.  I assisted in that, yes.

Q.    And this text relates to one of the functions that you played in the context of the preparation of this report.  It's entitled Before Value of Plaintiff Properties.  Did you draft this page?

A.    No, I did not.

Q.    Did you assist Ms. Clay in the drafting of this page?

A.    No, I did not.

109

Q.    Did you review this page prior to the -- prior to signing the letter to Mr. Graddy dated January 5?

A.    I did not.

Q.    Okay.  Have you reviewed it since January 5 before five minutes ago?

A.    No, I did not.

Q.    Okay.  The last paragraph, last sentence, on page 1 refers to a 1.25-mile radius.  Do you know why Ms. Clay utilized that radius?

A.    I do not.

Q.    Do you believe there is any significance to a 1.25-mile radius from a hog barn in terms of the value of the plaintiffs' properties in this case?

MR. PRATHER:  Object to form.  Go ahead.

A.    Please rephrase your question.

Q.    Sure.  Is there any significance in your mind to a 1.25-mile distance of a subject property to a hog barn?

MR. PRATHER:  Object to form.

A.    It's possible.

Q.    Okay.  Is proximity to a condition which may impair the value of property an important consideration in the appraisal field?

A.    Depends on the impact.  That's not necessarily the proximity, it's the impact from that.

110

Q.    Were you ever asked to prepare a valuation of the current value of the plaintiffs' properties without assuming a hypothetical condition associated with hog barns?

A.    No, sir.

Q.    Okay.  Do you have any such opinion today? The value of the plaintiffs' properties in the condition which they're found today with certain hog barns in a relative general area?

A.    In my opinion, they would negatively impact the properties' values.

Q.    Were you asked to render that opinion in this case?

A.    Not in the portion of the report that I was working on.

Q.    Okay.  Have you been asked to render that opinion at any time?

A.    No, sir.

Q.    Okay.  Do you have such an opinion?

A.    Not during the preparation of the report, no.

Q.    Okay.  Do you have any opinions outside the report as to whether the presence of any hog barns in any proximity to the plaintiffs' homes have on the current value of their -- of their property?

A.    If they im- -- if their presence impacts the

A.    I'm sorry; re- -- I misunderstood your question.

MR. FRIED:   Do you mind reading it back?

(The last question was read by the reporter.)

A.    Sorry.  You'll have to define a CAFO for me.

Q.    Concentrated animal feeding operation.

A.    Probably less than a half dozen.

Q.    Do you recall what distance those residential -- were they residential properties or a mix?

A.    It was a mix.

Q.    Okay.  Do you recall how many were residential properties?

A.    I do not.

Q.    Okay.  Of the ones that were residential properties, how close were they to the animal operation?

A.    I don't recall specifically.

Q.    Any of them under half a mile?

A.    Again, I don't recall specifically.

Q.    Okay.  Is there a way for you to determine which properties those were?

A.    Possibly.

Q.    Okay.  Fair to say that you don't have a great

185

deal of experience dealing with negative impacts of residential property values based upon their proximity to a concentrated animal feeding operation?

MR. PRATHER: Object to form.

A. Yes.

Q. Okay. Less than 1 percent of the time you've spent in the past five years?

A. Yes.

Q. And this is the only case you've ever rendered an expert opinion related to the proximity of residential properties to a CAFO?

MR. PRATHER: Reject -- object to form. Go ahead.

A. Yes, sir.

Q. Have you ever appraised a property where you concluded, before this case, that the property was monetarily impacted negatively by its proximity to an agricultural operation?

A. I don't recall having done that.

Q. Okay. Have you ever reviewed any studies, reports, articles about impacts on residential property values based upon proximity to animal operations?

A. No, sir.

Q. Okay. Were you aware that in Ms. Clay's report there are a number of studies that discuss that

186

very issue?

A.    Again, that -- that portion was compiled by her, and I am not aware of that.

Q.    Mr. Spann, are you the least bit concerned that your name is on a report that you haven't reviewed in toto?

A.    No, sir.

MR. PRATHER:  Object to form.  Go ahead.

A.    No, sir.

Q.    And why is that?

A.    Because the -- we have worked on this together and the part that I have taken part in I'm confident in.

Q.    Okay.  And what about the part that you didn't take part?  There's no -- is there anything in this report that differentiates the parts that you worked on and Ms. Clay worked on?

A.    I would have to review the report to tell you that.

Q.    Okay.  Was the report given to you at the time that you signed -- I'm sorry -- you never signed the January 5th letter, or did you?  Did you have the entirety of the report?

A.    Yes, sir.

Q.    But you didn't review it?

200

Q.    What do you do with them?  Are they still stuck in your inbox --

A.    They're in my inbox.

Q.    -- or do you delete them?

A.    They're in my inbox.

Q.    Okay.

A.    I'm sorry.  I didn't mean to interrupt.

Q.    So that's something we could ask you to produce; correct?

A.    Yes, sir.

Q.    Okay.  I would ask that you not delete any of those until the conclusion of this case.

A.    Yes, sir.

Q.    Can you generally describe your email communications with Ms. Clay?

A.    A lot of it was to do with, you know, where we are.  Of course, sending this information to her as well.

Q.    Were there any issues of disagreement in those communications?

A.    No, sir.

Q.    Okay.  Given the work that you've done in this case, am I correct in understanding that you didn't quantify the damages that the plaintiffs have allegedly sustained?

201

A.    I did not.

Q.    Okay.  That was exclusively done by Ms. Clay?

A.    Yes, sir.

Q.    Okay.  Were there any limiting conditions that you employed, other than the hypothetical condition, in the context of any of the work you did in this case?

A.    No, sir.

Q.    If you could turn to page -- to the addendum of the January 5th report, which follows page 106.

MR. PRATHER:  Are you on page 106?  Or are you...

MR. FRIED:  It's past --

MR. WALTERS:  January --

MR. FRIED:  It's past 106.

MR. PRATHER:  Okay.

MR. WALTERS:  Is that the January 12th report?  January 10th report?

MR. FRIED:  January 5th.  I'm sorry. January 10th.

MR. PRATHER:  Okay.  That makes more sense.

Q.    Actually, before we get there, if you could go to the beginning of the damage study, do you have the addendum?

A.    Yes.