UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:09-CV-00121

TERRY POWELL, *et al.*                                                   Plaintiffs

v.

JIMMY TOSH, *et al.*                                                    Defendants

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon the following motions to exclude the opinions and testimony of the several experts identified in this case:

(1)     The Tosh Defendants[1] and Howell and Davis Defendants'[2] respective motions to exclude Plaintiffs' expert property appraiser Mary Clay, (Docket Nos. 357 & 351, respectively), to which Plaintiffs have responded, (Docket No. 401), and Defendants jointly have replied, (Docket No. 432);

(2)     The Tosh Defendants' motion to exclude the Plaintiffs' expert property appraiser Rickie Spann, (Docket No. 349), joined by the Howell and Davis Defendants, (Docket No. 402), to which Plaintiffs have responded, (Docket No. 404), and Defendants jointly have replied, (Docket No. 432);

(3)     Plaintiffs' motion to exclude the Tosh Defendants and Howell and Davis Defendants' expert property appraiser, Thomas Waldrop,

---

[1] The "Tosh Defendants" include Jimmy Tosh; Tosh Farms, LLC; Tosh Farms General Partnership; Pig Palace, LLC; Shiloh Hills, LLC; Tosh Pork, LLC; and Bacon By Gosh, Inc.

[2] The "Howell and Davis Defendants" include Eric Howell, Ron Davis, and Heather Davis. Although these Defendants variously and inconsistently (even by themselves) are referred to elsewhere in this matter as the "Farmer Defendants," the "Defendant Farmers," the "Howell/Davis Defendants," the "Producer Defendants," the "Davis and Howell Defendants," and the "Davis/Howell Defendants," the Court has adopted the label most consistently used by the parties in the motions this Opinion addresses.

(Docket No. 350), to which Defendants jointly have responded, (Docket No. 408), and Plaintiffs have replied, (Docket No. 429);

(4)    The Tosh Defendants and Howell and Davis Defendants' respective motions to exclude Plaintiffs' expert Neil Webster, (Docket Nos. 341 & 345), to which Plaintiffs have responded, (Docket No. 412), and Defendants jointly have replied, (Docket No. 431);

(5)    The Tosh Defendants and Howell and Davis Defendants' respective motions to exclude Plaintiffs' expert Thomas Card, (Docket Nos. 342 & 346), to which Plaintiffs have responded, (Docket No. 411), and Defendants jointly have replied, (Docket No. 430);

(6)    The Tosh Defendants and Howell and Davis Defendants' respective motions to exclude Plaintiffs' expert Eric Winegar, (Docket No. 352 & 354), to which Plaintiffs have responded, (Docket No. 413), and Defendants jointly have replied, (Docket No. 442);

(7)    Plaintiffs' motion to exclude Defendants' expert Kirk Winges, (Docket No. 348), to which Defendants have responded, (Docket No. 374), and Plaintiffs have replied, (Docket No. 437); and

(8)    Plaintiffs' motion to exclude Defendants' expert Dwaine Bundy, (Docket No. 362), to which Defendants have responded, (Docket No. 373), and Plaintiffs have replied, (Docket No. 454).

Also before the Court are the following motions, which are related to the various motions to exclude expert testimony:

(9)    Defendants' "Joint Motion to Strike the Improper 'Declaration' of Eric Winegar," (Docket No. 443), to which Plaintiffs have responded, (Docket No. 470-1); and

(10)    The Tosh Defendants and Howell and Davis Defendants' respective motions to strike or exclude Neil Webster's supplemental report, (Docket Nos. 381 & 377, respectively), to which Plaintiffs have responded, (Docket No. 456), and Defendants separately have replied, (Docket Nos. 466; 464).

These matters are now fully briefed and ripe for adjudication.

## STANDARD FOR EXPERT TESTIMONY

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharm., Inc.*, "the Supreme Court established a general gatekeeping obligation for trial courts to exclude from trial expert testimony that is unreliable and irrelevant." *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (alteration and internal quotation marks omitted) (quoting *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001) (applying *Daubert*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999))). The Court must determine whether evidence proffered under Rule 702 "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.  A key consideration is "whether the reasoning or methodology underlying the testimony is sufficiently valid." *Id.* at 592-93.  The Supreme Court advises that the inquiry is "a flexible one," and that "[t]he focus . . . must be solely on principles and methodology, not on the conclusions they generate." *Id.* at 594-95.   A testifying expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the

practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.  But *Daubert* did not impose any new standard, other than that already found in the Federal Rules of Evidence, for the admissibility of the testimony of nonscientific expert witnesses.  *See id.*; *see also United States v. Velasquez*, 64 F.3d 844, 850 (3d Cir. 1995) (noting that *Daubert* did not impose a new standard other than what is already set out in the Federal Rules of Evidence "for the admissibility of the testimony of nonscientific experts such as . . . real estate appraisers"); *United States v. Starzecpyzel*, 880 F. Supp. 1027, 1040-41 (S.D.N.Y. 1995) (same).

Despite that there is no "definitive checklist or test" for meeting the standard of Rule 702, *Daubert* laid out a number of factors that typically "bear on the inquiry," including: whether the theory or method in question "can be (and has been) tested," whether it "has been subjected to peer review and publication," whether it has a "known or potential rate of error," and whether the theory or technique enjoys "general acceptance" in the "relevant scientific community."  *Daubert*, 509 U.S. at 593-94. Although *Daubert* addressed scientific evidence, the Supreme Court in *Kuhmo Tire Co. v. Carmichael* held that a trial court may consider the *Daubert* factors for all types of expert evidence.  *Kumho Tire*, 526 U.S. at 150.  Thus, the *Daubert* factors are nonexhaustive and may not be pertinent in cases where "the relevant reliability concerns . . . focus upon personal knowledge or experience."[3]  *Id.*; *see also First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001).

---

[3] The Advisory Committee Notes to Rule 702 reinforce this position:

The Sixth Circuit has developed further guidance on Rule 702 by recently outlining a number of "[r]ed flags that caution against certifying an expert." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)).  These include "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity."  *Id.* (citing *Best*, 563 F.3d at 177).  Also, that a purported expert's testimony was prepared solely for litigation may also be grounds for exclusion.  *Id.* (citing *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007)).

Where the testimony of a proffered expert is challenged for insufficient "factual basis, data, principles, methods, or their application . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [his or her] discipline." *Kumho Tire*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592).  The Court need not necessarily hold a *Daubert* hearing to determine the admissibility of

---

Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others.  Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise.  The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted.  The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded.  *See, e.g.*, American College of Trial Lawyers, Standards and Procedures for Determining the Admissibility of Expert Testimony after *Daubert*, 157 F.R.D. 571, 579 (1994) ("[W]hether the testimony concerns economic principles, accounting standards, property valuation, or other non-scientific subjects, it should be evaluated by reference to the 'knowledge and experience' of that particular field.").

Fed. R. Evid. 702 advisory committee's note (2000 amend.) (emphasis added).

expert testimony but, nonetheless, must ensure that the disputed testimony is both relevant and reliable.  *See Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000). Generally, "a trial judge . . . ha[s] considerable leeway in deciding whether particular expert testimony is reliable," *Kumho Tire*, 526 U.S. at 152; *accord Conwood*, 290 F.3d at 792; *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000), and his decision whether to admit expert testimony is reviewed for abuse of discretion, *see Kuhmo Tire*, 526 U.S. at 142; *Newell Rubbermaid*, 676 F.3d at 527; *Hardyman*, 243 F.3d at 258; *see also Tamraz v. Lincoln Electric Co.*, 620 F.3d 665, 672 (6th Cir. 2010) ("Rule 702, we recognize, does not require anything approaching absolute certainty.  And where one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line." (internal citations omitted)).

## DISCUSSION

### I.     Plaintiffs' Expert Mary Clay

Plaintiffs have identified Mary Clay, a real estate appraiser, as an expert witness. The Tosh Defendants and Howell and Davis Defendants separately move to exclude the opinions of Clay and preclude her from testifying at trial.  (Docket Nos. 357; 351, respectively.)  The Court will begin by addressing the Tosh Defendants' arguments before moving to those presented by the Howell and Davis Defendants.

### A.     Tosh Defendants' Arguments

The Tosh Defendants raise four arguments why Clay's testimony should be excluded: (1) Clay has insufficient experience with Western Kentucky real estate and

the effects of agricultural operations to testify as an expert in this matter; (2) Clay's analysis, methodology, and data are flawed and, thus, unreliable; (3) Clay's testimony is not relevant; and (4) Clay's opinion impermissibly takes "stigma" into account in calculating the diminution of value of the Plaintiffs' homes.  (*See* Docket No. 357-1.)

### 1.    Clay's experience and qualifications

The Tosh Defendants begin by arguing that Clay does not possess the necessary expertise to render an expert appraisal opinion as to real property in Western Kentucky. According to these Defendants, Clay did not satisfy the competency standards set out in the Uniform Standards of Professional Appraisal Practice (USPAP) because (1) she was unfamiliar with the relevant geographic market and with the effects had on residential real property by the construction and operation of hog barns; and (2) although Clay was assisted by Ricky Spann, a local appraiser, Spann's involvement was insufficient to cure the deficiencies in Clay's competency.

Clay's lack of familiarity or experience appraising properties in Marshall County or in Western Kentucky does not necessarily make her unqualified to offer an expert opinion, nor does it necessarily render her opinion unreliable.  The USPAP, which represents the prevailing professional standards for real property appraisal, provides: "Competency can be acquired in various ways, including, but not limited to . . . association with an appraiser reasonably believed to have the necessary knowledge and/or experience, or retention of others who possess the necessary knowledge and/or experience."  (Docket No. 401-6, at 1.)  Clay did just that by hiring Spann, a local residential real estate appraiser.  Furthermore, Clay familiarized herself

with the market by reviewing relevant data across a seven-year span between 2004 and 2011, which included more than 5,000 sales between 2006 and 2011 in the relevant Marshall County agricultural sector.  (*See* Docket No. 401-1, at 1.)

The Tosh Defendants are also critical of what they characterize as Clay's unfamiliarity with the valuation of property impacted by environmental damage— specifically, they argue she is unfamiliar with "the impacts on the value of residential real property based on odors from agricultural operations."  (Docket No. 357-1, at 9.) But the argument that Clay is unfamiliar with the effects of agricultural odors misses the point.  First of all, Clay represents herself as having "25 years' experience performing damage studies," noting that she was appointed to a committee of the Appraisal Institute that developed the first seminar on the appraisal of environmentally-contaminated property.  (Docket No. 401-1, at 1.)  But, more importantly, she expressly disclaims her process for performing a damage study based on before-and-after values as not dependent on the particular source of the harm:  "The relevant damage study is a reflection of market response, and is based on real estate market data, rather than the particular source of the harmful effects."  (Docket No. 401-1, at 2.)

Finally, the Tosh Defendants' reliance on *United States v. 12.94 Acres of Land in the Cnty. of Solano*, 2009 WL 4828749 (E.D. Cal. Dec. 9, 2009), is, at best, misplaced. Even if an unpublished decision from the Eastern District of California were somehow binding on this Court, that case is not as similar to the present one as these Defendants suggest.  The issue in *12.94 Acres* was whether an expert appraiser's testimony was admissible in a federal condemnation proceeding.  The district court held the appraiser's

testimony was not because: "He did not investigate the requirements for valuing federally-condemned property . . . . did not evaluate the differences between state and federal condemnation requirements. . . . did not seek review or input from an appraiser with relevant federal condemnation experience. . . . did not read, reference, or rely on the rules or regulations for valuing federally-condemned property. . . . [and] did not review or rely on [the Uniform Appraisal Standards for Federal Land Acquisitions] when rendering his opinions . . . ." *Id.* at *4. These considerations are inapplicable to the instant case.

To conclude, the Court is unpersuaded by the Tosh Defendants' contention that Clay's opinions must be excluded because of insufficient experience with either Western Kentucky real estate or the effects of agricultural operations. These arguments go more appropriately to the weight of Clay's testimony and are proper matters for cross-examination; they do not render Clay unqualified or her testimony unreliable.

### 2. Clay's data, analysis, and methodology

Second, the Tosh Defendants argue that Clay's analysis, methodology, and data are unreliable and, thus, must be excluded. (*See* Docket No. 357-1, at 12-27.[4]) In this regard, the Tosh Defendants challenge the admissibility of Clay's opinions on several grounds, arguing: (1) Clay "cherry-picked" data that supported the Plaintiffs' goal of maximizing damages; (2) the 1.25 mile circle employed by Clay to delineate the

---

[4] The numbering used by the Tosh Defendants for the headings in this section of their memorandum is off-kilter and confusing. Nonetheless, it appears pages 12-27 of their memorandum collectively address their challenges to Clay's data, analysis, and methodology, in spite of the inconsistent, nonsequential numbering of the various headings and subheadings in this section. (*See* Docket No. 357-1, at 12-27.)

affected area was arbitrarily drawn; (3) Clay's methodology and analysis are flawed and unreliable because the "before" or "unimpaired" values were calculated using a sales comparison approach, but the "after" or "impaired" values were calculated using various alternative approaches; and (4) the data used by Clay in reaching her conclusions is fundamentally flawed and arbitrarily selected, thus rendering her ultimate opinion unreliable.  (*See* Docket No. 357-1, at 13-27.)

In support of their first point—that Clay selectively chose data that would support the Plaintiffs' desired conclusion—the Tosh Defendants point to the sale of Lenette Bell's property at 4726 Brewers Highway, which is located one-half mile or less from the Ron Davis barns.  According to these Defendants, Clay's conclusion that the properties within one-half mile from the hog barns suffered a 50% diminution in value is disproven by the fact that the Bell property sold in two separate parcels for a total price within approximately 5% of those parcels' total unimpaired value.  The Plaintiffs refute this, arguing that the effective sale price, after seller concessions, shows an almost 11% diminution in value.  (*See* Docket No. 401, at 8-9.)  Plaintiffs further point to the sale of William Castleberry's property at 2440 Wadesboro Road as showing a diminution of approximately 23%, which confirms the accuracy of Clay's 25% diminution estimate for that property.

Regardless, the Tosh Defendants' challenge seeks, in effect, to disprove Clay's conclusions and thereby show that her methodology in reaching those conclusions must necessarily be flawed.  But the Court's role here is not to determine the correctness of Clay's opinion but instead simply whether it is based upon a reliable foundation.  *See In*

*re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-30 (6th Cir. 2008).  Therefore, this challenge goes more appropriately to the weight of Clay's testimony, which is a matter for cross-examination, and does not render her opinions unreliable.

Second, the Tosh Defendants argue that the 1.25 mile circle Clay drew to delineate the boundary for diminution in value was arbitrary and undercuts the reliability of her data.  But Clay explained that the 1.25 mile radius was based on her review of relevant sales data and the evidence she found of diminution in market values.  Ultimately, Clay's decision to draw a circle with a 1.25 mile radius is an issue for cross-examination and not a proper basis for excluding her testimony.

Third, these Defendants challenge the methodology employed by Clay in calculating the impaired values of Plaintiffs' property as "flawed and not generally accepted."  (Docket No. 367-1, at 16.)  They reason that because Spann used the sales-comparison approach to determine the unimpaired values, Clay's methodology in using several different appraisal methods to calculate the impaired values renders her opinion unreliable.  The Tosh Defendants suggest that "there is no reason that Ms. Clay could not have utilized consistent approaches with respect to the impaired 'after' value she 'calculated' for each of the Plaintiffs' real properties."  (Docket No. 357-1, at 19.)  In this regard, they compare Clay to the two other expert appraisers in this case, Spann and Waldrop, who each used the sales-comparison approach.  Additionally, they criticize Clay's use of "undocumented mental adjustments" rather than appraisal grids to document the adjustments made to each comparable sale, insisting this renders her

opinions too subjective and lacking of indicia of reliability to be admissible. (*See* Docket No. 357-1, at 21-23.)

Clay explained that she did not use the comparable sales adjustment grid method for calculating impaired values because the data set of sales in the area since the hog barns began operation was too small to determine reliable values. She further explained her use of various methods for calculating the impaired values as employing the most reliable method available in light of the available data for each property. The Tosh Defendants point to no standard that requires appraisers to use the same valuation method for determining before and after (or unimpaired and impaired) values, nor that requires appraisers to use the same method for calculating the after values of each property.

In a recent case, this Court dealt with an analogous challenge to before-and-after valuations. *See Smith v. Carbide & Chems. Corp.*, 2009 WL 5184342 (W.D. Ky. Dec. 22, 2009). In that case, in which, ironically, the Tosh Defendants' expert Waldrop testified on behalf of the plaintiff, this Court rejected a challenge to the admissibility of the expert appraiser's opinion based on his use of differing approaches to determine the unimpaired and impaired value of real property. *Id.* at *2. Instead, the Court concluded that any criticism of the expert appraiser's chosen approach "goes to the weight of [his] testimony and not admissibility," and thus "is a proper matter for cross-examination, but does not render [the expert's] opinions unreliable." *Id.* The same reasoning applies here.

The Court further concludes that the Tosh Defendants' criticism of Clay's "mental adjustments" as too subjective to be reliable is also unpersuasive.  Clay explained these mental adjustments, which related only to the sales of two properties used as comparable sales, as too minimal to necessitate a detailed grid.  That Clay discussed these adjustments and identified the criteria she used makes her expert opinion presents a wholly different scenario from that of the expert in the Northern District of New York decision relied on in the Tosh Defendants' Motion.  *Cf. Cayuga Indian Nation v. Pataki*, 83 F. Supp. 2d 318, 324-25 (N.D.N.Y. 2000) (excluding expert's testimony that was "based upon little more than his 'subjective feeling'").  Thus, this issue, again, is one properly reserved for cross-examination and does not, in the Court's view, render Clay's opinions unreliable or warrant exclusion.

Fourth and finally, the Tosh Defendants argue that Clay's opinions should be excluded because the data she used was so fundamentally flawed that her ultimate opinion is rendered unreliable.  In this regard, these Defendants take issue with Clay's use of sales data acquired from the county property valuation administrator (PVA), which they characterize as "hopelessly ambiguous."  (Docket No. 357-1, at 25.)  The Court is again unpersuaded.  The issue of Clay selecting this data is, at best, one for challenging her testimony on cross-examination; it does not sway the Court to exclude her expert opinion on the basis of reliability.

### 3.  Relevancy of Clay's testimony

The Tosh Defendants' third primary basis for excluding Clay's expert testimony is founded on their position that because her testimony is "based on unreliable data," it

is irrelevant and will not assist the trier of fact in understanding the issue at hand. (Docket No. 357-1, at 27-29.)  Though couched in terms of relevancy, this argument is essentially nothing more than a recap of these Defendants' other arguments—that Clay's opinions are unreliable, not based on sufficient facts or data, and not the product of reliable principles and methods.  For the reasons previously discussed, the Court finds this argument unpersuasive and need not address it further.

### 4.  Clay's inclusion of "stigma" in valuation

The Tosh Defendants' fourth principal challenge to Clay's expert opinions rests on her inclusion of stigma as a portion of her diminution valuation.  (*See* Docket No. 357-1, at 29-30.)  Here, they argue that "[a]ny diminution in value attributable to stigma damages must be excluded as it is not, and can never be, a fact in issue [under Kentucky law]."  (Docket No. 357-1, at 30.)  In this regard, these Defendants are correct that Kentucky law requires proof of actual injury and that mere damage to reputation—*i.e.*, stigma—does not create a right to recovery.  *Smith v. Carbide & Chems. Corp.*, 226 S.W.3d 52, 55-56 (Ky. 2007).  However, the Tosh Defendants are incorrect that stigma is not compensable.

In *Smith v. Carbide & Chems. Corp.*, the Kentucky Supreme Court, answering certified questions of Kentucky law for the Sixth Circuit, differentiated between the right to recovery and the measure of damages, holding that although mere damage to the reputation of real property does not create a right to recovery, it may nonetheless factor into the measure of damages once actual injury is established.  *Id.*  Where a plaintiff has shown actual injury to real property, "the diminution in fair market value is

a recognized measure of damages." *Id.* at 55 (emphasis omitted).  Thus, Kentucky law merely prohibits recovery for damage to the reputation of land where there has been no actual injury to the property.  *See id.* at 55-56.  It follows that stigma damages may be included in the measure of damages despite not creating a right of recovery in and of itself.  *See id.* at 55-56.  Therefore, the Court is unpersuaded by the Tosh Defendants' argument that Clay's testimony must be excluded because she the cost of stigma in calculating the measure of damages to the Plaintiffs' properties.

The Tosh Defendants conclude with a final argument that Clay's inclusion of the cost of stigma requires exclusion under Fed. R. Evid. 403 because its probative value is substantially outweighed by the danger it will confuse and mislead the jury.  (*See* Docket No. 357-1, at 30.)  The Court disagrees and finds no reason to exclude Clay's testimony on the basis that it would confuse or mislead the finder of fact.  Thus, the Court finds this argument without merit.

* * *

For these reasons, the Court finds exclusion of Mary Clay's expert testimony not warranted under Fed. R. Evid. 702 and *Daubert*.  Therefore, the Court will DENY the Tosh Defendants' Motion to Exclude.  (Docket No. 357.)

### B.   Howell and Davis Defendants' Argument

The Howell and Davis Defendants separately move to exclude Clay's expert opinions along the lines of each of these Defendants' particular hog barn operations.

**1.      Clay's opinions regarding Ron Davis's barns at 4188 Brewers Hwy.**

The Howell and Davis Defendants argue primarily that Clay's opinions on the alleged impact of Ron Davis's barns at 4188 Brewers Highway are not supported by sufficient data or a reliable methodology.  In brief, the Court finds the issues raised by these Defendants go to the weight of Clay's testimony and are proper matters for cross-examination.  In this regard, the Court's reasoning in Part I.A., *supra*, applies with equal force to the arguments presented by the Howell and Davis Defendants.  Thus, the Court is not persuaded, as these Defendants contend, that Clay's testimony unreliable.

**2.      Clay's opinions regarding Heather Davis's barns on Lela Green Rd.**

The Howell and Davis Defendants also move to exclude Clay's opinion that the barns located on Defendant Heather Davis's farm on Lela Green Road have caused a diminution in property values.  (*See* Docket No. 351, at 16-17.)  Plaintiffs have not directly addressed this challenge in their response.  (*See* Docket No. 401.)  On reviewing Clay's deposition testimony as it relates to Heather Davis's barns on Lela Green Road, the Court finds that Clay's opinion in this regard must be excluded.  In her deposition, Clay acknowledges that she did not have sufficient data to conclude that there had been a diminution in value of the properties proximate to those barns.  (Docket No. 351-6, at 23-27.)  Clay further acknowledged that any conclusion relative to the Lela Green Road barns would be based on an extrapolation of the data for Ron Davis's barns and on the "assum[ption] that -- that you would find the same situation."  (Docket No. 351-6, at 23-24.)  Accordingly, the Court concludes that Clay's opinions lack sufficient data and a reliable foundation as to a diminution in property values

relative to Heather Davis's barns on Lela Green Road.  Thus, Clay's expert opinion in this regard cannot pass muster under Fed. R. Evid. 702 and must be excluded.

### 3. Clay's opinions regarding Eric Howell's barns on Wilkins Rd.

Finally, the Howell and Davis Defendants move to exclude Clay's opinions as to Defendant Eric Howell's barns located on Wilkins Road.  (*See* Docket No. 351, at 17.) They argue that during her deposition, Clay never mentioned having any knowledge of the existence or location of Eric Howell's barns, and that Clay has no data as to any diminution in property value in connection with those barns.  Plaintiffs concede that "Clay has not disclosed any opinions relating to Mr. Howell's barn."   (Docket No. 401, at 24.)  The Court thus finds this issue is moot.  However, although Clay is precluded from testifying as to any diminution in value relative to Eric Howell's barns on Wilkins Road, the Court finds no reason to preclude Clay from testifying as to her disclosed opinions regarding the impact of manure injections on property values generally.

* * *

For these reasons, the Howell and Davis Defendants' Motion to Exclude, (Docket No. 351), will be GRANTED IN PART and DENIED IN PART consistent with the Court's conclusions above.

## II.    Plaintiffs' Expert Rickie Spann

Plaintiffs have also identified Rickie Spann, another professional property appraiser, as an expert witness.  The Tosh Defendants, joined by the Howell and Davis Defendants, move to exclude the opinions of Spann and preclude him from testifying at trial.  (Docket Nos. 349 & 402.)  Defendants do not challenge Spann's qualifications or

the reliability of the valuation method he employed, and the Court finds no reason to question the admissibility of Spann's expert opinions on these grounds.   Instead, Defendants argue that Spann's opinions should be excluded because his work was limited to the before or unimpaired values of the Plaintiffs' property and, thus, he could not testify as to any diminution in value.  Because Spann's opinions do not relate to the after or impaired value, Defendants argue his opinions would be unhelpful to the trier of fact and should be excluded.

Certainly, the measure of damages for trespass or permanent nuisance is the diminution in the value of the property measured as the difference between the fair market value before and after the injury to the property occurs.  *See, e.g.*, *Smith*, 226 S.W.3d at 55-56; *Ellison v. R&B Contracting, Inc.*, 32 S.W.3d 66, 69 & n.1 (Ky. 2000). Because Spann conducted appraisals of the Plaintiffs' properties to determine their before value, the Court finds his testimony will assist the trier of fact in calculating damages based on the Kentucky formula.  That Spann's opinions relate only to the before value does not render them irrelevant.  Moreover, Plaintiffs disclaim that Spann will testify as to either the after value or the diminution in value.  (Docket No. 404, at 2, 4.)  Thus, the Court is unpersuaded that Spann's expert opinions should be excluded on grounds of relevancy.

The Defendants other criticisms, presented only in passing, similarly ring hollow.  Whether Spann "has little to no experience dealing with the negative impacts of residential property values based on their proximity to animal feeding operations," as Defendants suggest, is immaterial.   Defendants concede "Spann has experience

appraising homes in the Benton area," which relates precisely to his expert opinion as a professional appraiser in performing valuations of the unimpaired values. (Docket No. 349-1, at 6.)   Thus, because Spann calculated only the unimpaired values and the subject of his proffered testimony is limited to those values, his experience "dealing with the negative impacts of residential property values based on their proximity to animal feeding operations" is beside the point, given that the unimpaired value is necessarily unaffected by such operations.

Accordingly, the Court finds no reason to exclude the proposed expert testimony of Spann as to the unimpaired values of the Plaintiffs' properties and will DENY the Defendants' respective Motions to Exclude.  (Docket Nos. 349; 402.)

**III.    Defendants' Expert Thomas Waldrop**

Defendants have identified Thomas Waldrop, a professional appraiser, as an expert witness.   Plaintiffs do not challenge Waldrop's general qualifications as an appraiser of real property; rather, Plaintiffs assert that Waldrop's opinions are not based on sufficient facts or data and are not the product of reliable principles and methods. (Docket Nos. 350, at 1; 350-1, at 4.)   Additionally, Plaintiffs challenge Waldrop's qualifications as an odor expert and as an expert on the construction and operation of hog barns.  (Docket Nos. 350, at 1; 350-1, at 4.)

**A.      Challenges to Waldrop's Appraisal Data, Analysis, and Methodology**

Plaintiffs challenge Waldrop's conclusions as not supported by sufficient facts or data, not reproducible, and unreliable.

To begin, Plaintiffs criticize Waldrop's analysis as based "on an arbitrarily chosen area of land," insisting that his data was insufficient to determine a change in the value of the Plaintiffs' properties.  (Docket No. 350-1, at 5.)  To this end, Plaintiffs argue that Waldrop's "sample area included very few properties outside of the known odor-affected area."  (Docket No. 350-1, at 5.)  But Plaintiffs base this "known area" on the conclusions reached by their own experts Mary Clay and Eric Winegar.  (*See* Docket No. 350-1, at 5.)  At his deposition, Waldrop explained what facts and data he was relying upon in forming his opinion.  He testified that he chose a roughly 3- by 3-mile area surrounding the Ron Davis farm in order to have enough "touches," meaning individual property listings or transactions, in order to conduct his analysis.  Furthermore, he explained objectively why he chose that sample area and how he selected his "touches."

Upon review, the Court is unpersuaded by Plaintiffs' criticism of Waldrop's data gathering as subjective and arbitrary.   Plaintiffs' experts' differing opinions as to the appropriate data set are irrelevant to the admissibility of Waldrop's testimony and cannot serve as a proper basis for excluding his opinions as based on insufficient facts or data.   Waldrop's decision not to expand his assessment or include additional properties goes to the weight of Waldrop's testimony, which is a matter for cross-examination, and not to its admissibility.  *See Hancock v. Island Creek Coal Co.*, 2009 WL 973371, at *4 (W.D. Ky. Apr. 10, 2009) (finding expert's decision to survey only 2.66 acres of the plaintiff's property rather than the entire 25 acres went to the weight of his testimony and not its admissibility).

Plaintiffs next argue that Waldrop's opinions are not based upon a reliable method.  (Docket No. 350-1, at 7.)  In this regard, Plaintiffs criticize Waldrop's opinions as (1) not "consider[ing] any property for comparison outside the area which Plaintiffs' experts have already identified that there was an adverse impact in property values," and (2) making no hypothetical evaluations as to what the property values would have been had the hog barns not been present.  (Docket No. 350-1, at 8.)  As to Plaintiffs' first contention, again, the area identified by Plaintiffs' experts is immaterial to the reliability of Waldrop's methodology and the admissibility of his opinion.

Plaintiffs' second challenge to Waldrop's method faults him for making no hypothetical evaluations of what the property values would be in the absence of the hog barns and, thus, "ha[ving] no basis to determine whether there had been an effect on property values."  (Docket No. 350-1, at 8.)  Waldrop, however, directly refutes this assertion in his sworn affidavit, which Defendants included as an exhibit in responding to Plaintiffs' instant Motion:

> In determining the unimpaired values for each of the 17 properties owned by the Plaintiffs, I utilized the sales comparison approach to determine their value.  My unimpaired analysis was based on the hypothetical assumption that hog barns had not been constructed in the vicinity of the subject properties.

(Docket No. 408-4, at 1.)

Plaintiffs further challenge Waldrop as unable to state the basis of his conclusion that the hog barns had no effect on the Plaintiffs' property values.  Here, they maintain Waldrop has been unable "to articulate any principle or method he relied on."  (Docket No. 350-1, at 10.)  Again, Waldrop has refuted this challenge.  In his affidavit, Waldrop

explains he could not use any of "the three traditional approaches to valuation (cost, income and direct sales comparison)" because of the nature of the 17 properties and insufficient data.[5]  (Docket No. 408-4, at 2.)  He goes on to explain the alternative approach he utilized, which he describes as "analysis of market conditions"; how he identified and acquired his data for this approach; what his review entailed; and the method he used to develop his opinion that there was no measurable impact on the Plaintiffs' property values since the construction of the Ron Davis hog barns.  (Docket No. 408-4, at 2-4.)

Plaintiffs take issue with Waldrop's affidavit, implicitly characterizing it as little more than an after-the-fact exposition on a methodology (or lack thereof, they argue) that he could not sufficiently explain despite being "deposed at great length in this case, over a period of two days."  (Docket No. 429, at 5.)  Whether Plaintiffs' insinuations are correct, it is not the Court's role at this juncture to evaluate the credibility of Waldrop's statements or the correctness of his conclusions.  *See In re Scrap Metal*, 527 F.3d at 529-30.  Instead, the Court must simply determine whether Waldrop's opinions are based on sufficient data and reliable methods, reliably applied.

The Court is satisfied that Waldrop's proposed testimony has a reliable basis in his knowledge and experience as a professional appraiser of real property.  *See Kumho Tire*, 526 U.S. at 149.  A number of courts within and without this Circuit have recognized, in various contexts, "that real estate appraisal is not an exact science and

---

[5] Plaintiffs concede this point: "In his affidavit, Waldrop states only that he could not use the sales comparison approach to determine impaired values, because there were no sufficient sales.  That is not disputed."  (Docket No. 429, at 4-5 (citation omitted).)

that considerable judgment on the part of the individual appraiser enters the evaluation process." *U.S. ex rel. Tenn. Valley Auth. v. Easements & Rights-of-Way over a Total of 3.92 Acres of Land, More or Less, in Greene Cnty., Tenn.*, 2010 WL 3861053, at *6 (E.D. Tenn. Sept. 24, 2010); *see also Nat'l R.R. Passenger Corp. v. Certain Temporary Easements Above the R.R. Right of Way in Providence, R.I.*, 357 F.3d 36, 39 (1st Cir. 2004) ("Determining the value of real estate is not a science . . . ."); *Portland Natural Gas Transmission Sys. v. 19.2 Acres of Land*, 318 F.3d 279, 281 (1st Cir. 2003) (same). Waldrop's methodology might not be beyond question, but as the Supreme Court advised in *Daubert*: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

> **B.      Challenges to Waldrop's Opinions Regarding the Construction and Operation of Hog Barns, and to the Dispersion of Odors**

Plaintiffs argue that because Waldrop did not disclose his opinions as to whether the hog barns were lawfully constructed and operated in his expert report as required by Fed. R. Civ. P. 26(a)(2)(B)(i), he should be precluded from testifying on those areas. (*See* Docket No. 350-1, at 11-13.)   Plaintiffs further argue that even if Waldrop's opinions in those areas had been properly disclosed, Waldrop is not qualified to testify as an expert in either the construction or operation of hog barns.  (Docket No. 350-1, at 11.)   Defendants, in their joint response, concede that Waldrop is not offered "as an expert in the area of swine barn construction."  (Docket No. 408, at 19.)

The Court agrees with Plaintiffs' contentions in this regard. Waldrop's Rule 26 expert report did not disclose a statement that he would opine as to the lawful construction and/or operation of the hog barns here. (*See* Docket No. 350-2.) But even if he had disclosed such opinions, the Court's review of Waldop's deposition testimony leaves no doubt that Waldrop, as a professional appraiser, lacks the requisite scientific, technical, or specialized knowledge to opine on these areas, and also that Waldrop lacks a reliable foundation for such opinions. Accordingly, Waldrop's opinions as to whether the hog barns at issue were lawfully constructed and/or lawfully operated must be excluded.

**C.     Challenges to Waldrop's Opinions Regarding the Creation, Perception, and Dispersion of Odors**

Finally, Plaintiffs challenge Waldrop as unqualified to opine on the creation, dispersion, or perception of odor, as well as for lacking a reliable data or methods to form such opinions. (Docket No. 350-1, at 14.) Waldrop acknowledged in his deposition that he is not an expert on the creation, perception, or dispersion of odor, and that he did not intend to opine on those areas. He also acknowledged not knowing the source of the odor information he received. Again, this much is effectively conceded by Defendants in their joint response. (Docket No. 408, at 19 ("The Defendants do not offer Mr. Waldrop as an expert in the area of . . . odor monitoring.").) Accordingly, the Court finds any expert opinions by Waldrop as to the creation, perception, or dispersion of odors properly excludable under Fed. R. Evid. 702.

* * *

For these reasons, Plaintiffs' Motion to Exclude, (Docket No. 350), will be GRANTED IN PART and DENIED IN PART consistent with the Court's conclusions above.

## IV.   Plaintiffs' Expert Neil Webster

Plaintiffs have identified Neil Webster as an expert witness "assisting in presentation of Tom Card's testimony as local engineer."[6]  Webster possesses bachelor's and master's degrees in civil engineering and has worked in wastewater treatment for over thirty years.  (*See* Docket No. 412, at 1.)  Webster bases much of his report on comparisons to some of the municipal wastewater facilities on which his professional work primarily focuses.  (Docket No. 341-3, at 3-4.)  Webster's expert report concludes that the design used for the Ron Davis barns does not control odor emissions, opining, "in fact the design could be described as an optimum odor generator."  (Docket No. 341-3, at 2.)  Webster proposes "[t]here are and were many state-of-the art methods of controlling odors from swine operations," suggesting one such method "is to capture and exhaust air from the manure pits to a biofilter odor control system for each barn."  (Docket No. 341-3, at 2.)  He goes on to state that "[t]here are and were many options available to control odors at the source (the barns) and prevent odors from dispersing in the atmosphere," and references the University of Kentucky Swine Research Facility's above-ground storage tanks as one such option.  (Docket No. 341-3, at 5.)

---

[6] The Tosh Defendants identify their Exhibit 1, Docket No. 341-2, for this statement; however, that exhibit omits Plaintiffs' expert disclosure relative to Webster and refers only to Plaintiffs' expert Eric Winegar.  Regardless, Plaintiffs' full expert disclosure does appear in the record at Docket No. 381-2.

The Tosh Defendants and Howell and Davis Defendants separately move to exclude Webster's expert opinions.  (Docket Nos., 341 & 345, respectively.)  The crux of the Defendants' collective arguments is that Webster lacks the requisite qualifications and expertise to render an expert opinion in this matter and, therefore, must be excluded under *Daubert* and its progeny.  Because the several Defendant groups' arguments are similar enough in this regard, the Court need not address them separately.

### A.     Webster's Qualifications

Webster's *curriculum vitae* indicates that his primary area of expertise is "in the operation and design of wastewater treatment facilities," and represents him as an "expert in odor and corrosion control for wastewater collection and treatment systems." (Docket No. 341-4, at 1.)  Defendants[7] take issue with the fact that Webster has never worked on a project relating to a hog farm and has no specialized knowledge regarding odor control at a swine facility.  (*See* Docket No. 341-1, at 5.)  Defendants further challenge Webster as having: "an utter lack of knowledge and understanding concerning the general operation of any swine facility or even a specific knowledge of the operation of the facility at issue.  Webster has never designed any system to store, manage or treat swine manure and is not aware of the regulations concerning facilities of that type." (Docket No. 341-1, at 6.)    Additionally, they criticize Webster's reliance on an anonymously authored industry publication, the *National Hog Farmer*, rather than a peer-reviewed academic journal or official government study.  (*See* Docket No. 341-1, at 6-7.)

---

[7] Because the Court will address the Tosh Defendants and Howell and Davis Defendants' arguments collectively in this Part, the Court will refer to the two defendant groups collectively in this discussion as "Defendants."

Plaintiffs concede that Webster has a "lack of direct experience with swine facilities." (Docket No. 412, at 4.) Still, Plaintiffs insist Webster should be permitted to testify because "where the Defendants' experts have not designed an effective odor control fro [sic] the Ron Davis barns, it will be helpful to the jury to consider the experience of Mr. Webster and his suggestions concerning odor treatment from businesses and activities that generate highly offensive odors." (Docket No. 412, at 4.)

Rule 702 requires that an expert have "scientific, technical, or other specialized knowledge." The Sixth Circuit instructs that "[e]xperts are permitted wide latitude in their opinions, including those not based on firsthand knowledge, so long as 'the expert's opinion [has] a reliable basis in the knowledge and experience of the discipline.'" *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) (second alteration in original) (quoting *Daubert*, 509 U.S. at 592). Still, the "liberal interpretation of this requirement does not mean that a witness is an expert simply because he claims to be." *Price v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (citations and internal quotation marks omitted). The Court's role is to examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997); *Berry v. City of Detroit*, 25 F.3d 1343, 1351 (6th Cir. 1994).

This Court recently dealt with an analogous challenge to an expert's qualifications in *Faulkner v. ABB Inc.*, 2012 WL 443757 (W.D. Ky. Feb. 10, 2012). The proposed expert in *Faulkner* had extensive degrees in chemistry and air pollution, and

was certified as an Industrial Hygienist.  His work and publication focused primarily on protective equipment and respiratory protection.  *Id.* at *3.  This Court framed the issue of admissibility as "whether or not these qualifications provide a foundation for [the expert] to answer the specific question of whether the product supplied . . . was a defective product unreasonably dangerous."  *Id.*  Recognizing the expert's "extensive education and expertise" in the "area of workplace safety and to some extent, the hazards of nitrogen in confined spaces," the Court nonetheless concluded that he lacked the requisite "education, training, or experience with the specific product that is at issue here: an instrument air system, backed up with nitrogen, utilized in an analyzer building."  *Id.* at *4.  The Court further found cause for concern in the expert's limited knowledge of relevant industry standards and practices, as well as his having no experience with designing the specific products at issue.  *Id.* at *4-5.

The Court has similar concerns here.  Although Webster appears to have extensive experience with municipal wastewater treatment, that experience does not necessarily provide a foundation for him to answer the specific questions at issue in this case.  Webster has never worked on a swine barn project.  He has no knowledge of how swine barns generally, let alone the particular barns here, actually operate.  He even acknowledged the "unusual part" of his work on this case was the presence of live animals.  (*See* Docket No. 341-8, at 20-21.)  He has never designed a system to store, manage, or treat swine manure.  He has no knowledge of the regulations applicable to swine facilities, either generally or specifically in relation to the facilities here.  He has never designed or worked on the construction of a swine facility, nor has he designed any type of waste management system for a swine facility.

Additionally, this Circuit "has recognized for some time that expert testimony prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work, should be viewed with some caution." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007) (citing *Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1352 (6th Cir. 1992)); *see also Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 252 (6th Cir. 2000) (noting that an appropriate factor to consider is whether the "[expert's] study was conducted and the expert's opinions were formed for purposes of litigation"). Plaintiffs state that Webster "was requested to bring his experience solving odor problems from other sources to apply to these swine facilities." (Docket No. 412, at 2.) A review of Webster's *curriculum vita* confirms that his work, while extensive, is almost entirely limited to the context of municipal wastewater treatment. Thus, it is clear to the Court that Webster's testimony was prepared solely for purposes of this litigation and that his opinions in this matter do not necessarily flow naturally from his scientific research and technical work on municipal wastewater facilities.

In sum, Webster has no experience with waste or odor management relative to the specific type of facilities at issue in this litigation; he has no experience designing waste or odor control systems for these types of facilities; he has no knowledge of the operation of this type of facility or of the regulations and standards applicable to it; and his opinions here have been prepared solely for the purposes of litigation, as opposed to flowing naturally from the work he has performed during his career. Therefore, without concluding that Webster is not qualified to offer his expert opinions in this matter, the Court nonetheless has serious doubt whether his qualifications and experience provide

an adequate foundation upon which he could answer the specific questions regarding the facilities at issue here.  While the Court doubts Webster is properly qualified, his opinions suffer other deficiencies.

**B.      Webster's Testimony Regarding the University of Kentucky Swine Facility**

Defendants move to exclude any testimony by Webster regarding the University of Kentucky College of Agriculture's Swine Research Facility in Woodford County, Kentucky.  Webster refers to this facility in a single paragraph in his expert report under the heading "What could have been done to prevent odors."  (Docket No. 341-3, at 5.) There, he states: "The University of Kentucky, College of Agriculture, has been experimenting with and testing odor control from swine operations for years.  In fact, at their Swine Research Facilities they have barns where the hog waste is removed frequently and is pumped to above ground, covered storage tanks."  (Docket No. 341-3, at 5.)

Defendants argue that any testimony regarding the U.K. facility should be excluded because Webster identifies no source or basis for this information and has admitted in his deposition that he has never visited this facility or conducted any air emission testing in the area of this facility.  (Docket No. 341-1, at 11.)  In response, Plaintiffs merely state that Defendants' objection is misplaced because Webster references this facility only "to prove that one possible waste handling design that could have been considered is a closed tank facility like the UK facility."  (Docket No. 412, at 6.)  After reviewing Webster's deposition testimony, the Court agrees that any testimony by Webster regarding the U.K. facility is properly excludable because he has no

personal knowledge of that facility's operation or its methods, and has identified no basis for his assertions relative to that facility.

### C.    Webster's Testimony Regarding Alternative Methods to Control Odors

Defendants also move to exclude Webster's opinions regarding alternative methods to control odors.  In his expert report, Webster provides four bulleted points, which he introduces as "The best available methods for odor control for swine operations at the time of [the Ron Davis's barns'] design."  (Docket No. 341-3, at 7.) Here he suggests the following alternatives:

- Frequent removal of manure and urine with scrapers or water is required to prevent uncontrolled anaerobic decomposition
- Storage of manure on-site in covered lagoons or covered tanks would minimize odors
- Anaerobic digesters could have been used to generate energy and to control odors
- Biofilters to treat odors from covered manure storage areas are an effective odor control technology

(Docket No. 341-3, at 7.)   In regard to the fourth alternative, Webster spends approximately a page and a half in his report explaining how biofilters retrofitted to the Tosh barns "could be evaluated as an alternative."  (Docket No. 341-3, at 7-9.)  He includes a half-dozen citations in this section, all to the *National Hog Farmer*, to state that "Biofilters have been used in swine operations" and "Many facilities use biofilters for treating hog barn odors, as an established gas phase odor control method."  (Docket No. 341-3, at 7 (citations omitted).)

Defendants challenge each of Webster's four suggested alternatives on grounds that they are not the product of reliable principles and methods that have been reliably applied to this case.  According to Defendants, Webster's deposition testimony shows he is wholly unfamiliar with the alternatives he proposes.  Moreover, they challenge the reliability of his opinions given that "he has never designed any of his suggested alternative methods for a swine facility nor has he personally observed any other deep pit barns utilizing such methods for manure."  (Docket No. 341-1, at 15.)  Plaintiffs respond, rather summarily, staking their argument for the reliability of Webster's opinions entirely on his qualifications: "Mr. Webster has thirty years' experience solving odor problems that he considers, in many respects, similar to the swine barns.. [sic]" (Docket No. 412, at 8.)

The Court has substantial concern whether Webster's opinions regarding his proposed alternatives are the product of reliable principles and methods that he has reliably applied to the facts of this case.  Webster does not address how these methods could have been incorporated into the Ron Davis barns either at the time they were constructed or today.  (*See* Docket No. 341-8, at 10-11.)  When questioned about his proposed alternatives of scrapers and covered tanks or lagoons, Webster could not identify how many, or even if any, other swine operations in the country used such methods.  (*See* Docket No. 341-8, at 4-5, 10-11.)  He performed no calculations or analysis as to his first recommendation, scrapers, nor did he perform any calculation as to the cost or size necessary in regard to his second recommendation, covered tanks or covered lagoons.  (*See* Docket No. 341-8, at 14-15.)  He has no knowledge whether the anaerobic digesters he suggests at bullet point three are actually in use in swine

facilities, nor did he perform any calculation or analysis regarding the installation of these digesters.  (*See* Docket No. 341-8, at 15-16.)  In fact, he conceded that Ron Davis's barns were probably no different than any other deep pit commercial barns in the United States.  (Docket No. 341-8, at 5.)

Upon reviewing Webster's expert report and deposition testimony, the Court can neither conclude that Webster's opinions regarding his first three proposed alternatives are the product of reliable principles and methods, reliably applied to the facts of this case, nor that he has a reliable basis in his professional knowledge and experience to offer such opinions.  Accordingly, the Court finds that Webster's proposed expert opinions and testimony as to his suggested alternative solutions of scrapers, covered tanks and/or lagoons, and anaerobic digesters must be excluded.

Lastly, Defendants challenge Webster's fourth suggested alternative: biofilters. Despite asserting that "[b]iofilters have been used in swine operations" and that "[m]any facilities use biofilters for treating hog barn odors, as an established gas phase odor control method," Webster cites no basis for these statements other than a nonacademic, non-peer reviewed swine-industry publication, the *National Hog Farmer*. (Docket No. 341-3, at 7 (citations omitted).)  Aside from preparing what he describes as a "preliminary conceptual design of a biofilter," Webster admitted having never designed a biofilter for this type or facility or application before.  (Docket No. 341-8, at 10-11.)  In fact, he has never seen such a method used by a swine facility nor could he identify any such facility using such a biofilter.   He also admitted having not reviewed the relevant Kentucky regulations dealing with commercial swine operations.  (Docket

No. 341-8, at 11-12.)  As Defendants point out, "the biofilters advocated by Webster are designed for the treatment process associated with sewer systems, the wastewater treatment processes, pump stations, sludge thickening, and sludge dewatering—not agricultural facilities in which live animals must live and where the manure byproducts have significant commercial value to farmers."  (Docket No. 341-1, at 9.)

Ultimately, Webster's questionable qualifications in this area do little to shore up the questionable reliability of his proposed expert testimony.  Thus, the Court finds that Webster's proposed testimony regarding biofilters must also be excluded.

### D.      Webster's Testimony Concerning Odor Measurements

Defendants' final challenge to Webster focuses on the odor measurements Webster recorded using the Nasal Ranger olfactometer.  Upon review, the Court cannot conclude that Webster's olfactometer measurements are not the product of reliable principles or methods, reliably applied.  Instead, the Court finds Defendants' objections to Webster's measurements and his use of those measurements go more appropriately to the weight of his testimony rather than its admissibility.  Thus, the Court finds no reason to exclude Webster's testimony concerning odor measurements.

* * *

In conclusion, the Court will GRANT IN PART and DENY IN PART Defendants' motions to exclude Webster's expert testimony.  (Docket No. 341 & 345.)  Webster may testify regarding the olfactometer measurements he recorded.  However, Webster is precluded from expressing an expert opinion regarding his proposed alternative methods to control odors, including the application of his proposed biofilter,

and is also precluded from testifying in regard to the University of Kentucky Swine Facility.

## V.     Plaintiffs' Expert Thomas Card

Plaintiffs have identified engineer Thomas Card as an expert witness "retained to give expert opinion about the widespread knowledge within the environmental engineering community that large scale swine operations generally—and deep pit/funnel fan facilities in particular—can be expected to create offensive odor problems; that unless the proposed facility is prudently located at sufficient distance from other people, or with odor control equipment and processes, nuisance odors can be expected," and "to examine the plans for the Ron Davis barns and Dr. Winegar's first report and express his opinion about the prudence of this location and the presence or absence [of] effective odor control equipment or technology at these barns."  (Docket No. 411, at 2.)  The Tosh Defendants and Howell and Davis Defendants each move to exclude Card's opinions and testimony on separate but overlapping grounds.  (Docket Nos. 342-1; 346.)  The Court will first address the Tosh Defendants' challenges before moving on to those raised by the Howell and Davis Defendants.

### A.     Tosh Defendants' Arguments

The Tosh Defendants raise essentially two arguments why Card's testimony must be excluded.  First, these Defendants insist that "Card's opinions with respect to Defendants' intent in the design and operation of the swine facilities lacks [sic] proper scientific or evidentiary support and are based solely on impermissible speculation."  (Docket No. 342-1, at 2.)   Second, they argue that "[t]he only 'scientific' work

completed by Card was for his opinion on the 'anticipated odor impact' of the swine facility at issue," and "[i]n forming this opinion . . . Card relied on a model he located on the internet—a model that that [sic] he failed to use correctly and whose creators acknowledge has a mere 32% success rate at accurately predicting odors." (Docket No. 342-1, at 2.)

### 1.    Card's opinions regarding the Defendants' intent

The Tosh Defendants begin by challenging Card's opinions as to the "intent" of Jimmy Tosh and/or the other Defendants in this litigation. (Docket No. 342-1, at 5-7.) In his initial report dated January 5, 2011, Card proposed to answer a series of specific questions under the heading "Specific Issues Regarding this Site." (Docket No. 411-2, at 3.) Card begins that section, stating: "The following paragraphs address some specific questions *as to the intent* of the livestock integrator." (Docket No. 411-2, at 3 (emphasis added).) He goes on to reach the following conclusions:

> 1. *Did the livestock integrator anticipate severe odors from this facility?*
>
> Based on the amount of data and information available I would find that it would be impossible that integrator was not aware of odor problems associated with large scale hog production. Therefore, I can conclude that the livestock integrator was aware of the potentially severe odor problems caused by large scale hog production.
>
> 2. *Does the facility planning, design, and construction reflect a concern as to the production and transport of odor?*
>
> Based on my experience, this particular configuration of barn (long term open storage of manure) produces the highest level of odor of any hog containment/management system. In addition, there are no apparent methods currently available at the facility to mitigate odors at the facility. Therefore, I can conclude that the lack of attention to

managing odors to reduce the impact to the neighbors during the planning, design, and construction of the facility was part of the original design intent of the integrator.

. . . .

> 4.  *Was the integrator aware of strategies to develop facilities that would not have a negative impact on the facilities['] neighbors?*

I am confident that the integrator is aware of the strategies that have been implemented by other facilities that successfully manage the impact to their neighbors and in addition, is aware of the reasons that they do not impact their neighbors.

Therefore, I am concluding that the livestock integrator chose to develop this facility with the full awareness that this facility would likely have a severe negative impact on the facility neighbors. As further evidence, I am anticipating that the business model that the integrator has chosen to utilize, was chosen, at least in part, to protect him from the expected negative consequences of placing these facilities at locations that can severely impact the facility neighbors both from a quality of life and monetary standpoint.

In addition, the placement and design of the barn system at the Ron Davis farm is defective because its construction and operation knowingly put the property neighbors at risk to significant reduction to both quality of life and material wealth.

(Docket No. 411-2, at 3-4.)  According to these Defendants, Card's opinions regarding their intent and state of mind fail *Daubert*'s standard because they are not relevant, will not assist the trier of fact, and are prejudicial.  (Docket No. 342-1, at 6.)  Plaintiffs offhandedly respond to these challenges with a lengthy recitation of Card's qualifications before stating: "It is not clear that the Defendants are challenging the qualifications of Mr. Card to testify.  However, the Tosh Defendants complain that Mr. Card's testimony is based upon speculation at DN-342-1, page 5 . . . . Mr. Card has responded to these criticisms by the Defendants in his declaration, attached as Exhibit

5." (Docket No. 411, at 6.)   Plaintiffs make no further argument in this regard, apparently content to refer the Court to Card's declaration, which they attached in response to Defendants' motion to exclude.

In his declaration, Card responds to "Section B" of the Tosh Defendants' motion (the section in which the Tosh Defendants challenge Card's testimony regarding a party's intent as inadmissible speculation), by stating, in full:

> Section B.  Party's Intent
>
> The [Tosh Defendants'] motion mischaracterizes my opinion. My opinion is that odor impacts are a [sic] well known and historically significant for concentrated hog farming operations. Any large hog business, such as that owned by Jimmy Tosh, would certainly be aware of the known odor impacts of his type of operations.

(Docket No. 411-5, at 1.)

This Court has held that "[a] party's state of mind . . . is not within the knowledge of any expert." *Johnson v. Baker*, 2009 WL 3486000, at *5 (W.D. Ky. Oct. 23, 2009) (Russell, C.J.) (citing *Woodhull v. Cnty. of Kent*, 2006 WL 2228986, at *6 (W.D. Mich. Aug. 3, 2006); *United States v. Libby*, 461 F. Supp. 2d 3, 7 (D.D.C. 2006)). As the Court previously recognized, "Various courts have excluded expert testimony on issues relating to state of mind in civil cases." *Id.* (citing *Halcomb v. Washington Metro. Area Transit Auth.*, 526 F. Supp. 2d 24 (D.D.C. 2007); *Woodhull*, 2006 WL 2228986, at *6; *Meals v. City of Memphis*, 2005 WL 5988642, at *2 (W.D. Tenn. Feb. 10, 2005)); *accord CMI-Trading, Inc. v. Quantum Air, Inc.*, 98 F.3d 887, 890 (6th Cir. 1996) ("[An expert's] opinion regarding whether the parties *intended* to enter a [contractual]

relationship was not admissible.  The intent of the parties is an issue within the competence of the jury and expert opinion testimony will not assist the jury, within the meaning of Federal Rule of Evidence 701 . . . ."), *abrogated on other grounds by Morales v. Am. Honda Motor Co.*, 151 F.3d 500 (6th Cir. 1998).

Card's conclusions as to Defendants' awareness, intent, choices, and knowledge are, quite plainly, state-of-mind opinions.  Card's declaration does little to alter that characterization and, in fact, reinforces it.  Based on the facts available, Card could not know that the Defendants were "aware of a potentially severe odor problem," "aware of the strategies that have been implemented by other facilities," or "aware of the reasons [other facilities] do not impact their neighbors."  (*See* Docket No. 411-2, at 3-4.)  He could not know what the "original design intent" in constructing their facilities was, that Defendants "chose to develop this facility with the full awareness that this facility would likely have a severe negative impact on the facility neighbors," or that Defendants' business model "was chosen, at least in part, to protect [them] from the expected negative consequences of placing these facilities in locations that can severely impact the facility neighbors."  (*See* Docket No. 411-2, at 4.)  Finally, Card could not know whether the Defendants "knowingly put the property neighbors at risk."  (*See* Docket No. 411-2, at 4.)  Thus, the Court agrees that this testimony amounts to impermissible speculation.  Additionally, the Court believes that the potential prejudice of these statements outweighs the necessity of their inclusion to make Card's testimony comprehensible.  Therefore, Card's opinions concerning state of mind are inadmissible and must be excluded.

2.      **Reliability of Card's proposed testimony and his use of the Minnesota OFFSET model**

The Tosh Defendants also move to exclude Card's testimony as lacking a proper scientific or evidentiary basis, and because the conclusions he reached are based on an unreliable estimation model that he incorrectly used.  Because the Tosh Defendants present a number of challenges to Card's opinions in this regard, the Court will further divide its discussion into (a) challenges to Card's testimony as lacking a reliable basis, and (b) challenges to Card's use of the Minnesota OFFSET model.

a.      **Challenges to Card's testimony as unreliable**

The Tosh Defendants challenge a number of Card's opinions as lacking a reliable basis in either scientific or experiential evidence.

First, they take issue with the following conclusion: "Based on my experience, this particular configuration of barn (long term open storage of manure) produces the highest level of odor of any hog containment/management system."  (Docket No. 342-1, at 7 (referencing Docket No. 411-2, at 3).)  These Defendants reason that when asked in his deposition about the basis for his opinion concerning the barn configuration, Card could reference only nonspecific conversations with unnamed individuals at conferences.  Plaintiffs do not directly respond to this challenge in their response; however, Card does answer these criticisms in his declaration, explaining that his opinion "was based both on anecdotal evidence of the industry and that in the

Minnesota Extension Offset Methodology, deep pit hog barns have the highest odor rating of all swine finishing animal confinement structures."[8]   (Docket No. 411-5, at 1.)

The Sixth Circuit, in a decision just last year, warned that "reliance on anecdotal evidence" was a "red flag" that cautioned against certifying an expert.   *Newell Rubbermaid*, 676 F.3d at 527 (6th Cir. 2012) (citing *Best*, 563 F.3d at 177); *see also Istvan v. Honda Motor Co.*, 455 F. App'x 568, 572 (6th Cir. 2011) (holding that anecdotal support was "plainly not befitting of an expert's opinion").   Thus the Court has serious concerns with the reliability of expert testimony that the expert himself expressly describes as "based . . . on anecdotal evidence."   (*See* Docket No. 411-5, at 1.)   Furthermore, two of the specific factors set forth in *Daubert* were whether a method or technique enjoys "general acceptance" in the "relevant scientific community" and whether it has a "known or potential rate of error."   509 U.S. at 593-94.   As will be discussed more fully *infra* Part V.A.2.b, the Court cannot conclude that the Minnesota OFFSET model, which has a published 32% probability of correctly predicting odor intensity and whose own creators do not advocate for it becoming an industry standard in its current form, forms a sufficiently reliable basis for Card's opinion that "this particular configuration of barn (long term open storage of manure) produces the highest level of odor of any hog containment/management system."   Card's general industry experience and having grown up on a cattle ranch do not alleviate these shortcomings in the reliability of his expressed opinion.   Therefore, because this opinion

---

[8] The Court notes that although Card cited conversations with professionals from various states in his deposition, he apparently, and perhaps inconsistently, recharacterizes his basis for this knowledge as "anecdotal evidence of the industry" in his declaration.

lacks a reliable foundation, it does not satisfy the requirements of Fed. R. Evid. 702 and *Daubert* and, thus, must be excluded.

Second, the Tosh Defendants challenge Card's statement that:

> There are ways to mitigate the odors, both in design and operation. These include:
>
> 1. Capturing and venting the odors to an odor control device,
> 2. Removing the manure within 24 hours, and/or
> 3. Storing and treating the manure in an enclosed anaerobic lagoon.
>
> All three of these strategies have been successfully used at least at some other large scale hog farms.

(Docket No. 342-1, at 8 (referencing Docket No. 411-2, at 3).)   These Defendants state that "Card does not address how to implement the alternatives, the commercial viability of such designs or the costs associated with implementation," arguing Card's deposition testimony shows that "he did not conduct any independent cost calculations and relied on water treatment expert Neil Webster to do the thinking."  (Docket No. 342-1, at 8.) They further argue that "[w]hen asked where these large scale hog farms were located, Card backtracked indicating 'that last sentence – should have been qualified,'" and that Card "admitted the only hog farm that actually has an odor control device is in Europe and that he is not aware of any large-scale hog farm that has an enclosed anaerobic lagoon." (Docket No. 342-1, at 8.)  Plaintiffs respond with Card's declaration, where he clarifies that the research he refers to was a study in The Netherlands in which acid scrubbers and biotrickling filters were developed for ammonia removal in pig and poultry houses.  (*See* Docket Nos. 411-5, at 1; 411-6, at 1.)  Card concedes, "It is granted that it would be difficult to retrofit odor control to the animal containment

structures in question," but insists "it would certainly not be impossible."  (Docket No. 411-5, at 1.)

The Court cannot conclude that Card's testimony in this regard is sufficiently reliable to satisfy *Daubert* and Fed. R. Evid. 702.  In his expert report, Card does not advocate either of the specific methods used in The Netherlands study.  Card has never designed, tested, or implemented the hypothetical alternative systems he advocates—he merely speculates that based on his "over thirty years['] experience in adapting odor control to industrial facilities . . . it would certainly not be impossible."  (Docket No. 411-5, at 1.)  This sort of testimony not only flies against several of the factors outlined in *Daubert*, but also raises several of the "[r]ed flags that caution against certifying an expert" recently laid out by the Sixth Circuit in *Newell Rubbermaid*. Thus, the Court cannot conclude that Card's speculative opinion regarding a largely untested, not-generally accepted alternative is based on a reliable foundation as required by *Daubert* and Rule 702 and, therefore, will exclude Card's proposed testimony in this regard.

Third, the Tosh Defendants challenge several of Card's conclusions in his September 30, 2011, supplemental report.  In that supplemental report, which he prepared after a site visit over two days in July 2011, Card opines:  "Based on the author's experience, the majority of people would find the odor character and intensity very objectionable."  (Docket No. 411-3, at 2.)  He goes on to make a series of conclusions, including:

> 1. During the site visit the livestock barns in question were producing a high level of odor, as expected by the author, and this odor was observed to severely impact the neighbors.

2. Odors, that had originated at the barn, were observed . . . at the residence of one of the plaintiff's [sic]. The odor intensity and character would be considered unacceptable by the majority of the population. In addition, based on the author's experience, the odors were severe enough that the typical air quality regulator would consider them to be a violation.

(Docket No. 411-3, at 2.)   When asked during his deposition about the basis for these conclusions, Card responded: "Thirty years of experience in the odor business. . . . I've been to a lot – participated in a lot of odor assessments and odor events over the last 30 years, and I have developed a pretty good sense of what people consider significant and what they don't consider significant." (Docket No. 496-1, at 114-15.)   These Defendants argue that Card's testimony in this regard must be excluded because he offers no objective testing to support these opinions and because there is "no data, no records, no research, no scholarly publications cited . . . as a basis for his opinions and, no way to independently verify any of Card's claims." (Docket No. 342-1, at 9.) According to Defendants, "we simply have to take his word for it." Card responds in his declaration, stating, "my over thirty years of experience allow me to predict what will likely be and likely not be objectionable," and were "an objective measured [sic] be made, the likely outcome, based on over thirty years of experience, would that [sic] be the majority of people would find the odor objectionable." (Docket No. 411-5, at 1.)

In *Gen. Elec. Co. v. Joiner*, the Supreme Court, citing an opinion by this Circuit, advised:

Trained experts commonly extrapolate from existing data. But nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to

> existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion offered.

522 U.S. 136, 146 (1997) (citing *Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992)).  Here, the Plaintiffs essentially ask the Court to permit Card's testimony based solely on his thirty-years' experience—more or less, simply because he says so.  This the Court cannot do.  Even granting Card his thirty-years' experience, these opinions are entirely anecdotal, subjective, and incapable of independent verification.  The Court is in no way convinced that Card's experience suffices to render reliable his subjective conclusions as to what the majority of people would find objectionable or unacceptable, and what "severely impact[s] the neighbors."  (*See* Docket No. 411-3, at 2.)  Further, Card's statement that "the odors were severe enough that the typical air quality regulator would consider them a violation" is entirely speculative and without a reliable foundation, particularly in light of Card's admitting to having undertaken no review of the relevant Kentucky's regulations.  (*See* Docket No. 496-1, at 66, 102.)  Because the Court must decline to simply take Card's word for it, these opinions are properly excludable under *Daubert* and Fed. R. Evid. 702.

b.      **Challenges to the reliability of the Minnesota OFFSET model and Card's application of that model to the instant case**

Finally, the Tosh Defendants challenge Card's use of the Minnesota OFFSET model, arguing that the OFFSET model is neither accurate nor a generally accepted method and, thus, is unreliable.  A scholarly report concerning the "OFFSET Model for Determination of Odor-Annoyance-Free Setback Distances from Animal Production Sites" was published in two parts in 2005 by *Transactions of the ASAE*, a scholarly

journal for the American Society of Agricultural Engineers.  (*See* Docket Nos. 342-4;

342-5.)   The report states that "[t]he OFFSET model was developed to estimate the

setback distances from animal production sites in Minnesota" and "is based on

extensive odor emission measurements, an evaluated air dispersion model, and

historical weather data from Minnesota."   (Docket No. 342-5, at 7-8.)     Its authors

noted:

> A high variation in the observed odor intensities existed for all
> levels of intensity predicted by OFFSET. . . . The results indicate
> that OFFSET is a good estimation tool, but improvements in its
> accuracy should be made with better emission values, weather
> data, dispersion models that consider topographic and peak to
> mean effects, and better odor intensity measurement by field odor
> assessors.

(Docket No. 342-5, at 7.)  The report then concludes:

> Based on the results of OFFSET evaluation in eight areas of
> Minnesota, the OFFSET model might predict odor intensity
> correctly at a probability of 32%, but it tended to underpredict odor
> intensity for the majority of the time, as compared with the
> residents' responses.   Further research is needed to improve the
> accuracy of OFFSET . . . ."

(Docket No. 342-5, at 8.)

The Plaintiffs' principal argument in response rests on the report's language

where it states that although the "OFFSET model might predict odor intensity correctly

at a probability of 32%, . . . it tended to **under predict** odor intensity for a majority of

the time."  (Docket No. 411, at 9 (emphasis in original).)  Plaintiffs' argument in this

regard states, in its entirety: "Where the model under predicts odor intensity, any

prudent swine integrator in Kentucky or anywhere else should have been warned that the Ron Davis location was too close to too many people." (Docket No. 411, at 9.)

*Daubert* established several factors that are particularly relevant to the Court's consideration of the OFFSET model, namely whether it "has been subjected to peer review and publication," whether it has a "known or potential rate of error," and whether the theory or technique enjoys "general acceptance" in the "relevant scientific community." 509 U.S. at 593-94. The OFFSET model has been subjected to peer review and publication; however, in that published report, the model's own creators caution that it remains a work in progress and needs further research to improve its accuracy. The OFFSET model also has a known rate of accuracy: 32%. Contrary to Plaintiffs' position, the fact that the model tends to underpredict odor intensity does nothing to shore up its reliability—that is, the fact that the model tends to produce errors in Plaintiffs' favor does not make it more reliable for purposes of *Daubert* and Rule 702. And, the Court notes that the 32% accuracy rate relates to its ability to predict odor intensity *in Minnesota,* using *historical Minnesota weather data.* Further, the model's own creators acknowledge that there is no generally accepted model and that the differences calculated by different models, including the OFFSET model, between the shortest and farthest setback distances "might be as much as ten times." (Docket No. 342-5, at 8.) Moreover, Card himself states in his declaration: "OFFSET is a screening tool, not a site specific absolute determination of odor impact. OFFSET should be used to determine the potential for odor problems, not used to determine actual odor problems." (Docket No. 411-5, at 1.)

Upon reviewing Card's expert report, declaration, and deposition testimony, along with the relevant scholarly literature, the Court cannot conclude that the Minnesota OFFSET model is sufficiently reliable under *Daubert* and Rule 702. Therefore, any testimony concerning odor analysis using the Minnesota OFFSET method must be excluded.[9]

\* \* \*

For the reasons above, the Court will GRANT the Tosh Defendants' motion to exclude the testimony and expert opinions of Plaintiffs' expert Thomas Card. (Docket No. 342.)

### B. Howell and Davis Defendants' Arguments

The Howell and Davis Defendants separately move to exclude the opinions of Card. (Docket No. 346.) Specifically, these Defendants move to exclude seven particular opinions expressed by Card: (1) that many states have specific regulations for the planning, design, construction and/or operation of the facilities because of the severe odor problems associated with them; (2) the climate and meteorological conditions in Minnesota are far more favorable to both reducing odor generation and odor transport, therefore, it is likely that characteristics of the Kentucky site will result in worse impacts than the Minnesota OFFSET model predicts; (3) there are alternative ways of mitigating the odor by capturing and venting to an odor-control device or removing

---

[9] The Court notes that the Tosh Defendants also challenge Card's application of the OFFSET method, arguing that his application of the model to the facts of this case was unreliable. The Court is inclined to agree with the Tosh Defendants' criticisms, but need not decide or discuss this issue further, having already found that the method itself is unreliable and must be excluded.

manure within 24 hours; (4) the placement and design of the barns is defective because their construction and operation knowingly put the neighboring property owners at risk of reduced quality of life and monetary loss; (5) the majority of people would find the odor character and intensity observed by Card at one of the Plaintiff's properties very objectionable; (6) Card noted a high level of odor at the site of the barns; and (7) the odors Card observed at Plaintiff Rhonda Free's property on July 7, 2007, were at the level that a typical air quality regulator would consider them a violation. (Docket No. 346, at 1-2.)

The Howell and Davis Defendants first challenge Card's statement in his January 5, 2011, report, which reads:

> Currently many states have specific regulations for the planning, design, construction, and/or operation of these facilities because of the severe odor problems associated with them. These include very specific regulations regarding setbacks (distance between facility and property line), acceptable odor levels during operation, and many other aspects of the facility's design and operation.

(Docket No. 411-2, at 2.) Again, Plaintiffs respond by merely referring the Court to Card's declaration. (Docket No. 411, at 6.) There, Card directly answers the Howell and Davis Defendants' first challenge, stating:

> I do not represent myself as an expert in any aspect of state regulations. However, having said that, I have general knowledge of state odor regulations and how they are usually implemented. I am not claiming that any of the defendants are violating any State of Kentucky regulations. However, if that subject comes up further in the matter, I reserve the right to offer my opinion on state regulations, if I believe that I am qualified to offer that opinion. . . .

(Docket No. 411-5, at 2.)

Card's admitted lack of expertise in relation to this opinion unquestionably requires exclusion under Rule 702 and *Daubert* because Card offers no "specific, technical, or other specialized knowledge" that would "help that trier of fact to understand the evidence or to determine a fact in issue."  Moreover, this opinion lacks a reliable basis in Card's knowledge or experience—as he concedes, he is not "an expert in any aspect of state regulations."   Thus, Card's opinion in this regard must be excluded.

Second, the Howell and Davis Defendants challenge Card's opinion in his January 5, 2011, expert report that because "[t]he climate and meteorological conditions in Minnesota are far more favorable to both reducing odor generation and odor transport, therefore it is likely that characteristics of the Kentucky site will result in worse impacts than the Minnesota [OFFSET] model predicts."  (Docket No. 411-2, at 3.)   Card responds in his declaration:

> I do not represent myself as an expert in Meteorology generally.   However, I have a sufficient understand [sic] of meteorology based upon its application to my ordinary work in my field. . . .   [B]ased on that knowledge, I know that for the application of a screening device such as OFFSET, it would be unlikely that [sic] difference between Minnesota and Kentucky Meteorology would be significant. . . .

(Docket No. 411-5, at 2.)

Here, the Court again finds that Card's opinion in this regard must be excluded under *Daubert* and Rule 702.  For the reasons discussed *supra* Part V.A.2.b, any

testimony based on the Minnesota OFFSET model must be excluded as unreliable. Moreover, as Card concedes, he is not an expert on meteorology.   Thus, he is not qualified to opine on the comparative meteorological conditions of Minnesota and Kentucky, or on how the characteristics of the Kentucky site would result in worse impacts than the Minnesota OFFSET model predicts (not to mention the fact that this testimony appears to contradict Card's assertion that it is unlikely that any difference between Minnesota and Kentucky would be significant).   Accordingly, the Court finds this testimony would not aid the trier of fact and does not satisfy the requirements of *Daubert* and Rule 702.   Therefore, it must be excluded.

Third, the Howell and Davis Defendants challenge Card's opinions regarding the three alternative methods of mitigating odors proposed in his January 5, 2011, expert report.   For the same reasons discussed *supra* Part V.A.2.a in relation to the Tosh Defendants' motion, this proposed testimony does not satisfy *Daubert* and Fed. R. Evid. 702 and, therefore, must be excluded.

Fourth, these Defendants challenge Card's opinion in his expert report that "the placement and design of the barn system at the Ron Davis farm is defective because its construction and operation knowingly put the property neighbors at risk to significant reduction to both quality of life and material wealth."  (Docket No. 411-2, at 4.)  For the same reasons discussed *supra* Part V.A.1, this opinion must be excluded.

Fifth, the Howell and Davis Defendants challenge Card's opinion in his supplemental report that "the majority of people would find the odor character and intensity" Card observed during his July 2011 site visit "very objectionable."  (Docket

No. 411-3, at 2.)  The Court previously addressed this argument *supra* Part V.A.2.a in relation to the Tosh Defendants' motion, and, for the same reasons there, this opinion must be excluded.

Sixth, these Defendants argue for exclusion of Card's opinion that he observed a "high level of odor" at the barns during his July 2011 site visit.  In his deposition, Card unequivocally testified that he has had no training in either the unaided quantifying or qualifying of odors, or in the use of an odor-measuring device such as an olfactometer or scentometer.  (Docket No. 496-1, at 114.)  Accordingly, the Court finds he lacks both the qualification and also a reliable foundation on which to testify as an expert that he observed a "high level of odor"; thus, he is precluded from offering an expert opinion in this regard.

Seventh and lastly, the Howell and Davis Defendants move to exclude Card's expressed opinion that "the odors were severe enough that the typical air quality regulator would consider them to be a violation."  (Docket No. 411-3, at 2.)  For the same reasons discussed more fully *supra* Part V.A.2.a, the Court again finds this opinion must be excluded.

* * *

For these reasons and those referenced above in relation to the Tosh Defendants' motion, *supra* Part V.A, the Court will GRANT the Howell and Davis Defendants' motion to exclude, (Docket No. 346), on each of the seven expert opinions challenged.

## VI.    Plaintiffs' Expert Eric Winegar

Plaintiffs have identified Eric Winegar as an expert witness retained to investigate the origin and nature of odors relative to their claims. The Tosh Defendants and Howell and Davis Defendants separately move to exclude the opinions of Winegar. (Docket Nos. 352 & 354, respectively.)

### A.    Winegar's December 11, 2012, Declaration

As an initial matter, the Court must address "Defendants' Joint Motion to Strike the Improper 'Declaration' of Eric Winegar."  (Docket No. 443.)  In responding to Defendants' motions to exclude Winegar's testimony, Plaintiffs attached their "Declaration of Dr. Eric Winegar," a 28-page document written by Winegar for the purpose of responding to Defendants' *Daubert* challenges.   (Docket No. 413-4.) Defendants[10] argue that Winegar's declaration must be stricken pursuant to Fed. R. Civ. P. 37(b)(2)(A)(iii) because it does not comply with the requirements of 28 U.S.C. § 1746 for unsworn documents and because it "contains material changes to his previously disclosed opinions, apparently in an effort to survive the pending *Daubert* challenge." (Docket No. 443-1, at 2.)  The Court disagrees with both contentions.

28 U.S.C. § 1746 sets forth the requirements for unsworn declarations under penalty of perjury.  Winegar's declaration concludes with the statement, "Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct." (Docket No. 413-4, at 28.)  That statement is followed by Winegar's signature and the date executed.  (Docket No. 413-4, at 28.)  Winegar's declaration thus satisfies § 1746's

---

[10] For purposes of the discussion in Part VI.A, the Court will refer to the Tosh Defendants and Howell and Davis Defendants collectively as "Defendants."

requirements because it is in writing, subscribed to by Winegar, dated, and in substantially the same form as provided in § 1746(1).  Thus, Defendants' first argument is without merit.

The Court similarly is unpersuaded by Defendants' second argument:  that Winegar's declaration should be stricken because it contains material changes to his previously disclosed opinions.  Fed. R. Civ. P. 26(e)(2) provides that "[a]ny additions or changes to [an expert witness's report] must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."  Pursuant to the Court's Scheduling Order of July 9, 2012, Rule 26(a)(3) pretrial disclosures were due "[o]n or before February 1, 2013."  (Docket No. 328, at 1.)  Therefore, Winegar's declaration filed October 5, 2012, (Docket No. 413-4), complied with the timing requirements of Rule 26(e)(2).

For these reasons, "Defendants' Joint Motion to Strike the Improper 'Declaration' of Eric Winegar," (Docket No. 443), is DENIED.

### B.    Tosh Defendants' Arguments

The Tosh Defendants move to exclude Winegar's testimony in its entirety in a sprawling 41-page, 104 footnote memorandum, with attacks ranging from challenges to Winegar's qualifications to his data collection and equipment, to his scientific analysis—they even go so far as to analogize his approach to ghost-hunting reality television shows.  Fortunately, the Court can address their challenges with much more brevity.

### 1.      Winegar's qualifications

The Tosh Defendants argue in their motion that "Dr. Winegar does not possess the requisite skill or experience to render an opinion about the strength and frequency of agricultural odors," (Docket No. 352-1, at 39), before then stating in their reply brief that they "have not challenged Dr. Winegar's qualifications as an air quality monitoring professional," (Docket No. 442, at 1).  Regardless, a review of Winegar's *curriculum vitae*, (Docket No. 413-1) and deposition testimony, (Docket Nos. 497; 498), leaves little doubt that he is qualified to testify as to his expert opinions in this matter.

### 2.      Challenges to the reliability of Winegar's data

These Defendants raise a series of specific challenges under the banner that "Dr. Winegar's monitoring program failed to collect data useful to measurement of odor intensity impacting the Plaintiffs."   (Docket No. 352-1, at 8-19.)   These include criticisms that (1) he "failed to use established odor monitoring protocols," (2) he "developed an unproven ratio between hydrogen sulfide surrogate and quantitative accuracy of odor intensity," and (3) his "ratio is not supported by the objective data obtained from other chemical samples."   (Docket No. 352-1, at 10-19.)   Plaintiffs respond to these challenges not by presenting counter-arguments, but rather by summarily referring the Court to Winegar's attached declaration.  (*See* Docket Nos. 413, at 9-10.)

The Court finds the Tosh Defendants' first argument—that Winegar's testimony should be excluded because he failed to use established odor monitoring protocols— without merit.  Defendants apparently base this challenge on a paper written by two

engineers in conjunction with a presentation at the 2004 ASAE/CSAE annual meeting. (*See* Docket No. 352-4.)  That paper expressly disclaims that it has not been subject to "the formal peer review process" and is "not to be presented as a refereed publication[]."  (Docket No. 352-4, at 1.)  Notably, the authors of that paper were employed by St. Croix Sensory, Inc., a company that performs odor testing services and manufactures odor testing devices, including the Nasal Ranger olfactometer.  Not surprisingly, much of the odor monitoring program advocated by that paper involves either services or products sold by St. Croix Sensory, Inc.  Thus, the argument that Winegar's testimony must be excluded because he failed to use the "established odor monitoring protocols" advocated in that paper is unpersuasive.

The Tosh Defendant's second argument—that Winegar "developed an unproven ratio between hydrogen sulfide surrogate and quantitative accuracy of odor intensity" —similarly does not warrant exclusion.  (Docket No. 352-1, at 11-13.)  Here, Defendants rely heavily on excerpts from Winegar's deposition testimony to argue that Winegar fails to explain how he correlated odor and hydrogen sulfide.  Upon reviewing Winegar's declaration and deposition testimony, the Court is satisfied that this opinion satisfies the reliability threshold of *Daubert* and Fed. R. Evid. 702.  To the extent these Defendants disagree with Winegar's chosen approach or the conclusions he reached, those challenges more appropriately go to the weight of his testimony and, accordingly, are proper matters for cross-examination.

These Defendants next argue that "Winegar's ratio is not supported by the objective data obtained from other chemical samples."  (Docket No. 352-1, at 13.)  This

third argument in essence challenges Winegar's conclusions as contradictory to, or not supported by, his recorded data.    Plaintiffs again are content to refer the Court to Winegar's declaration rather than presenting an argument in their responsive brief. (*See* Docket No. 413, at 10.)

Defendants' lengthy, confusing argument here does little to persuade the Court that Winegar's data is unreliable or that his opinions must be excluded.  As previously stated, the Court's role is not to determine the correctness of an expert's opinion but instead simply whether it is based upon a reliable foundation. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-30 (6th Cir. 2008).  After reviewing Winegar's several reports, declaration, and deposition testimony, the Court is unconvinced that his data is either unreliable or that his opinions lack a reliable foundation such that exclusion is warranted.

### 3.    Challenges to Winegar's use of his odor-monitoring equipment

In an attack related to their challenges to the reliability of Winegar's data, the Tosh Defendants argue that Winegar's data cannot be independently validated because he "failed to record the calibration procedures, and results of calibration testing on his equipment in his report."  (Docket No. 352-1, at 19.)  This creative assault on the admissibility of Winegar's opinions suggests that Winegar's failure to include "fundamental data" relative to the calibration of his equipment and the maintenance history of the sulfur dioxide scrubber in the Teledyne T101E device he used makes it "impossible to discern whether or not the observations that were taken by Dr. Winegar

were tainted by ambient sulfur dioxide, thereby giving higher readings for hydrogen sulfide than would actually be present."  (Docket No. 352-1, at 21.)

The Tosh Defendants make considerable reference to the Teledyne T101E's operator's manual in their attempt to undercut the reliability of Winegar's data; however, they offer little in the way of how their criticisms render that data or the conclusions based on it unreliable for purposes of *Daubert* and Fed. R. Evid. 702. Accordingly, after reviewing Winegar's expert reports, deposition testimony, and declaration, the Court finds no reason to exclude Winegar's opinions on this basis.

### 4.      Challenges to Winegar's opinions regarding odor plume behavior

The Tosh Defendants argue that "[t]he ammonia surrogate sampling does not support Dr. Winegar's theory without his purely speculative opinions that odor plumes rise then fall as a means of justifying the results he obtained."  (Docket No. 352-1, at 21.)  This argument in effect challenges Winegar's analysis of the data collected for the surrogate chemical ammonia as deficient.  (*See* Docket No. 352-1, at 21.)  Here, these Defendants apparently latch onto a single statement among Winegar's numerous mentions of plume behavior in his expert reports in an attempt to cast doubt on the reliability of his proposed testimony.  In light of Winegar's qualifications, and upon reviewing his expert reports, deposition testimony, and declaration, the Court is unpersuaded that Winegar's opinions are unreliable; rather, these criticisms go, if anywhere, to the weight of his testimony and are proper matters for cross-examination.

### 5.    Challenges to Winegar's use of observational data

The Tosh Defendants next argue that "[e]ven if reliable objective data had been obtained, there was no effort to show that the data correlate in any meaningful way with odor allegedly experienced in the community."  (Docket No. 352-1, at 23.)    They further argue that the observational data used by Winegar is unreliable and that Winegar's analysis of that data is skewed to support his opinion.  (Docket No. 352-1, at 23-28.)  On this point, they conclude by likening Winegar's approach to that used by "charismatic actors" on television ghost-hunting shows, who "run about in the dark looking for alleged 'evidence' of haunting."  (Docket No. 352-1, at 27-28.)  According to these Defendants, if the Court were to admit Winegar's data, it "would have to accept the same data from these paranormal shows as proof that ghosts, goblins and poltergeists inhabit various old buildings throughout the world."  (Docket No. 352-1, at 28.)

Despite its skepticism whether ghosts and goblins exist, the Court is nonetheless convinced that neither Winegar's observational data nor his use of that data raise sufficient reliability concerns to warrant exclusion under *Daubert* or Fed. R. Evid. 702.  Winegar explained how this data was obtained and used in his reports, deposition testimony, and declaration.  Winegar also explained, with reference to a number of seemingly reputable published sources, how the use of such observational data is a generally accepted data-collection method.  (*See* Docket No. 413-4, at 3-5.)  Thus, the Court finds no reason to exclude Winegar's proposed testimony on this basis.

6.      **Challenges to Winegar's assertions regarding violations of the Kentucky hydrogen sulfide standard**

The Tosh Defendants argue that Winegar's conclusions regarding violations of the Kentucky hydrogen sulfide standard, 401 Ky. Admin. Regs. 53:010 & app. A, must be excluded because he failed to follow the regulatory protocols for testing hydrogen sulfide concentration.  (Docket No. 352-1, at 28.)  Plaintiffs, via Winegar's declaration, assert in response that his data shows "numerous and clear" violations of the Kentucky standard and that his expert report details the calculations supporting that conclusion. (*See* Docket No. 413-4, at 14.)  Plaintiffs further insist that the EPA protocol referenced by Defendants "applies to stationary sources, such as smoke stacks at coal fire power plants [and] is not applicable to ambient air quality monitoring."  (Docket No. 413, at 10.)

A review of Winegar's expressed opinions in this regard shows that his conclusions were based on the correct Kentucky standard, that he explained his analysis in reaching these conclusions, and that he showed the calculations and data on which that analysis was based.  The Court is thus disinclined to exclude Winegar's testimony as unreliable.  For one, this is not an administrative hearing and these Defendants have not been cited for violating any Kentucky regulatory standard in conjunction with this litigation.  Therefore, an attack on Winegar's expert opinions based on his adherence (or lack thereof) to applicable regulatory protocols goes more to the weight of his testimony than to its reliability for purposes of *Daubert* and Fed. R. Evid. 720.  The fact that the Tosh Defendants make no reference in their argument to the admissibility standards of either Rule 702 or of *Daubert* and its progeny further buttresses the Court's decision not

to exclude Winegar's proposed testimony.  Moreover, the Court questions whether its rulings on the various motions for summary judgment in its separately entered Memorandum Opinion and Order renders moot this opinion's applicability to Plaintiffs' remaining causes of action.  For these reasons, the Court declines to exclude Winegar's testimony regarding whether his data and analysis show violations of the Kentucky hydrogen sulfide standard.

### 7.    Challenges to Winegar's testimony regarding barn emissions

The Tosh Defendants next argue that Winegar's testimony relative to barn emissions must be excluded because his opinions are based on flawed and insufficient data.  (Docket No. 352-1, at 31.)  Here, they challenge Winegar's data as insufficient to determine the emission rate of the barn because "[t]he data was collected from only one fan over a 9 hour period."  (Docket No. 352-1, at 32.)

As Plaintiffs point out, this is a rather remarkable argument for Defendants to make, given that they refused consent to allow Plaintiffs to conduct emissions testing of the barn fans until ordered by the Magistrate Judge to allow one day of air emission monitoring.   Regardless, the Court is unpersuaded that Winegar's opinions are unreliable on the basis of insufficient data.  The Tosh Defendants' arguments here ultimately challenge Winegar's conclusions regarding the barns' emissions rate, which goes more to the weight of his testimony and properly can be contested on cross-examination.

8.      **Remaining challenges to the admissibility of Winegar's testimony**

The Tosh Defendants' remaining arguments again attack Winegar's conclusions based on his data, this time that he "failed to account for all possible sources of hydrogen sulfide in the community," (*see* Docket No. 352-1, at 32-35), and also his methodology, arguing that he failed to use the proper methodology, "dilution to threshold," to evaluate odors, (*see* Docket No. 352, at 35-39).  Much of these arguments rehash points already made in their other challenges.  Upon reviewing Winegar's expert reports, deposition testimony, and declaration, the Court finds no basis in these arguments to exclude Winegar's proposed expert testimony.  These issues, again, go more to the weight of Winegar's testimony and are more appropriate matters for cross-examination.

\* \* \*

For these reasons, the Court finds no reason to exclude the proposed testimony of Plaintiffs' expert Winegar under either *Daubert* or Fed. R. Evid. 702.  Therefore, the Court will DENY the Tosh Defendants' motion.  (Docket No. 352.)

C.      **Howell and Davis Defendants' Arguments**

The Howell and Davis Defendants separately move to exclude Winegar's proposed expert opinions and testimony. Although they present their objections with varying form from that of the Tosh Defendants, the bulk of their arguments, with perhaps one exception,[11] falls within the ambit of the challenges addressed *supra* Part

---

[11] The Howell and Davis Defendants challenge Winegar's opinion that "[h]og barns produce high levels of emissions that are offensive to the community when exposed to them," an argument not specifically made by the Tosh Defendants.  (Docket No. 354.)  Based on its review of Winegar's *curriculum vitae* and deposition testimony, the Court is satisfied that Winegar's generalized opinion in

VI.B and, therefore, need not discussed again to any length.  Because the Court has sufficiently dealt with these challenges and found that Winegar's proposed testimony is admissible under *Daubert* and Fed. R. Evid. 702, it will likewise DENY the Howell and Davis Defendants' motion to exclude.  (Docket No. 354.)

## VII.    Defendants' Expert Kirk Winges

Defendants[12] have identified Kirk Winges as an expert witness retained in this matter to conduct a study of the odors emitted from Defendants' hog barns.  Plaintiffs move to exclude Winges' opinions on two grounds: (1) that Winges lacks the proper qualifications to conduct an analysis of "ongoing odors"—*i.e.*, the ongoing impact of odors from confined animal feeding operations that are already in operation; and (2) that Winges' conclusions are not reliable because they are not supported by sufficient facts or data.  (*See* Docket No. 348-1, at 6.)

### A.    Winges' Qualifications

Plaintiffs do not dispute Winges' qualifications to render expert opinions as to the prospective impact of odor emissions from facilities not yet constructed.  (Docket No. 348-1, at 7.)  Rather, they argue that Winges is not qualified to provide expert testimony regarding the impact of odors from facilities that have already been constructed and are in operation.  (Docket No. 348-1, at 7.)  Thus, the crux of Plaintiffs' argument rests on the distinction between Winges' qualifications and experience

---

this regard rests on a reliable foundation in his qualifications and professional experience; therefore, the Court finds no reason to exclude this opinion under either *Daubert* or Fed. R. Evid. 702.

[12] For purposes of this Part, the Court will refer to the Tosh Defendants and Howell and Davis Defendants collectively as "Defendants."

regarding *existing, ongoing impacts* as opposed to the *potential impact* of a given operation.

Winges earned a bachelor's of science in earth and planetary science from the Massachusetts Institute of Technology and a master's of science in chemical engineering from the University of California at Berkeley. (Docket No. 374-1, at 1.) He bills himself as having "extensive experience in the conduct of odor investigations," and references various air-quality studies, odor investigations, and environmental impact reports he has conducted in contexts ranging from cattle-feeding operations, to solid waste operations, to industrial manufacturing, to wastewater facilities. (*See* Docket No. 374-1, at 1-2.)   Winges testified in his deposition to having previously conducted an investigation of a hog barn in Illinois, where he was retained as part of a team of experts to investigate odors at a facility complained of by neighboring residents. (Docket No. 490, at 31-32.)   He did not author a report or give a deposition in conjunction with that litigation, but was called as a witness. (Docket No. 490, at 32-33.)   He stated that he has also performed professional services in several odor-investigation projects involving concentrated livestock- and cattle-feeding operations. (Docket No. 490, at 34-36.) Winges testified that his work with odor investigation and dispersion and air-quality models began in 1985. (Docket No. 490, at 13-14.)   He further testified that he has performed odor measurements in the field and has developed computer modeling in his odor investigations since the 1980s. (Docket No. 490, at 15-16.)

Plaintiffs' principal challenge to Winges' qualifications focuses on his experience in performing air-quality analyses on confined animal feeding operations already in existence. (Docket No. 348-1, at 8.) In light of the Court's review of Winges' *curriculum vitae* and deposition testimony, the Court finds unpersuasive Plaintiffs' argument that Winges lacks the requisite qualifications to render an expert opinion as to the impact of Defendants' facilities in this matter. Accordingly, the Court is satisfied that Winges' qualifications as to his proposed expert testimony satisfy both *Daubert* and Fed. R. Evid. 720 and, therefore, should not be excluded on that basis.

### B.      Winges' Data, Analysis, and Methodology

Plaintiffs' second primary argument against the admissibility of Winges' proposed expert testimony challenges the reliability of his data and methodology. According to Plaintiffs, Winges' analysis is not reliable because the data he used was not gathered firsthand from either the site of the hog barns in question or from Plaintiffs' properties. (*See* Docket No. 348-1, at 9-11.) Furthermore, by way of their reply, Plaintiffs argue that the AERMOD[13] model is unreliable, as is Winges' use of that model. (*See* Docket No. 437.)

---

[13] "AERMOD" is an air-dispersion model developed by the American Meteorological Society/Environmental Protection Agency Regulatory Model Improvement Committee. *See Preferred/Recommended Models*, EPA.gov, http://www.epa.gov/scram001/dispersion_prefrec.htm (last updated December 20, 2012).

1.      Challenges to the data used by Winges

The parties seem to agree that two key components of a reliable air quality model are (1) emission source data and (2) meteorological data.  (*See* Docket Nos. 348-1, at 9; 374, at 6.)

Plaintiffs begin by arguing that Winges' analysis is unreliable because the emission data he utilized was based on data and an emissions factor from an Environmental Protection Agency (EPA) study rather than from personal on-site data collection.  (Docket No. 348-1, at 9.)  According to Plaintiffs, Winges' use of this "non-specific" source data renders his analysis "flawed and unreliable."  (Docket No. 348-1, at 10.)  Defendants respond, arguing that the source data Winges incorporated into his model was scientifically reasonable and that the data from the EPA report was itself reliable.  They further point out that Plaintiffs' own expert, Winegar, confirmed the accuracy of Winges' conclusions based on the EPA's emissions factor data.  (*See* Docket No. 374, at 8 (referencing Docket No. 374-11, at 3).)

The EPA report to which Winges refers is a 400-plus page report by the agency's Emissions Standards Division, of which an entire section is devoted to "Swine Feeding Operations."  (*See* Docket No. 374-10.)  Winges' expert report identifies the data he used from that report, how he applied that data in his analysis, and the precise calculations he made to estimate the daily emissions rate of the Defendants' facilities based the emissions factor data from the EPA report.  (*See* Docket No. 374-8, at 24-25.)

Based on its review of Winges' report and deposition and the parties' respective arguments, the Court cannot conclude that either Winges' use of the EPA report or the

emissions data contained in that report fails to satisfy the reliability standards of *Daubert* and Rule 720.   Rather, the issues of Winges' data selection and his use of that data go more to the weight of his testimony and, therefore, more appropriately are matters for challenging his testimony on cross-examination.

Plaintiffs' second challenge to the data used by Winges focuses on his use of National Weather Service meteorological data from the Paducah airport's meteorological station.  (*See* Docket No. 348-1, at 10.)  Here, Plaintiffs essentially argue that because the Paducah airport is located some 29 miles from the hog barns in question, Winges' failure to take on-site meteorological data at either the hog barns or Plaintiffs' properties renders this data, and any conclusions based on it, "flawed and unreliable."  (Docket No. 348-1, at 10.)

In his expert report, Winges explains he used four-years' worth of "high quality National Weather Service data less than 30 miles from the facility with no intervening terrain," because he "judged [it] to be very representative of the area."  (Docket No. 374-8, at 25.)   He states that "[t]he years selected for analysis were the most recent available," and were comprised of "[a] total of 35,064 hourly observations of wind speed, wind direction, temperature, and other meteorological data."  (Docket No. 374-8, at 25.)   He further contrasts the data he used with that used by Plaintiffs' expert Winegar:

> Dr. Winegar's data, although collected closer to the Ron Davis Barns, are very poor quality in terms of the data capture.  The large quantity of missing data makes the Winegar data inappropriate for air quality modeling.  In addition, Dr. Winegar's present location is heavily impacted by its poor siting. . . .  The present site [of

> Winegar's recording instrument] is heavily impacted by the
> residence and the large tree to the east of the station.

(Docket No. 374-8, at 25.)

Upon considering Winges' expert report, his description of the data itself, and his explanation for the data chosen, the Court cannot conclude that Winges' use of this meteorological data fails to satisfy the reliability standards of *Daubert* and Fed. R. Evid. 720.   Again, the issue of Winges' data selection goes more to the weight of his testimony and, as such, is a proper matter for challenging his testimony on cross-examination.

### 2.        Challenges to the AERMOD model's reliability

Plaintiffs' second primary argument goes to the reliability of the AERMOD model in estimating odor dispersion and impact.  Plaintiffs do not raise this argument in their motion to exclude Winges' expert opinions—in fact, the term "AERMOD" is not mentioned anywhere in the body of their motion, appearing only in a single footnote in reference to "reliable air quality model[s] based on EPA standards."  (Docket No. 348-1, at 9 n. 7.)   Instead, they present this argument for the first time (and do so at considerable length) in their reply brief.  (*See* Docket No. 437, at 2-7.)  This Court and other district courts in this Circuit have held that "[i]t is well established that a moving party may not raise a new issue for the first time in its reply brief or at oral argument." *Keys v. Dart Container Corp. of Ky.*, 2012 WL 2681461, at *6 (W.D. Ky. July 6, 2012); *see Maher v. Int'l Paper Co.*, 600 F. Supp. 2d 940, 949 n.4 (W.D. Mich. 2009); *Probst v. Central Ohio Youth Ctr.*, 511 F. Supp. 2d 862, 871 (S.D. Ohio 2007); *In re First Energy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 599 (N.D. Ohio 2004).   However, even

considering Plaintiffs' argument in this regard, the Court is nonetheless convinced that exclusion is not warranted on the basis of the AERMOD model's reliability.

EPA regulations recognize AERMOD as a preferred and recommended air dispersion model. *See* 40 C.F.R. pt. 51, app. W.  Paragraph 4.1.d of Appendix W to 40 C.F.R. pt. 51 describes AERMOD as: "employ[ing] best state-of-practice parameterizations for characterizing the meteorological influences and dispersion. AERMOD has been evaluated using a variety of data sets and has been found to perform better than ISC3 for many applications, and as well or better than CTDMPLUS for several complex terrain data sets."  Paragraph 4.2.2.b, titled "Refined Analytical Techniques," states:  "For a wide range of regulatory applications in all types of terrain, the recommended model is AERMOD.  This recommendation is based on extensive developmental and performance evaluation."   Furthermore, that same regulation addresses the choice between using model estimates versus measured data, advising: "Modeling is the preferred method for determining emission limitations for both new and existing sources.  When a preferred model is available, model results alone (including background) are sufficient."  *Id.* app. W, ¶ 10.2.2.a.  And, based on the EPA's designation of AERMOD as a preferred model, this Court's sister court in the Eastern District of Kentucky rejected the argument that AERMOD was unreliable, expressly holding:  "[T]he court finds that AERMOD is a reliable methodology."  *Adams v. Cooper Indus., Inc.*, 2007 WL 1805586, *9-10 (E.D. Ky. June 21, 2007).

The Court finds no reason not to do the same here.  The AERMOD model is a preferred and recommended air-quality and air-dispersion model.  The Court thus finds

the AERMOD model is a reliable methodology.  The Court is further satisfied that Winges' use of AERMOD in this matter satisfies the reliability requirements of *Daubert* and Rule 702.  To the extent Plaintiffs wish to challenge Winges' conclusions or selection of the AERMOD model, these challenges go more appropriately to the weight of Winges' opinions and are properly reserved for cross-examination.

* * *

For these reasons, the Court finds no reason to exclude Winges' expert opinions on the basis of Winges' qualifications, nor on the bases that the data utilized in his analysis is unreliable, that the AERMOD model is an unreliable methodology, or that Winges' use of the AERMOD model is unreliable.  Accordingly, the Court is satisfied Winges' proposed expert testimony satisfies both *Daubert* and Fed. R. Evid. 720 and, therefore, will DENY  Plaintiffs' "Motion to Exclude or Limit the Testimony of Kirk D. Winges."  (Docket No. 348.)

## VIII.   Defendants' Expert Dwaine Bundy

Defendants[14] have identified Dwaine Bundy, Ph.D., P.E., as an expert witness retained in this matter to conduct odor studies and air monitoring relative to the odors allegedly emitted from Defendants' hog barns.  Bundy prepared an eleven-page report of his findings, (Docket No. 362-2, at 1-11), and was deposed on November 11, 2011, (Docket No. 488).  Bundy's report concludes with a section titled, "Opinions resulting from short and long-term air monitoring," in which Bundy opines:

---

[14] For purposes of this Part, the Court will refer to the Tosh Defendants and Howell and Davis Defendants collectively as "Defendants."

[1] Based upon the short term and long-term monitoring that I conducted, it is my opinion that the levels of odors at the monitoring locations were minimal in both duration and intensity. [2] It is also my opinion that any odors from the barns at issue would reach the Plaintiffs' homes at a frequency of significantly less than one percent of the time.

[3] The Ron Davis and Heather Howell Davis barns are well designed swine facilities.   [4] The design of these buildings provide excellent protection against surface water, ground water, and soil contamination.

[5] Based upon my education, training, and experience, it is my opinion that the design and operation of the buildings including the manure injection practices used at these facilities are effective in reducing odor at these facilities.

I hold these opinions to a reasonable degree of scientific certainty.

(Docket No. 362-2, at 11 (numbering added for reference to Plaintiffs' five challenges).)

Plaintiffs challenge each of Bundy's five stated opinions, arguing that each lacks a reliable factual basis and/or methodology, and is not relevant.  (*See* Docket No. 362-1, at 1-2, 5.)

As an initial note, the Court is surprised by the degree to which Defendants' joint response recharacterizes or outright ignores several of these challenges—in fact, much of Defendants' response has little to do with the opinions challenged by Plaintiffs. For example, Plaintiffs begin their motion:  "Plaintiffs do not question the general qualifications of Dr. Bundy.  Dr. Bundy's VITA, included with his Report documents that he has extensive education, training and experience in the matter of odors from swine facilities."  (Docket No. 362-1, at 2 (citation omitted).)  Yet Defendants begin

their response:  "Plaintiff's [sic] first criticism of Dr. Bundy is that he is not qualified to give opinions regarding the construction of the barns at issue in this case.  Given his education and training, along with the scope of his teaching a research career Dr. Bundy is well qualified to give opinions relating to the construction and operation of the barns at issue as is readily apparent from even a cursory examination of his CV."  (Docket No. 373, at 3.)   Given that Plaintiffs expressly disclaim any challenge to Bundy's qualifications, it is unclear why Defendants devote the entire first section of their response to this argument.  Regardless, the Court will proceed to examine each of Plaintiffs' challenges to the five opinions expressed in Bundy's expert report.

### A.      Bundy's First Opinion

Bundy's first opinion states, "Based upon the short and long-term monitoring that I conducted, it is my opinion that the levels of odors at the monitoring locations were minimal in both duration and intensity."  (Docket No. 362-2, at 11.)  Plaintiffs argue that this opinion is inconsistent with the data recorded by Bundy on August 4, 2010, between 1:38 p.m. and 3:28 p.m.  (Docket No. 362-1, at 10.)  Specifically, they reason that because the recorded data shows that hydrogen sulfide levels exceeded the standard set forth in 401 Ky. Admin. Regs. 53:005 between 2:38 p.m. and 3:28 p.m., Bundy's opinion is not supported by his own data.  (Docket No. 362-1, at 10.)  Defendants argue in response that the data recorded on August 4, 2010, between 2:38 p.m. and 3:58 p.m. was invalid due to temperature issues.  (Docket No. 373, at 11.)  Because the Odalog measuring device is temperature sensitive and rated for a maximum of 104° Fahrenheit, Defendants reason that the August 4 recorded high of 103.3° renders those measurements unusable.  (Docket No. 373, at 11.)

The Plaintiffs' challenge in this regard seeks, in effect, to disprove Bundy's opinion and thereby show that his methodology and/or analysis in forming that opinion must necessarily be unreliable. But, as noted earlier in this Opinion, the Court's role here is not to determine the correctness of an expert's opinion but instead simply whether it is based upon a reliable foundation. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529-30. Upon reviewing Bundy's expert report and transcript, together with the Defendants' explanation in response to Plaintiffs' motion to exclude, the Court finds that this challenge goes more appropriately to the weight of Bundy's proposed testimony, which is a proper matter for cross-examination, and does not necessarily render his opinions unreliable for purposes of *Daubert* and Fed. R. Evid. 702. Therefore, Bundy's first opinion will not be excluded.

### B.      Bundy's Second Opinion

The second opinion challenged by Plaintiffs states, "It is also my opinion that any odors from the barns at issue would reach the Plaintiffs' homes at a frequency of significantly less than one percent of the time." (Docket No. 362-2, at 11.) Plaintiffs argue that Bundy's report is devoid of any analysis or methodology to explain how his monitoring data supports this conclusion. Furthermore, they insist that because Bundy offers no explanation how he connects the data to this conclusion, the fact-finder is left with alternative interpretations of that data, thereby highlighting the absence of any discernible principles or methodology in reaching this conclusion. Finally, they argue that because of Bundy's failure to identify or explain how the data supports this opinion, his methodology is not reproducible and, thus, is incapable of verification. (*See* Docket

No. 362-1, at 7-9.)  Surprisingly, Defendants do not address this argument in any way in their joint response.

The Court must determine whether a reliable foundation exists for Bundy's opinion that "any odors from the barns at issue would reach the Plaintiffs' homes at a frequency of significantly less than one percent of the time."  *See Daubert*, 509 U.S. at 597.  "The focus . . . must be solely on principles and methodology, not on the conclusions they generate."  *Id.* at 594-95.  Neither Bundy in his report, nor Defendants in their joint response, identify or explain the principles and methodology used in reaching this conclusion.  Thus, the Court has nothing to consider other than Bundy's conclusion that any odors would reach the Plaintiffs' homes less than one percent of the time.  In the absence of a discernible methodology, the Court cannot conclude that this opinion rests on a reliable foundation.  Rather, the Court finds that the conclusion "significantly less than one percent of the time" appears entirely subjective.  For these reasons, this opinion falls short of the reliability standards of Rule 702 and *Daubert* and its progeny and, therefore, must be excluded.

## C.     Bundy's Third Opinion

Bundy's third opinion states, "The Ron Davis and Heather Howell Davis barns are well designed swine facilities."  (Docket No. 362-2, at 11.)  Plaintiffs challenge this opinion, arguing:

> No explanation of the basis for that opinion is given.  The opinion is too vague to be helpful to the factfinder.  If Dr. Bundy is opining that the barns are well designed for the purposes of swine production and swine health, Plaintiffs agree that Dr. Bundy is very well qualified to give such an opinion but it is not relevant to this case.

> If Dr. Bundy is opining that the barns are well designed to effectively control swine and manure odors and to prevent the air emission of chemicals and odors, he is expressing an opinion that is relevant to this case—but he has provided no basis for such opinion.

(Docket No. 362-1, at 10.)

The Court's review of Bundy's expert report shows that he explains over several pages the basis for his opinion that the hog barns are well designed to control or mitigate odor. (*See* Docket No. 362-2, at 2-3.) Based on his qualifications and experience with swine-facility design and management, the Court finds that Bundy's opinion in this regard is founded on a reliable basis in his knowledge and professional experience as required by *Daubert* and its progeny. Therefore, Bundy's third opinion will not be excluded.

### D.    Bundy's Fourth Opinion

After stating that the "Ron Davis and Heather Howell Davis barns are well designed swine facilities," Bundy next opines that "[t]he design of these buildings provide excellent protection against surface water, ground water, and soil contamination." (Docket No. 362-2, at 11.) Plaintiffs challenge this opinion as "offered without any basis" and "not . . . relevant to this case." (Docket No. 362-1, at 11.) Plaintiffs disclaim any complaint that the barns in question are the cause of water or soil contamination, stating instead: "Plaintiffs complain about the air emissions and odor from the barns. Plaintiffs also complain that the land application of the swine waste by Eric Howell has caused and will cause water contamination. However – this claim is

not related to their design of the swine barns." (Docket No. 362-1, at 11.) Defendants do not appear to address this argument in their joint response. (*See* Docket No. 373.)

Rule 702 requires that the Court determine whether proffered evidence "is relevant to the task at hand." *Daubert*, 509 U.S. at 597. In light of the fact that Defendants have not responded to this challenge, the Court agrees that Bundy's opinion that these barns' design "provide[s] excellent protection against surface water, ground water, and soil contamination" is not relevant and would do nothing to aid the trier of fact in determining any factual issue of consequence in this matter. Therefore, this opinion must be excluded.

### E.    Bundy's Fifth Opinion

The fifth and final opinion expressed by Bundy in his expert report states, "Based upon my education, training, and experience, it is my opinion that the design and operation of the buildings including the manure injection practices used at these facilities are effective in reducing odor at these facilities." (Docket No. 362-2, at 11.) Based on Bundy's preceding statements in this section of his report, the Court reads "these facilities" as referring specifically to the "Ron Davis and Heather Howell Davis barns." (*See* Docket No. 362-2, at 11.) Plaintiffs' challenge to this opinion consists of a single sentence: "As above, Bundy fails to provide any basis for this opinion." (Docket No. 362-1, at 11.)

Much like Bundy's third opinion, discussed *supra* Part VIII.C, the Court finds that Bundy's expert report sufficiently explains the basis for his opinion that "*the design and operation of the buildings* . . . used at [the Ron Davis and Heather Davis barns] are effective in reducing odor at these facilities." Therefore, based on his qualifications and

experience with swine-facility design and management, the Court concludes that Bundy's opinion in this regard is founded on a reliable basis in his knowledge and professional experience and, thus, does not warrant exclusion.

Bundy's expert report also sufficiently explains the portion of his fifth opinion that states, ". . . *the manure injection practices* used at these facilities are effective in reducing odor at [the Ron Davis and Heather Davis barns]."  Bundy discusses manure injection in his report under the heading "Land Application" in relation to the Ron Davis barns located on Brewers Highway.[15]  Again, the Court is satisfied that Bundy's opinion in this regard is founded on a reliable basis in his knowledge and professional experience with swine-facility operations and should not be excluded.

The Court notes that neither Bundy's expert report nor deposition testimony makes any specific mention of Eric Howell or his Wilkins Road barns.  Upon reviewing Bundy's *curriculum vitae* and deposition testimony, the Court has no doubt Bundy is qualified to testify generally about the land application and injection of manure as it relates to odor.  Because Plaintiffs have not specifically challenged Bundy's opinion as it relates to the land application or manure injection practices by Eric Howell, the Court finds no reason to address further the admissibility of Bundy's testimony in that regard.

Therefore, to the extent Bundy's opinion goes to the land application and injection of manure as it relates to odor generally, and whether the Ron Davis and Heather Davis facilities' practices of manure injection are effective at reducing odors at

---

[15] Bundy refers to this site as the "Porky & Petunia" site on Route 402, which is otherwise referred to in this matter as the Ron Davis barns on Brewers Highway or the "Brewers Highway barns."

those facilities, his opinion is relevant to this case.  Accordingly, because the Court finds that Bundy is qualified and that such testimony has a reliable basis in Bundy's knowledge and professional experience, his opinion in this regard is admissible.

>    **F.    Miscellaneous Challenges**

Despite addressing their principal arguments to the five opinions expressed by Bundy on page 11 of his expert report, Plaintiffs raise a series of additional challenges to the admissibility of Bundy's opinion.  First, they argue that Bundy's air-monitoring data was invalid and insufficient because of improper sampling locations. Second, they challenge Bundy's randomly selected collection periods and locations.  Third, they argue that the Odalog device was "inadequate and/or [the] wrong instrumentation." And finally, they argue that Bundy's data analysis was "superficial" and fell short of the "usual standards for scientific work."  (*See* Docket No. 362-1, at 11-16.)

Based on its review of Bundy's expert report and deposition testimony in light of the parties' respective arguments, the Court cannot conclude that any of these miscellaneous arguments warrant exclusion for failure to satisfy the reliability standards of *Daubert* and Fed. R. Evid. 720.  Rather, these issues all go more to the weight of Bundy's opinions and, thus, more appropriately are matters for challenging his testimony on cross-examination.

* * *

In sum, the Court will GRANT IN PART and DENY IN PART Plaintiffs' motion to exclude Bundy's expert opinions.  (Docket No. 362.)  Bundy's second opinion, ("It is also my opinion that any odors from the barns at issue would reach the Plaintiffs' homes

at a frequency of significantly less than one percent of the time"), and Bundy's fourth opinion, ("The design of [the Ron Davis and Heather Davis barns] provide excellent protection against surface water, ground water, and soil contamination"), shall be excluded.  All other challenges to Bundy's opinions are overruled.

CONCLUSION

For these reasons, and consistent with the Court's conclusions above,

IT IS HEREBY ORDERED as follows:

(1)    The Tosh Defendants' motion to exclude Plaintiffs' expert Mary Clay, (Docket No. 357), is DENIED.  The Howell and Davis Defendants' motion to exclude Clay, (Docket No. 351), is GRANTED IN PART and DENIED IN PART consistent with the Court's opinion above;

(2)    The Tosh Defendants' motion to exclude Plaintiffs' expert Rickie Spann, (Docket No. 349), is DENIED.   The Howell and Davis Defendants' motion to exclude Spann, (Docket No. 402), is also DENIED;

(3)    Plaintiffs' motion to exclude Defendants' expert Thomas Waldrop, (Docket No. 350), is GRANTED IN PART and DENIED IN PART consistent with the Court's opinion above;

(4)    The Tosh Defendants and Howell and Davis Defendants' respective motions to exclude Plaintiffs' expert Neil Webster, (Docket Nos. 341 & 345), are each GRANTED IN PART and DENIED IN PART consistent with the Court's opinion above;

(5)    The Tosh Defendants and Howell and Davis Defendants' respective motions to exclude Plaintiffs' expert Thomas Card, (Docket Nos. 342 & 346), are each GRANTED;

(6)     The Tosh Defendants and Howell and Davis Defendants' respective motions to exclude Plaintiffs' expert Eric Winegar, (Docket No. 352 & 354), are each DENIED;

(7)     Plaintiffs' motion to exclude Defendants' expert Kirk Winges, (Docket No. 348), is DENIED;

(8)     Plaintiffs' motion to exclude Defendants' expert Dwaine Bundy, (Docket No. 362), is GRANTED IN PART and DENIED IN PART consistent with the Court's opinion above;

(9)     Defendants' "Joint Motion to Strike the Improper 'Declaration' of Eric Winegar," (Docket No. 443), is DENIED; and

(10)    The Tosh Defendants and Howell and Davis Defendants' respective motions to strike or exclude Neil Webster's supplemental report, (Docket Nos. 381 & 377), are each DENIED AS MOOT in light of the Court's opinion *supra* Part IV.


IT IS SO ORDERED.

Date:  March 8, 2013

Thomas B. Russell, Senior Judge
United States District Court

cc:     Counsel